# Exhibit 2

# Collective Bargaining Agreement

between the

## University of Florida Board of Trustees

and the

## United Faculty of Florida

FEA, NEA, AFT, AFL-CIO

## 2021-2024

**TABLE OF CONTENTS**

Article 1 – Titles and Headings
Article 2 – Recognition
Article 3 – Management Rights
Article 4 – UFF Rights
Article 5 – Payroll Deduction
Article 6 – Consultation
Article 7 – Maintenance of Benefits
Article 8 – University of Florida Regulations and Policies
Article 9 – Bylaws Governing Terms and Conditions of Employment
Article 10 – Academic Freedom and Responsibility
Article 11 – Nondiscrimination
Article 12 – Appointment
Article 13 – Non-Renewal
Article 14 – Assignment of Responsibilities
Article 15 – Office Space and Safe Conditions
Article 16 – Travel
Article 17 – Summer Appointments and Assignments
Article 18 – Faculty Member Performance Evaluations and Evaluation File
Article 19 – Tenure and Promotion
Article 20 – Sabbaticals and Professional Development Programs
Article 21 – Other Leaves
Article 22 – Intellectual Property
Article 23 – Other Faculty Member Rights
Article 24 – Salaries
Article 25 – Benefits
Article 26 – Outside Activity and Conflict of Interest
Article 27 – Disciplinary Action and Job Abandonment
Article 28 – Grievance Procedure and Arbitration
Article 29 – Access to Documents
Article 30 – Layoff and Recall
Article 31 – Totality of Agreement
Article 32 – Severability
Article 33 – Amendment and Duration
Article 34 – Copies of Agreement
Article 35 – Definitions
Appendix A – Position Classifications in the Bargaining Unit
Appendix B – UFF Dues Sample Check-off Authorization Form and Sample PAC Dues Form
Appendix C – Grievance Form
Appendix D – Notice of Arbitration Form
Appendix E – PKY Salary Schedule
Appendix F – P. K. Yonge Developmental Research School Faculty Salary Supplements
Appendix G – UFOLIO Electronic System for Disclosure and Review of Outside Activities and Interests

**ARTICLE 1**
**TITLES AND HEADINGS**

The titles of articles and headings that precede text are inserted solely for convenience of reference and shall not be deemed to limit or affect the meaning, construction, or effect of any provision of this Agreement.

**ARTICLE 2**
**RECOGNITION**

2.1      Bargaining Unit. The University of Florida Board of Trustees (hereinafter Trustees) recognizes the United Faculty of Florida (hereinafter UFF) as the exclusive representative for the purpose of collective bargaining with respect to wages, hours, and other terms and conditions of employment for all faculty members in the bargaining unit as defined in Commission Order No. 05E-195, Certification No. 1558, issued by the Florida Public Employees Relations Commission on September 9, 2005 or as subsequently modified by Commission Order. APPENDIX A, POSITION CLASSIFICATIONS IN THE BARGAINING UNIT lists the titles included in the bargaining unit.

2.2     Job Classification.

(a)      New or revised position classifications with job duties that include a substantial teaching or research component that traditionally have come under the purview of an administrative unit within the bargaining unit or otherwise significantly overlap duties of positions within the bargaining unit shall be treated as within the bargaining unit, pending a final determination to the contrary by the Public Employees Relations Commission. New or revised faculty position classifications with job duties that do not include a substantial teaching or research component that traditionally have not come within the purview of an administrative unit within the bargaining unit or otherwise do not significantly overlap duties of positions within the bargaining unit shall not be regarded as within the bargaining unit, pending a final determination to the contrary by the Public Employees Relations Commission.

(b)      The University may create new position classifications with job duties that include a substantial teaching or research component or otherwise significantly overlap duties of positions within the bargaining unit only after discussions with UFF regarding the nature and necessity of the new position classifications and whether they will be designated within or outside the bargaining unit, unless UFF notifies the University in writing that it does not object to the new classification or designation. If UFF does not request such discussions within thirty (30) days after notification of the proposed new position classification, the University may proceed to implement it.

(c)      If the University wishes to revise the specifications of an existing class so that the bargaining unit designation needs to be changed, it may do so only after negotiations with UFF regarding such new designation, unless UFF notifies the University in writing that it does not object to the new designation.

(d)      If an agreement cannot be reached after discussions or negotiations referenced in 2.2(b) and 2.2(c), above, the University and UFF shall request that the Public Employees Relations Commission resolve the dispute through unit clarification proceedings.

(e)      Disputes Over Classifications or Bargaining Unit Status of Individuals.
(1)      Upon request by a faculty member or UFF, the Provost or designee shall

4

review the faculty member's classification and bargaining unit status and send a written explanation of the faculty member's classification and bargaining unit status to both the faculty member and UFF.

(2)     If UFF disagrees with the results it shall inform the Provost or designee of its opinion in writing and have ninety (90) days from receipt of the Provost's explanation to request that the Public Employees Relations Commission resolve the dispute through unit clarification proceedings.

(3)     Until the Public Employees Relations Commission makes a final determination, the presumptions regarding new or revised position classifications or bargaining unit status specified in Section 2.2(a), above, shall apply.

2.3     Reclassification of Faculty Members to a Non-Unit Classification.

(a)     When the University proposes to reclassify a faculty member to a classification that is not in the bargaining unit, it shall notify the faculty member and UFF ninety (90) days in advance.

(b)     The faculty member may request a review under the provisions of Section 2.2.

(c)     UFF may discuss such action pursuant to ARTICLE 6, CONSULTATION.

(d)     If UFF believes the classification represents an error that may potentially affect the broader composition of the bargaining unit, the UFF may request that the Public Employees Relations Commission resolve the dispute through unit clarification proceedings.

(e)     No faculty member shall be reclassified to a classification that is not contained in the faculty bargaining unit for the purpose of denying the faculty member rights or protections under this Agreement. A faculty member may pursue a timely grievance over any contract violation alleged to have occurred prior to the reclassification becoming effective. A grievance filed under this section will entitle the grievant to the remedies otherwise available to a unit employee under this contract.

2.4     Board of Trustees Meetings.

(a)     The University shall bargain with UFF prior to altering wages, hours, or any other term or condition of employment of bargaining unit faculty. If an item on a public meeting agenda of the Trustees (or of any subcommittee of the Trustees) directly impacts wages, hours, or any other term or condition of employment of bargaining unit faculty, the University shall notify UFF, and UFF shall be afforded the opportunity to consult, upon timely request, with the Trustees' designee(s) about the item. In addition, upon timely request from UFF, UFF shall be afforded an opportunity to address the item at the Trustees meeting with the time and place on the agenda to be determined by the Trustees.

(b)     Minutes of public Trustees or public committee meetings are available to UFF via trustees.ufl.edu at the time they are made available to the Trustees involved.

**ARTICLE 3**
**MANAGEMENT RIGHTS**

3.1      Policy. The parties agree that the University shall have the rights, powers, and authority vested in it by the Florida Constitution, the Board of Governors, Florida statutes and case law, including the right to plan, manage, administer, and control the University of Florida in carrying out the ordinary and customary functions of management.

3.2      Limitations.

(a)      All such rights, powers, and authority are subject to those limitations imposed by this Agreement or applicable law.

(b)      The management rights referenced in Section 3.1, above, do not constitute a waiver of, nor shall in any way be deemed to waive, any rights UFF possesses under law to bargain over subsequent changes with respect to wages or other terms and conditions of employment of bargaining unit faculty.

3.3      Other Rights Recognized. Nothing in this Article shall limit or waive the right of UFF or any faculty member to seek to remedy violations of the Public Employees Relations Act, or to initiate federal or state court actions for violations of federal or state laws.

**ARTICLE 4**
**UFF RIGHTS**

4.1      Use of Facilities and Services. UFF shall be provided with the same campus office it currently uses or a campus office with equivalent meeting and storage space. The office shall be provided with secure locks and standard office equipment, including standard campus software, a telephone for local access calling (no long distance service provided), access to the internet, a desk, and a conference table with an appropriate number of chairs.

4.2      Communications.

(a)      UFF shall have the right to post bulletins or other materials relevant to its position as the collective bargaining agent on a reasonable number of existing bulletin boards. All such postings shall bear the date of the posting and may be removed after having been posted for thirty (30) days.

(b)      The University shall maintain links to the local UFF Chapter on the University web site.

(c)      UFF shall have the right to use without cost the University's campus mail and e-mail systems (including use of the standard delivery mode to send messages to all faculty) in order to communicate with the faculty. The mails may not be used for election campaigns for public office, except that UFF may announce endorsements made by UFF or its affiliates. Faculty members who are e-mail recipients of UFF listserv(s) shall have the right to be removed from the listserv(s) upon written request.

4.3      Released Time.

(a)      The University shall provide eighteen (18) units of released time to full-time faculty members designated by UFF for the purpose of carrying out UFF's obligations in representing employees, bargaining, and administering this Agreement. This allocation is for the life of this agreement. Unused units will not accrue beyond this contract. No more than three (3) of these units may be used in Summer.

(1)      Each unit of released time shall consist of a reduction in teaching load of one (1) course per Fall or Spring semester for faculty with instructional duties or, for faculty without instructional duties, a reduction in workload of ten (10) hours per week. Faculty on 9-month contracts who receive release units in the summer shall be paid 12.5% of regular annual salary per unit.

(2)      Each unit of released time for P. K. Yonge Developmental Research School faculty members shall consist of a reduction in teaching load of one (1) class per day during a semester for secondary school teachers, or its equivalent for other teachers. One DRS faculty member may be designated by UFF as a member of the bargaining team and be released from assigned duties for up to twelve (12) days. These days are to be used in increments of one (1) whole day.

(3)      A faculty member may receive more than one (1) unit of released time per semester.

(4)      Where the schedule of classes will allow, the University shall, whenever practicable, arrange for Tuesday-Thursday teaching schedules for faculty members who are bargaining.

(b)      Released time during the academic year is subject to the following conditions:
(1)      In departments with ten (10) or fewer faculty members, no more than one (1) faculty member may be granted released time at any one time without consent of the department supervisor.
(2)      UFF shall provide the University with a list of requested designees for each semester of the academic year no later than May 1 of the preceding academic year.
(3)      Substitutions for the Spring semester shall be made upon written notification submitted by UFF no later than October 31.

(c)      Faculty members who are on leave shall not be eligible to receive released time.

(d)      Salary Increases. Faculty members on released time shall be eligible for salary increases on the same basis as other faculty members.

(e)      Released time activities may require a significant commitment of time and shall be acknowledged.

(f)      Faculty members on released time shall not be considered representatives of the University for any activities undertaken on behalf of UFF. UFF agrees to hold the University harmless for any and all claims arising from such activities, including the cost of defending against such claims.

4.4      Leave of Absence—Union Activity.
(a)      At the written request of UFF, provided no later than May 1 prior to the beginning of the academic year when such leave is to become effective, a full-time or part-time leave of absence for the academic year shall be granted to up to three (3) faculty members designated by UFF for the purpose of carrying out UFF's obligations in representing faculty and administering this Agreement. For faculty members on 12-month appointments, such leave shall also be granted for the entire summer term, upon written request by UFF provided no later than March 15.

(b)      UFF shall reimburse the University for the salary and benefits of the faculty members approved for leave granted under the provisions of this Article.

(c)      A faculty member on such leave shall not be evaluated for this activity, but such activity shall be considered service.

(d)      Salary Increases. Faculty members on leave under this paragraph shall be eligible to receive salary increases on the same basis as other faculty members.

(e)      The University shall not be liable for the acts or omissions of any faculty member granted leave under this Section, and UFF shall hold the University harmless for any such acts or omissions, including the cost of defending against such claims (except for claims brought by UFF alleging a violation of the Agreement or Chapter 447, Florida Statutes).

4.5      Faculty Orientations. UFF shall be afforded the opportunity to set up a table for the purpose of distributing materials at the University New Faculty Orientation, and the existence and location of that table shall be mentioned during the orientation presentation. Notification by email of the date, time, and location of new faculty orientations shall be made to UFF no later than two (2) weeks prior to the event.

**ARTICLE 5**
**PAYROLL DEDUCTION**

5.1      Deductions. The University shall deduct bi-weekly the following from the pay of those faculty members in the bargaining unit who individually and voluntarily make such request on a written authorization form as contained in APPENDIX B to this Agreement:

(a)      One after-tax deduction code for UFF membership dues and another after-tax deduction code for PAC contributions in an amount established by UFF and certified in writing by UFF state president to the University; and

(b)      One pre-tax deduction code and one after-tax deduction code for UFF voluntary economic services programs. Deductions shall be made on a pre-tax or after-tax basis at UFF's designation, provided there is no legal impediment to doing so. All such programs and deductions shall meet the requirements of state and federal law as well as University rules or regulations. The parties agree that proposed changes in University rules or regulations impacting these programs and deductions shall be subject to collective bargaining negotiations before implementation.

5.2      Timing of Deductions.
(a)      The University shall make deductions beginning with the first full pay period that commences at least seven (7) days following the date that UF Human Resources receives the authorization.

(b)      UFF shall give written notice to the University of any changes in its dues at least forty-five (45) days prior to the effective date of such changes.

5.3      Remittance.
(a)      The University shall remit dues and other authorized deductions to UFF state office on a biweekly basis within fifteen (15) days following the end of the pay period.

(b)      Accompanying each remittance shall be a list in electronic form containing the following information for each faculty member from whose salary a deduction has been made:
(1)      Name of the faculty member;
(2)      Bi-weekly salary of the faculty member; and
(3)      Amounts deducted from the faculty member's salary.

5.4      Termination of Deduction.
(a)      The University's responsibility for deducting dues and other authorized deductions from a faculty member's salary shall terminate upon either
(1)      thirty (30) days written notice from the faculty member to both the University Human Resource Services office and UFF revoking the faculty member's prior deduction authorization, or
(2)      the termination of employment of the faculty member.

(b)      The UF Human Resources shall provide UFF with a copy of any written authorization from a faculty member terminating dues or other deductions within ten (10) days of the date the authorization was received.

5.5      Reinstatement of Deduction.

(a)      The University shall reinstate dues deductions for faculty members who have previously filed authorization and who have not revoked that authorization, but whose payroll deductions have been discontinued for any other reason.

(b)      The University shall deduct and remit to UFF dues for any period for which dues deductions were not, but should have been, made.

5.6      Indemnification. UFF assumes responsibility for (1) all claims against the University, including the cost of defending such actions, arising from their compliance with this Article, and for (2) all monies deducted under this Article and remitted to UFF. UFF shall promptly refund to the University excess monies received under this Article. Nothing herein shall make the University a fiduciary for any benefits offered by UFF. This subsection does not relieve the University of its responsibility to comply with the provisions of this Article.

5.7      Exceptions. The University will not deduct UFF fines, penalties, or special assessments from the pay of any faculty member.

5.8      Termination of Agreement. The University's responsibilities under this Article shall terminate upon (1) decertification of UFF or the suspension or revocation of its certification by the Florida Public Employees Relations Commission, or (2) revocation of UFF's deduction privilege by the Florida Public Employees Relations Commission.

**ARTICLE 6**
**CONSULTATION**

The President or designee and representative(s) may meet with UFF representatives to discuss matters pertinent to the implementation or administration of this Agreement, University Administration actions affecting terms and conditions of employment, or any other mutually agreeable matters, at either's request.

**ARTICLE 7**
**MAINTENANCE OF BENEFITS**


7.1      The rights and benefits provided by this Agreement shall apply to any faculty member who is or shall become upon hiring a member of the bargaining unit and may not be waived by any such faculty member, except with the consent of UFF.

7.2      To the extent required by law, the rights and benefits set forth in this Agreement shall not change absent collective bargaining.

**ARTICLE 8**
**UNIVERSITY OF FLORIDA REGULATIONS AND POLICIES**

8.1     Changes in Regulations or Policies.

(a)        Established terms and conditions of employment for bargaining unit faculty shall not be changed without collective bargaining, pursuant to Chapter 447, Florida Statutes.

(b)        If any regulation, policy, or resolution proposed by the University has a direct and substantial impact on wages, hours, or any other term or condition of employment, the University shall satisfy any collective bargaining obligation with respect to the change prior to implementing it, unless UFF declines in writing to bargain over the change.

8.2     Notice of Proposed Regulations. The University shall provide to UFF, via posting on the University General Counsel web site, an advance copy of any proposed regulation that could reasonably be construed to affect terms or conditions of employment contained in this Agreement.

8.3     Inconsistencies with Agreement. No existing, new or amended University regulation, policy, or resolution shall apply to bargaining unit faculty members if it conflicts with an express term of the Agreement.

14

**ARTICLE 9**
**BYLAWS GOVERNING TERMS AND CONDITIONS OF EMPLOYMENT**

9.1      Policy. Faculty members of the colleges, schools, departments, centers, or other traditional academic units have the right to create bylaws or other written unit policies by which to conduct their responsibilities as they relate to policy matters that the University and UFF have agreed by the express terms of a specific section of this Agreement to delegate to the unit faculty, consistent with the provisions of this Agreement. Such written unit policies shall be subject to review and approval by appropriate administration officials and posted on the unit web sites.

(a)      Faculty members shall have the right to participate in the development of and to vote on such bylaws. If the bylaws are developed by means of a committee, such committee shall be comprised of faculty members elected by the faculty of the unit.

(b)      The University and UFF have agreed by the express terms of this Agreement to delegate to the faculty of appropriate units, in specific instances and within specified parameters, the development of discipline-specific clarifications of University criteria for tenure, promotion, merit salary increases, market equity salary increases, and performance evaluations.

(c)      No provision of the bylaws that governs terms and conditions of employment shall be inconsistent with the provisions of this Agreement or with the mission and goals of the unit and the University.

(d)      During the life of this Agreement, all units shall review bylaws and propose revisions.

9.2      Development and Approval of Bylaws.
(a)      The deadlines specified in this Article apply to calendar days of the weeks in which classes or final exams are held during the Fall and Spring semesters. If a semester ends before the period specified, the clock stops and restarts on the first day of classes in the next semester (excluding summers).

(b)      Faculty Proposal. Faculty members in each unit, in conjunction with the chair, shall develop and maintain bylaws. Provisions in the bylaws relating to tenure, promotion, merit salary increases, market equity salary increases, and performance evaluations must be approved in a vote by a majority of all affected faculty in the relevant unit who are eligible to vote on the matter under consideration. The vote shall take place in a publicly noticed meeting and shall be by show of hands. The totals of yes or no shall be recorded in the minutes of the meeting. The proposed bylaws shall be forwarded for approval to the dean. If the chair and the other faculty are unable to reach agreement on an issue, both the chair's proposal on that issue and the proposal approved by a majority of the faculty shall be submitted to the dean.

(c)      Dean's Review. Within thirty (30) days of receiving the proposed bylaws, the

dean shall review them to ensure that they comply with this Agreement and with the mission and goals of the University and either approve the proposed bylaws or return them to the unit for revision.

      (1)     If the dean approves the proposed bylaws that a majority of the unit's faculty voted to adopt or does not respond within thirty (30) days after receiving them, the bylaws shall be adopted as passed.

      (2)     If the dean objects to any provision of the faculty's proposed bylaws, the dean shall return the bylaws to the unit, together with his/her written objections.

      (d)     Reconsideration, if Necessary. The faculty shall consider the dean's written objections and, within thirty (30) days after receiving them, shall resubmit the bylaws to the dean, incorporating all, some, or none of the objections, along with a justification for the resubmitted language, which shall be written by a faculty member from the unit selected by faculty members in the unit.

      (1)     If the faculty do not resubmit proposed bylaws within thirty (30) days after receiving the dean's objections, the bylaws shall be adopted as modified consistent with the dean's objections.

      (2)     If the dean approves the reconsidered bylaws or does not respond within thirty (30) days after the dean's receipt of them, the bylaws shall be adopted as resubmitted.

      (3)     If the dean does not approve the reconsidered bylaws and the proposed changes impact the items specifically referenced in 9.1(b), the dean within thirty (30) days shall make final revisions to the reconsidered bylaws. The revisions may change only those portions of the reconsidered bylaws that are unreasonable or unworkable. The reconsidered bylaws shall be adopted as modified by the dean's final revisions.

      (e)     Once approved, no provision of the bylaws altering a term or condition of employment shall be unilaterally altered or suspended, except pursuant to Chapter 447, Part II, Florida Statutes. The application or interpretation of provisions of the bylaws shall be grievable under this Agreement.

      (f)     A copy of the bylaws shall be kept on file in the unit office, as well as posted on the unit's website. A copy of the bylaws shall also be provided to UFF and to the University.

**ARTICLE 10**
**ACADEMIC FREEDOM AND RESPONSIBILITY**

10.1     Policy. Academic freedom and responsibility are essential to the integrity of the University. The principles of academic freedom are integral to the conception of the University as a community of scholars engaged in the pursuit of truth and the communication of knowledge in an atmosphere of tolerance and freedom. The University serves the common good through teaching, research, scholarship/creative activities, and service. The fulfillment of these functions rests upon the preservation of the intellectual freedoms of teaching, expression, research, and debate. The University and UFF affirm that academic freedom is a right protected by this Agreement in addition to a faculty member's constitutionally protected freedom of expression and is fundamental to the faculty member's responsibility to seek and to state truth as he/she sees it.

(a)     The University and UFF shall maintain, encourage, protect, and promote the faculty's full academic freedom in teaching, research/creative activities, and professional, university, and employment-related public service, consistent with the exercise of academic responsibility described in Sections 10.3 and 10.4, below.

(b)     In order to ensure within the University an atmosphere of academic freedom,
(1)     The University shall not apply any provision in this Agreement to violate a faculty member's academic freedom or constitutional rights, nor shall a faculty member be punished for exercising such freedom or rights, either in the performance of University duties or activities outside the University.
(2)     The University recognizes that internal and external forces may seek at times to restrict academic freedom, and the University shall maintain, encourage, protect and promote academic freedom.

10.2     Academic Freedom. Consistent with the exercise of academic responsibility described in Sections 10.3 and 10.4 below, a faculty member shall be free to discuss all relevant matters in the classroom, to explore all avenues of scholarship, research, and creative expression, to speak freely on all matters of university governance, and to speak, write, or act in an atmosphere of freedom and confidence.

(a)     Teaching and Research/Creative Activities. Faculty members shall have the freedom to:
(1)     Freely engage in scholarly and creative activity and publish the results.
(2)     Present and discuss, frankly and forthrightly, academic subjects, including controversial material relevant to the academic subject being taught.
(3)     Select instructional materials, define course content, and determine grades within general department guidelines. Consistent with the principle that the faculty member should be the sole judge of a student's performance in a course, the grade a faculty member determines for a student's performance shall not be changed without the faculty member's consent, except as the result of an official investigation. In the case of an official

17

investigation, the chair shall appoint a panel of faculty members with expertise in the course material. Such panel shall conduct the investigation and shall report its findings to the chair. The chair of the department shall then take appropriate action. The factors to be considered include if:

           a.     there was discrimination against a student in determining the grade or the grade was imposed without proper authority; or

           b.     the faculty member's assessment of the student's performance was not supportable by an accepted pedagogical practice or was substantially inconsistent with the basis for evaluation that the faculty member specified for the course.

     (b)     Service. Service includes, but is not limited to, participation in governance processes of the University. Faculty members shall have freedom to present and discuss, frankly and forthrightly, academic subjects and policy, university governance, or other matters pertaining to the health of the University.

     (c)     All rights provided in this Article shall extend to all bargaining unit members, regardless of whether their primary assignments include teaching and research.

10.3     Academic Responsibility of the Faculty. Academic responsibility implies the competent performance of duties and obligations and the commitment to support the responsible exercise of academic freedom by others. Members of the faculty have a responsibility to:

     (a)     Observe and uphold the ethical standards of their disciplines in the pursuit and communication of scientific and scholarly knowledge;

     (b)     Treat students, staff, and colleagues fairly and civilly in discharging one's duties as teacher, researcher, and intellectual mentor. Avoid any exploitation of such persons for private advantage and treat them in a manner consistent with the provisions of the article on NONDISCRIMINATION;

     (c)     Respect the integrity of the evaluation process, evaluating students, staff, and colleagues fairly according to the criteria and procedures specified in the evaluation process;

     (d)     Represent one self as speaking for the University only when specifically authorized to do so;

     (e)     Participate, as appropriate, in the system of shared academic governance, especially at the department level, and seek to contribute to the civil and effective functioning of the faculty member's academic unit (program, department, school and/or college) and the University;

     (f)     Perform appropriate duties assigned by the University and observe applicable state and federal law and applicable published College, University, and Board of Governors regulations, policies, and procedures, provided that the assigned duty or the regulation, policy, or procedure at issue does not contravene the provisions of the Agreement or the faculty

18

member's right to criticize or seek revision of those duties, laws, regulations, policies, or procedures. Faculty members seeking change must not do so in ways that unreasonably obstruct the functions of the University.

10.4     Academic Responsibility of the University. Academic responsibility implies the competent performance of duties and obligations and a commitment to foster within the University a climate favorable to the responsible exercise of academic freedom. Therefore, it is the responsibility of the University to:

(a)     Maintain, encourage, protect and promote academic freedom so that it is not compromised by harassment, censorship, reprisals, or prohibited discrimination as defined in ARTICLE 11, NONDISCRIMINATION. Recognize the right of faculty members to enjoy, without fear of institutional censorship or discipline, the same constitutional rights and freedoms as other individuals.

(b)     Treat faculty members fairly and civilly in discharging the duties in managing the University.

(c)     Respect the integrity of the evaluation process, evaluating faculty fairly and accurately according to the criteria and procedures specified in the evaluation process.

(d)     Sustain principles of the system of shared governance, which recognizes that in the development of academic policies and processes the professional judgments of faculty members are of crucial importance.

(e)     Prohibit persons who are not authorized students, authorized instructional staff, or authorized officials of the University from entering or interrupting faculty classrooms or laboratories during instructional time, except with prior permission from the responsible administration representative, faculty member or during emergencies. The University shall support the authority of each faculty member to have unauthorized persons removed from the faculty member's classroom/laboratory.

(f)     Prohibit disruptive student behavior, including behavior that involves violence against faculty, staff or students, threat(s) of violence, instigation of violence, malicious vandalism, possession of weapons of any type, willful disregard of a faculty member's legitimate directions, continued use of abusive language or gestures, or other behavior that is so unruly, disruptive, harassing, or abusive that it seriously interferes with the faculty member's ability to effectively communicate with other students in the class or with the ability of the student's classmates to learn. The University shall support the authority of each faculty member to have disruptive persons removed from the faculty member's classroom/laboratory.

(1)     Upon receiving a report of disruptive student behavior, the Dean of Students shall act promptly to investigate and resolve the matter. Faculty may request that a disruptive student be barred from returning to the classroom. If the Dean of Students declines such a request, the Dean shall take appropriate alternative action that ensures against a recurrence of the disruptive behavior and shall inform the faculty member.

19

(2)     A faculty member shall not be disciplined for taking reasonable action in self-defense or in defense of others.

**ARTICLE 11**
**NONDISCRIMINATION**

11.1    Statement of Intent.

(a)    It is the intent of the parties that each faculty member work in an environment free from any form of discrimination or harassment.

(b)    The parties recognize their obligations under federal and state laws, and regulations prohibiting discrimination. Both parties shall work together to assure equal employment opportunities at the University  for women, minorities, and other affected groups to achieve equality. To this end the parties shall implement programs, policies, and practices to facilitate the recruitment, appointment, retention and professional development of such groups and to ensure equitable opportunities for faculty members to receive salary adjustments, tenure, multi-year appointments, promotion, sabbaticals, and other benefits. This statement of intent is not subject to ARTICLE 28, GRIEVANCE PROCEDURE AND ARBITRATION.

11.2    Policy.

(a)    Discrimination.

(1)    Personnel decisions shall be based solely on job-related criteria and performance.

(2)    The University of Florida acknowledges the importance of an inclusive environment for all, and shall not discriminate against any faculty member based upon race, color, sex, gender identity, religious creed, national or ethnic origin, age, disability, political opinions or affiliation, sexual orientation, marital status, or veteran status as protected under the Vietnam Era Veteran's Readjustment Assistance Act.

(b)    Harassment. Faculty members shall be protected from illegal harassment, in accordance with federal and state law.

(1)    Sexual Harassment. It is the policy of the University that each faculty member be allowed to work in an environment free from any form of discrimination. Sexual discrimination is prohibited by Title VII of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972. Under these laws, sex discrimination includes sexual harassment and sexual misconduct. Sexual harassment is unwelcome conduct of a sexual nature and includes but is not limited to unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal or physical conduct of a sexual nature. Types of sexual harassment include:

a.    "Quid pro quo harassment" assumes a power differential and occurs when an employee or student is subject to unwelcome sexual behavior or advances, and submission is made a condition of hiring, advancement, admission, or evaluation in the work or academic setting. Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment.

b.    "Hostile environment harassment" occurs when unwelcome sexual behavior unreasonably interferes with an individual's job performance or creates an intimidating, hostile, or offensive work environment. Hostile environment harassment generally

21

requires a severe and pervasive pattern of behaviors to constitute sexual harassment. Submission to or rejection of such conduct by an individual is used as the basis for decisions affecting the individual's employment.

(2)     Sexual misconduct is defined as a sexual act perpetrated against a person's will or where a person is incapable of giving consent. Sexual misconduct includes but is not limited to sexual violence, sexual exploitation, non-consensual sexual contact and non-consensual sexual intercourse. Sexual violence includes rape, domestic violence, dating violence, stalking, sexual assault, sexual battery and sexual coercion.

(3)     Consensual sexual relationships may involve a conflict of interest. Conflicts of interest are subject to the provisions of ARTICLE 26, OUTSIDE ACTIVITY AND CONFLICT OF INTEREST.

(4)     In addition to the concern with respect to sexual harassment between faculty members or between faculty and other employees, the University and UFF recognize the potential for this form of illegal discrimination involving students, either by students against faculty or by faculty against students. Such illegal discrimination includes unwelcome sexual advances, requests for sexual favors, sexual misconduct, or other verbal or physical conduct of a sexual nature that constitutes sexual harassment.

(5)     The University and UFF recognize that sexual relationships between students and faculty, even if consensual, may become exploitative and especially so when a student's academic work, residential life, or athletic endeavors are supervised or evaluated by a faculty member.

a.     There shall be no sexual or romantic relationships between faculty members and undergraduate students. This policy shall not apply to sexual or romantic relationships that existed before one or both partners' arrival at the university and/or before this policy went into effect.

b.     There shall be no sexual or romantic relationships between faculty members and graduate students where both parties are affiliated with the same degree program or department, and under any circumstances in which the faculty member exercises academic, evaluative, or supervisory authority over the students. This policy shall not apply to sexual or romantic relationships that existed before one or both partners' arrival at the university and/or before this policy went into effect.

c.     Faculty who have, or have had, a sexual or romantic relationship with a student are prohibited from exercising academic, evaluative, or supervisory authority over that student. Relationships that pre-date one or both parties' affiliation with the University and that would otherwise be prohibited under this policy shall be promptly disclosed by the faculty member to his or her dean or designee.

(6)     Policies and regulations regarding harassment shall be employed to protect individuals from discrimination, not to regulate the content of speech or restrict the academic freedom or free speech rights of faculty members.

(c)     Where appropriate, informal resolution of concerns is encouraged. Such resolution may include such things as speaking up when the incident occurs, communicating with the individual and asking him or her to stop the offensive behavior, or consulting with a professional counselor in the employee assistance program.

22

(d)    Responsibilities of Faculty Members Regarding Formal Accusations of Possible Discrimination or Harassment. A faculty member who has actual knowledge by direct observation or who receives a formal accusation of discrimination, or of harassment as defined in this Article involving an individual over whom the faculty member has direct official authority, must contact Office of Human Resource Services, who shall investigate the matter to determine whether the observation or accusation has substance and, if appropriate, take corrective action.

(e)    Formal Complaints of Discrimination or Harassment. Faculty members who believe that they may be victims of discrimination or harassment may file a formal complaint directly with UF Human Resources.

(f)    Retaliation. Retaliation for exercising civil rights is prohibited by federal and state law. No harassment, intimidation, threats, coercion, discrimination, or other form of retaliation shall be made by a faculty member, the University or UFF against any party, witness or representative arising from their good faith participation in the investigation of a complaint of discrimination or harassment. Retaliation shall be regarded as seriously as discrimination itself and shall justify discipline pursuant to the procedures established in ARTICLE 27, DISCIPLINARY ACTION AND JOB ABANDONMENT.

(g)    Disciplinary Action.
(1)    If an investigation finds that discrimination or harassment has occurred, the University may, in appropriate cases, prescribe counseling instead of formal disciplinary action. If the university imposes discipline, it shall be done in accordance with the provisions of ARTICLE 27. The complainant shall be advised of the action taken against the faculty member.
(2)    No faculty member shall be disciplined for discrimination or harassment until the investigation of the charges according to the procedures described in Section 11.3 is complete and a finding of discrimination or harassment has been issued and, if a timely grievance is filed, until the grievance process ends with a finding of just cause that permits the discipline. During the investigation, the faculty member may be placed on administrative leave pursuant to the OTHER LEAVES article of this Agreement.

11.3    Investigation of Formal Complaints of Discrimination or Harassment. Charges of discrimination or harassment shall be investigated according to the following principles and procedures:
(a)    An investigation of alleged discrimination or harassment shall be initiated when an individual files a formal complaint with UF Human Resources.
(1)    UF Human Resources shall appoint trained professionals to investigate the alleged discrimination or harassment. It shall notify the accused, the complainant, the dean of the appropriate college/unit, and UFF. Such notification shall occur within fifteen (15) days.
(2)    UF Human Resources shall inform the accused of the content of the accusation (including any complaints redacted as required by law, the time frame of the alleged actions, and the name of the complainant as allowed by law) and the date of any scheduled

initial interview with the accused, which shall not be less than seven (7) days after the date of notification, during which time the accused shall not speak to the complainant about any aspect of the complaint. UF Human Resources shall inform the accused that he/she has the right to have a UFF Grievance Representative or legal counsel present during any interviews involving the accused.

(3)     The investigation shall be conducted in as confidential a manner as possible to protect the confidentiality of the alleged victim, the accused party, and witnesses.

(4)     The alleged conduct shall be considered in the context of the circumstances.

(5)     The investigation shall include interviewing the complainant, the accused, any pertinent witnesses, and reviewing any relevant documentation.

(6)     At any time the University, the complainant, and the accused may agree to a resolution of the complaint.

(7)     Upon completion of the investigation, the investigators shall make a report of their findings to UF Human Resources, which shall forward the report to the accused individual, the accused individual's representative (if any), the complainant, the dean of the appropriate college/unit, and UFF.

(b)     The investigative report shall contain at least the following information: The nature of the complaint, all formal statements by the parties, a summary of the facts, and a conclusion as to whether the alleged action or incident has occurred. The faculty member has the right to append a response to the investigation report.

(c)     The University shall take appropriate remedial measures to correct any discrimination or harassment that is found. Remedial measures shall not adversely affect the faculty member who was found to be the object of discrimination or harassment.

(d)     UF Human Resources shall notify the complainant, the accused individual, the accused individual's representative (if any), the dean of the appropriate college/unit, and UFF of any proposed action to be taken, including a counseling letter or disciplinary action.

(e)     Records maintained for the purposes of investigating formal complaints of discrimination or harassment shall be confidential until a final decision is made.

(1)     For harassment investigations, portions of the records that identify the complainant, a witness, or information that could reasonably lead to the identification of the complainant or a witness, shall retain their confidential status even after the investigation is closed and the final decision is made.

(2)     However, the records shall be open to University personnel conducting the investigation, the accused individual or designee, the dean of the appropriate college/unit, and UFF.

(3)     Pursuant to state and federal law, the findings shall be maintained in UF Human Resources.

(f)     In instances where no findings of discrimination or harassment is made, no

record of any allegations or the formal complaint shall be placed in the faculty member's evaluation or personnel file unless the faculty member requests in writing that a record of the complete investigation be placed in the evaluation or personnel file.

11.4     Access to Documents. A faculty member shall have the right to inspect and copy documents relating to any claim of discrimination or harassment to which the faculty member is a party except for records that are exempt from the provisions of the Public Records Act, Chapter 119, Florida Statutes.

11.5     Grievance Procedures.

(a)     Claims of discrimination or harassment brought against the University may be presented as grievances pursuant to ARTICLE 28, GRIEVANCE PROCEDURE AND ARBITRATION. However, no grievance may be maintained under this section if the faculty member has also initiated a complaint arising from the same issue(s) filed with any court or fair employment practices agency, except as specifically provided for in ARTICLE 28.

(b)     Appeals of adverse employment decisions made against faculty members accused of discrimination or harassment may be presented as grievances pursuant to ARTICLE 28, GRIEVANCE PROCEDURE AND ARBITRATION.

11.6     Neither the University nor UFF shall abridge any rights of faculty members related to union activity granted under Florida law including but not limited to the right to assist or to refrain from assisting UFF.

**ARTICLE 12**
**APPOINTMENT**

12.1    Policy

(a)        Working with faculty, the University shall establish standards, qualifications, and criteria to fill vacancies. The parties recognize and mutually agree that the University's mission and desire to foster excellence require faculty of diverse backgrounds and interests. The parties support efforts to assure candidate pools include faculty from historically underrepresented groups. Faculty committees and University officials shall develop applicant pools and receive and review applications; and the dean working with the faculty shall make such appointments as appropriate under established standards, qualifications, and criteria.

(b)        Recognizing that the appointment of a spouse or domestic partner may be an important means of attracting and retaining qualified faculty members, the University shall give consideration to funding for spousal/domestic partner appointments in the bargaining unit. In such instances, all search committee requirements are waived, save for a requirement that the departmental faculty shall meet with the candidate and give a recommendation on the potential hire as stipulated in 12.2(d)(1).

(c)        No special commitment or conditions offered to new hires shall bind the University indefinitely. A special commitment or condition will be observed unless it is no longer financially or logistically feasible or circumstances have changed enough that it is no longer in the legitimate interests of the University.

12.2    Procedures for Filling Vacancies.

(a)        Bargaining unit vacancies shall be advertised through appropriate professional channels.

(b)        Each candidate interviewed for a job position in the bargaining unit shall be provided with the URL addresses for the UFBOT-UFF Agreement.

(c)        Search committees composed of faculty members from the appropriate department(s) shall be established by the department chair for all tenure-track faculty appointments and other faculty appointments as may be appropriate or as specified in the department's bylaws. No less than three-fourths of the committee's members shall be faculty members in the department. A faculty search committee may include all faculty members in the department.

(d)        The search committee shall receive applications, screen candidates, and make recommendations for these appointment vacancies.

(1)        After the interview process has been completed, faculty members of the department shall vote by secret ballot to register their recommendations. The faculty search committee shall recommend to the chair for possible appointment those candidates it deems acceptable.

26

(2)      In instances in which more than one (1) department is involved in a search (such as interdisciplinary programs), the department in which tenure would be earned is responsible for the above, and the department chair shall make appropriate arrangements for the other department(s) involved to participate in the process. Three-fourths of the committee members shall be faculty from the departments involved.

(e)      Department Chair's Recommendation.

(1)      Prior to making a recommendation to appoint a candidate for a faculty position, the chair shall meet with the other faculty members in the department to discuss the recommendations of the faculty search committee.

(2)      The chair shall recommend to the dean those candidates the chair deems acceptable. The chair shall also submit to the dean the faculty search committee's recommended candidates, if any, and the vote of the department faculty on the interviewed candidates.

(3)      The chair may make a recommendation different from the preferences of the faculty search committee or those reflected in the vote of the department faculty.

(f)      Dean's Decision.

(1)      The dean may ask the committee to consider additional candidates from the remaining pool of candidates.

(2)      After receiving the recommendation(s) of the faculty search committee, the input from the department faculty, and the chair's recommendation(s), the dean shall appoint the candidate that the dean deems is most qualified. The dean may appoint a candidate that is not recommended by the faculty only after obtaining the Provost's approval. When requested, the Provost or provost's office designee shall explain the decision to the faculty in a meeting.

12.3    Letter of Appointment. All appointments shall be made on a University Letter of Appointment and signed by the President or designee and the faculty member. The Letter of Appointment may include informational addenda reflecting negotiated agreements between the parties, except that such addenda shall not abridge the faculty member's rights or benefits provided in this Agreement. All Letters of Appointment shall contain the following elements:

(a)      Title.

(b)      Department, college, or other employment unit.

(c)      Length of appointment.

(d)      Percent of full-time equivalent "FTE" assigned.

(e)      Principal place of employment.

(f)      Salary rate.

(g)      A statement that the position covered by the appointment is (1) tenured (2) eligible for tenure, or (3) not eligible for tenure.

(h)      The duties and responsibilities the faculty member may be assigned to perform in teaching, research, and service, or other assigned responsibilities.

(i)      Special conditions of employment, including assignments to a second instructional location, special restrictive covenants of clinical teaching, and any special commitments from the University that were negotiated.

(j)      If the appointment is not subject to the notice provisions of Section 13.3(b), the University shall include the following in the letter of appointment: "Your employment under this contract will cease on the date indicated. No further notice of cessation of employment is required."

12.4     Appointments. Appointments are classified by title, rank, duration, degree of effort, and tenure status.

(a)      The academic appointees of the University shall consist of personnel holding the academic ranks of assistant professor or above, or the equivalent academic ranks in the instructional, research, or other academic functions, and personnel holding other specialty faculty titles or ranks. Equivalent faculty ranks may be granted in the librarian, scholar, scientist, engineer, and curator series.

(b)      Appointments Classified by Duration of Time.
(1)      Regular faculty appointments may be academic year (9) month; ten (10) month; or twelve (12) month.
a.      Nine (9)-month (academic year) faculty appointments shall be for approximately thirty-nine (39) consecutive weeks. The parties agree that there are exceptions to this normal calendar and agree that the full academic-year salary rate associated with appointments shall be prorated across the appointment period.
b.      No faculty appointment shall be for a term exceeding a twelve (12)-month period ending June 30 except as noted in (3) below.
(2)      In the event of an emergency temporary appointment (less than thirty-nine (39) weeks), the contract or letter of appointment shall so state and notice of non-renewal is not required.
(3)      Multi-year appointments are for a fixed term as indicated in the employment offer and appointment, as referenced in 12.4(g) below.

(c)      Appointments Classified by Degree of Effort.
(1)      Full-time - the utilization of effort considered to be the normal or standard amount required during a given time period, equivalent to 100% or 1.00 FTE.
(2)      Part-time - the utilization of effort considered less than customary or standard during a given time period, equivalent to less than 100% or less than 1.00 FTE, or appointments for less than thirty-nine (39) weeks. Such an appointment involves either working

less than 100% of the time through an academic or calendar year or working full-time for less than the full number of terms in the academic year.

(d)     Faculty with Administrative Assignments. A faculty member appointed to an administrative role (such as chair) may be reclassified and reassigned to other faculty or administrative duties at any time during the term of that appointment. If the faculty member is reclassified and reassigned, the pay rate and appointment period shall be adjusted to reflect the new responsibilities.

(e)     Renewal of Appointments.

(1)     The appointment of tenured or permanent status faculty shall be renewed annually unless terminated for just cause subject to the limitations set forth in ARTICLE 27, DISCIPLINARY ACTION AND JOB ABANDONMENT. The terms of the renewal of the appointment shall be consistent with the appointment in which the faculty member was granted tenure or permanent status or prior renewal.

(2)     Renewal of appointments, as well as other personnel decisions, shall be based on the effectiveness of the faculty member's performance in the assigned duties as they related to the areas of teaching, research, and service, and the requirements of the department.

(f)     P. K. Yonge Developmental Research School Appointments. The initial annual contract of a P. K. Yonge faculty member shall include a one (1) year probationary period during which time the faculty member's contract may be terminated without cause or the faculty member may resign without breach of contract.

(g)     Multi-Year Appointments.

(1)     A multi-year appointment may be offered for a period of not less than two (2) and not more than five (5) years.

(2)     The appointment may be renewed.

(3)     Faculty members on multi-year appointments cannot be terminated during the contract period except for just cause, layoff, termination of the funding source in the case of soft money appointments, or two successive unsatisfactory evaluations. The faculty member shall be given notice of termination as specified in ARTICLE 13, NON-RENEWAL.

(4)     Multi-year appointments may be offered only for the following:

a.     Non-tenure-earning academic appointments, such as lecturers or Professors of Practice.

b.     Individuals who have retired from universities or other organizations.

c.     Individuals who are appointed with time-limited soft-money funding.

(5)     Criteria and Procedures. Department chairs and deans, working with the faculty, shall develop the criteria and procedures for an initial or successive multi-year appointment in each department or college.

a.     The criteria for an initial or successive appointment shall include

consideration of the basis for the initial multi-year appointment, annual evaluations of performance, extent and currency of professional qualifications, contribution to the mission of the department or program, staffing needs, funding source alternatives, and continuing program considerations.

        b.      The faculty member shall be advised in the penultimate year of the appointment that to be considered for a successive multi-year appointment, the faculty member must submit a written request to the department chair.

        c.      Prior to making a recommendation on the request, the chair shall consult with the faculty members in the department and shall make the faculty's views known to the dean.

    (h)      "Job sharing" shall be permitted between two (2) faculty members under the following conditions:

        (1)      Participation is voluntary;

        (2)      The hours and responsibilities are outlined in writing;

        (3)      The hours and responsibilities provide both faculty members with the time worked necessary to qualify for salary increases as well as retirement and other benefits;

        (4)      The job sharing is approved by the participating faculty members and their chair; and

        (5)      The dean or deans supervising the faculty members have granted their approval for the sharing for a specific period, up to a maximum of one (1) year, at which time the sharing will be reviewed and approval will be either renewed or denied.

    (i)      Visiting Appointments. Visiting appointments may not exceed three years in total. No faculty member with a visiting appointment shall be given a regular appointment without following the search procedures set forth in this Article.

    (j)      Adjunct Appointments.

        a.      Adjunct instructional appointments are for one (1) academic term at a time and are ordinarily part-time, non-salaried instructional employees paid on a per course basis. As such, they are not represented by UFF.

        b.      The use of adjuncts shall, upon the request of UFF, be a subject of consultation under the provisions of the CONSULTATION article of this Agreement.

12.5    Change in Appointments.

    (a)      Notification of changes in an appointment shall be given in the same fashion as the notification of non-renewal provisions of the NON-RENEWAL article of this Agreement.

    (b)      A faculty member may request a change in the length of his/her appointment period (12, 10, or 9 month appointments). If the requested change is denied, the University shall provide written notice of the reasons for the denial.

        (1)      Upon approval by the University, and assuming that the assigned responsibilities remain substantially the same, a faculty member's base salary shall be adjusted by 81.8 percent when changing from a twelve (12) month to an academic-year appointment, or

by 122.2 percent when changing from an academic-year to a twelve (12) month appointment.

       (2)     Upon approval of a change from a twelve (12) month appointment to an annual-leave-accruing appointment of less than twelve (12) months but more than nine (9) months, the faculty member's salary shall be adjusted to a percent of the twelve (12) month base salary that is mathematically proportionate. Any benefits will be adjusted accordingly.

      (c)     FTE Reduction. The FTE may be altered by written agreement between the University and the faculty member, provided that

       (1)     The reduction in FTE reflects a corresponding tangible net reduction in the faculty member's assigned duties, and

       (2)     Such changes in the appointment are submitted for approval through the appropriate administrative channels to the Office of Academic Affairs prior to any change.

12.6    The biweekly salary rate of faculty members serving on twelve (12)-month appointments shall be calculated by dividing the twelve (12)-month salary rate by the actual number of pay periods in the calendar year.

**ARTICLE 13**
**NON-RENEWAL**

13.1     Policy. Faculty appointment shall not create any right, interest, or expectancy in any other appointment beyond its specific terms, except as provided in this Agreement.

13.2     Non-renewal and Termination of Faculty Appointments.

        (a)     Tenured or Permanent-Status Faculty. The appointment of tenured or permanent-status faculty members shall not be terminated except for just cause pursuant to the procedures in ARTICLE 27, DISCIPLINARY ACTION AND JOB ABANDONMENT, or a layoff pursuant to ARTICLE 30, LAYOFF AND RECALL.

        (b)     Tenure-accruing Faculty. The appointment of a tenure-accruing faculty member shall be renewed annually until the end of the tenure probationary period unless:

                (1)     The faculty member's department or equivalent unit is abolished, or the faculty member's department experiences a reallocation of resources or reorganization of program offerings or functions that would justify the non-renewal; or

                (2)     The faculty member receives an overall "unsatisfactory" evaluation on the annual performance evaluation.

        (c)     Non-permanent-status, Non-tenure-accruing, Faculty. The University may choose not to renew the employment of a faculty member who does not have tenure or permanent status and is not on a tenure-accruing appointment. In the case of such non-renewal, the faculty member will be given a reason for the decision and an opportunity to appeal to the dean or equivalent.

13.3     Notice of Ending of Employment of Non-Tenured and Non-Permanent Status Faculty Members.

        (a)     Notice Only in the Employment Contract or Letter of Appointment.

                (1)     Faculty members on "soft money," e.g., contracts and grants, sponsored research funds, and grants and donations trust funds with less than five (5) years of continuous service, faculty members who are on visiting appointments, faculty members who are appointed for less than one (1) year, or faculty members on multi-year appointments as defined in the APPOINTMENT article shall have the following statement included in their letter of appointment: "Your employment under this contract will cease on the date indicated. No further notice of cessation of employment is required."

                (2)     If such statement is not included in the letter of appointment, then the faculty member whose appointment is not being renewed shall be provided ninety (90) days written notice.

        (b)     Except for faculty members described in subsection 13.3(a)(1) above, any non-tenured faculty member who is not being offered a further appointment shall receive written notice according to the following terms:

                (1)     One (1) semester for those in their first two (2) years of continuous

University service.

        (2)     Twelve (12) months for those with more than two (2) years of service.

        (3)     Twelve (12) months for faculty members who are on "soft money" (e.g., contracts and grants, sponsored research funds, and grants and donations trust funds) who have five (5) or more years of continuous university service.

    (c)     The notice of non-renewal shall include the following:

        (1)     A statement that the University is not renewing the employment contract;

        (2)     A reference to the meeting held to advise the faculty member of non-reappointment;

        (3)     The last date of employment with the University;

        (4)     A statement that the faculty member may contest the decision, in accordance with ARTICLE 28, GRIEVANCE PROCEDURE AND ARBITRATION, because of an alleged violation of a specific term or provision of the Agreement or because of an alleged violation of the faculty member's constitutional rights.

        (5)     A copy of ARTICLE 28.

    (d)     All such notices and statements shall be sent by certified mail, return receipt requested, or delivered in person to the faculty member with written documentation of receipt obtained.

    (e)     A faculty member who receives a Notice of Non-Renewal has twenty (20) days to request in writing a statement of the basis for the decision not to renew the appointment. The University shall provide such written statement within twenty (20) days following receipt of the request. All such notices and statements shall be sent by certified mail, return receipt requested, or delivered in person to the faculty member with written documentation of receipt obtained.

    (f)     If the University does not comply with providing proper notice, as required in subsections 13.3(b) - 13.3(e), above, the faculty member's non-renewal notice period will not begin until the corrected notice is provided.

    (g)     Reassignment.

        (1)     Following the delivery of the notice of non-renewal, the University may reassign such faculty member to other university duties after consultation with the faculty member and the departments or other units affected.

        (2)     Such reassignment does not release the University from its contractual commitment to compensate the faculty member for the period prior to the effective date of non-renewal.

13.4    Grievability.

    (a)     A faculty member who receives written notice of non-renewal may, according to ARTICLE 28, GRIEVANCE PROCEDURE AND ARBITRATION, contest the decision because of an

alleged violation of a specific term or provision of the Agreement or because of an alleged violation of the faculty member's constitutional rights.

(b)      Such grievances must be filed within forty-five (45) days of receipt of the notice of non-renewal or the statement of the basis for the decision.

13.5      Re-employment Considerations. If the decision not to renew the appointment was based primarily upon adverse financial circumstances, reallocation of resources, reorganization of degree or curriculum offerings or requirements, reorganization of academic or administrative structures, programs, or functions, or curtailment or abolition of one (1) or more programs or functions, the University shall take the following actions:

(a)      Make a reasonable effort to locate appropriate alternative or equivalent employment within the University; and

(b)      Offer such faculty member, who is not otherwise employed in an equivalent full- time position, re-employment in the same or similar position at the University for a period of two (2) years following the initial notice of non-renewal, should an opportunity for such re-employment arise.

(1)      It shall be the faculty member's responsibility to keep the University advised of the faculty member's current address.

(2)      Any offer of re-employment pursuant to this section must be accepted within fifteen (15) days after the date of the offer, such acceptance to take effect not later than the beginning of the semester immediately following the date the offer was made. In the event such offer of re-employment is not accepted, the employee shall receive no further consideration pursuant to this Article.

13.6      Resignation.

(a)      Upon resignation, all consideration for tenure and renewal shall cease.

(b)      A faculty member who wishes to resign has the professional obligation to provide the University with at least one (1) semester's notice.

(c)      Upon notice of non-renewal any consideration of promotion shall end; in addition, those in non-renewal status may not receive any professional development leaves and other professional development opportunities.

13.7      Notice Document. Notice of appointment and non-renewal shall not be contained in the same document, except in the circumstances explicitly provided in Section 13.3(a)(1), above.

**ARTICLE 14**
**ASSIGNMENT OF RESPONSIBILITIES**

14.1    Policy.

(a)      The assignment of responsibilities to faculty members is one of the mechanisms by which the University establishes its priorities, carries out its mission, and creates opportunities to increase the quality and integrity of its academic programs and enhance its reputation and stature as a major research university.

(b)      The professional obligation of faculty members (teaching, scholarship/creative activities, service, or other duties assigned for that year) is comprised of both scheduled and non-scheduled activities.

(c)      The University and UFF recognize that it is a part of the professional responsibility of faculty members to carry out their duties in an appropriate manner and place. For example, while instructional activities, office hours, and other duties and responsibilities may be required to be performed at a specific time and place, non-scheduled activities are more appropriately performed in a manner and place determined by the faculty member.

(d)      The University shall make a reasonable and good faith effort, consistent with the other provisions of this Agreement, to provide faculty members with the necessary facilities and resources for carrying out their assigned duties and responsibilities.

(e)      A written commitment made by the University to a faculty member regarding the faculty member's assignments or matters associated with the assignments shall be subject to enforcement under ARTICLE 28, GRIEVANCE PROCEDURE AND ARBITRATION.

14.2    Considerations in Assignment.

(a)      The University and UFF recognize that while the Legislature has described the minimum full academic assignment in terms of twelve (12) contact hours of instruction or equivalent research/scholarship and service, the professional obligation undertaken by a faculty member will ordinarily be broader than that minimum.

(b)      Subject to the provisions of this Agreement, the University has the right to determine the types of duties and responsibilities that comprise the professional obligation and to determine the relative proportion of effort a faculty member may be required to expend on the various components.

(c)      Faculty on twelve (12)-month appointments, who accrue vacation leave, shall be provided reasonable opportunity to utilize their vacation during the course of the year. Individual and department needs will be taken into consideration when approving the leave.

(d)      The chair shall provide the faculty member with the opportunity to consult about the course schedule.

(e)　　The chair shall inform the faculty member of the impact of any contemplated change in the faculty member's assigned allocations for teaching, research/scholarship/creative activity, and service. The chair shall offer the faculty member the opportunity to discuss any such contemplated change.

(f)　　In making assignments, the University shall consider:
　　(1)　　The needs of the program or department;
　　(2)　　The faculty member's preferences, qualifications and experiences, and professional development interests.

14.3　　Assignments.
　　(a)　　Communication of Assignment.
　　　　(1)　　A tentative assignment of responsibilities shall be provided no later than May 1. New faculty members shall be informed of assigned duties as soon as it can be done.
　　　　(2)　　If it can be done, the faculty member shall be notified of the final assignment in writing no later than six (6) weeks in advance of the starting date of each term.

　　(b)　　Change in Assignment.
　　　　(1)　　If it should become necessary to make changes in a faculty member's assignment, the person responsible for making the change shall notify the faculty member as soon as practicable prior to making such change and shall specify the change in writing.
　　　　(2)　　If a change in assignment results in needing to move University supplies or equipment, the University shall provide assistance in such a move and shall notify the faculty member of the time of the move at least one (1) month in advance.
　　　　(3)　　The University shall make a good faith effort not to change a faculty member's teaching assignment less than four (4) weeks prior to the first class session.
　　　　(4)　　If a faculty member has been assigned or reassigned a course fewer than four (4) weeks prior to the first class session, such circumstances shall be taken into consideration when reviewing student evaluations of the course.

14.4　　Equitable Opportunity. Each faculty member shall be given assignments that provide equitable opportunities, in relation to other faculty members in the same department, to meet required criteria for promotion, tenure, and merit salary increases.
　　(a)　　For the purpose of applying this principle to promotion, assignments shall be considered over the entire period since the original appointment or since the last promotion if the faculty member has been promoted, not solely over the period of a single annual assignment.

　　(b)　　For the purpose of applying this principle to tenure, assignments shall be considered over the entire probationary period. If an arbitrator determines that a faculty member was not provided an equitable opportunity as described in this section, the arbitrator may award an additional period of employment (not to exceed one [1] year) for the purpose of rectifying the inequity requiring the University to provide the equitable opportunity as

36

described herein.

(c)     If it is determined that a faculty member has not received assignments that provide equitable opportunities described above, then the faculty member must receive a timely appropriate adjustment in the assignment that corrects the inequity.

14.5     Resolution of Assignment Disputes.
(a)     A faculty member shall, upon written request, be granted a conference with the person responsible for making the assignment to express concerns. If the conference does not resolve the faculty member's concerns, the faculty member shall be granted, upon written request, an opportunity to discuss those concerns with the dean. The faculty member shall perform the assignment until final resolution of the matter as prescribed in this Agreement.

(b)     No faculty member's assignment shall be arbitrary or unreasonable.

(c)     Assignments shall be deemed arbitrary or unreasonable if one or more of the following applies:
(1)     The assignment was made without providing the faculty member the opportunity to consult about the assignment.
(2)     After consulting with the faculty member, the University did not make a fair and reasonable attempt to accommodate the faculty member's circumstances. In this regard, the parties recognize the following:
a.     Assignments are driven primarily by the program and curricular needs of the students in the programs in the department. The preferences and desires of the faculty members are secondary to these program and curricular needs.
b.     Not all circumstances can be accommodated, and that inability to accommodate does not in and of itself represent an arbitrary or unreasonable assignment.
(3)     The time between the beginning of the first assignment and the end of the last assignment in any one (1) day exceeds eight (8) hours, unless the faculty member has agreed to such an arrangement or there is no practicable alternative.
(4)     The time between the end of the last assignment on one (1) day and the beginning of the first assignment for the next day is less than twelve (12) hours, unless the faculty member has agreed to such an arrangement or there is no practicable alternative.

(d)     Assignments are subject to the provisions of the GRIEVANCE PROCEDURE AND ARBITRATION article.

(e)     If the dean denies a faculty member's request for re-assignment, the University shall provide the reason in writing to the faculty member, with a copy to UFF.

14.6     Place of Employment.
(a)     Principal. Each faculty member shall be assigned one (1) principal place of employment, as stated on the University Letter of Appointment.
(1)     Where possible, a faculty member shall be given at least nine (9) months

notice of a change in principal place of employment.

              (2)      The faculty member shall be granted, upon written request, a conference with the person responsible for making the change to express concerns regarding such change.

              (3)      Voluntary changes and available new positions within the department shall be considered prior to involuntary changes.

(b)      Secondary.

              (1)      Each faculty member, where possible, shall be given at least ninety (90) days written notice of assignment to a secondary place of employment more than fifteen (15) miles from the faculty member's principal place of employment.

              (2)      The faculty member shall be granted, upon written request, a conference with the person responsible for making the change to express concerns regarding such a change.

              (3)      If the assignment to a secondary place of employment is made, the supervisor shall make an appropriate adjustment in the assignment in recognition of time spent traveling to a secondary place of employment.

              (4)      Necessary travel expenses, including overnight lodging and meals, for all assignments not at the faculty member's principal place of employment shall be paid at the State rate.

14.7    Schedule of Assigned Duties.

      (a)      Supervisors are encouraged to make appropriate adjustments in the number of hours scheduled in recognition of evening, night, and weekend assignments, and for periods when a faculty member is on call. Evenings, nights, and weekends when a faculty member is on call shall be considered in making other assignments.

      (b)      Except for P. K. Yonge, the academic year shall consist of a Fall and Spring semester of approximately 19.5 weeks each. Activities in each semester shall be scheduled during contiguous weeks with the exception of Spring Break.

14.8    Overload Assignments.

      (a)      An overload assignment is defined as the assignment of any duties in excess of a faculty member's full-time appointment (1.0 FTE).

      (b)      No faculty member shall be required to accept an overload assignment.

      (c)      As compensation for an overload assignment, the University shall offer the faculty member either

              (1)      financial compensation; or

              (2)      reduction in teaching assignment in a mutually agreeable following academic semester or year.

      (d)      Monetary compensation for overload assignments shall not qualify for

retirement compensation or credit.

14.9     The appropriate academic department and college may submit a request to the Office of the Provost for a change to full-time tenure for any faculty member who was granted tenure at less than 1.00 FTE.

14.10     A tenured or tenure-accruing faculty member may be transferred as a result of a reorganization or program curtailment within the University. No department or unit of the University is obliged to accept the transfer of a faculty member from another unit. The acceptance of a transferring faculty member is conditioned upon an affirmative vote of the tenured faculty members of the receiving academic department or unit. A report of the transfer shall be submitted through the appropriate administrative channels to the Office of the Provost for approval. If the transfer is approved, the faculty member's tenure or tenure eligibility shall be transferred to the new department.

14.11   P. K. Yonge Assignments

      (a)       P. K. Yonge has a special mission and that mission is reflected in the annual academic year assignments. The developmental research school designation and the setting within the College of Education at the University provide unique opportunities and special responsibilities for P. K. Yonge faculty. P. K. Yonge faculty are expected to participate in teaching, research, outreach, and dissemination activities as part of their assignment.

      (b)       Academic Year Appointments. The academic year appointment period for P. K. Yonge faculty members is a 10-month appointment consisting of a Fall and Spring semester. Included in this appointment period are required planning days prior to the start of school in the fall, four (4) teacher work days during the school years, and one (1) post-planning day.

      (c)       The University shall submit the proposed calendar to the faculty for its consideration before the end of the academic year, and such scheduling shall be subject to consultation under ARTICLE 6 of this Agreement.

      (d)       Work Day for P. K. Yonge Faculty. The work day for P. K. Yonge faculty members shall be seven and one-half (7.5) continuous hours. The University and UFF recognize that a faculty member's professional responsibilities and obligations may on occasion necessitate the faculty member's working beyond the work day. The University will provide two (2) additional paid hours for research per week and the faculty member is responsible for determining how to spend that research time within or outside of the work day. A work day may include instruction, research and planning time.

            (1)       The starting and ending times for work days shall be determined by the principal after discussion with the faculty. The principal's final decision shall be announced by August 1 of each year.

            (2)       The normal student contact time for a secondary school faculty member shall be the equivalent of twenty-five (25) fifty (50)-minute periods during the week. The normal student contact time for an elementary school faculty member shall be the equivalent

of one thousand, five hundred, and fifteen (1,515) minutes per week. General education classroom teachers shall not be required to supervise students before the instructional school day and for no more than fifteen (15) minutes after student dismissal.

(3) Each faculty member shall be provided a thirty (30)-minute lunch period without duties. Faculty members teaching in the elementary grades may be expected to escort their students to the serving line.

(4) One teacher workday and two early release Wednesday afternoons will be designated for Elementary Fall Family Conferences.

(5) Faculty members shall not be required to eat breakfast or lunch with their students.

(6) Faculty members shall be permitted to leave school at the end of the student day on school days immediately preceding the weekend, a holiday, or student vacation day as long as students are not left unsupervised. The principal shall make appropriate arrangements to ensure that faculty members who are needed to supervise students on these days are given comparable release time on other days.

(7) Faculty members shall be provided additional time within the work day during the last three (3) days of student attendance at the conclusion of the school year, in order to allow adequate time for completing records and paper work.

(8) Additional Considerations.

a. No faculty member shall be asked to teach more than one (1) academic subject during a class period.

b. Faculty members teaching in middle school or high school shall not be required to teach more than three (3) separate, unrelated academic classroom subjects.

14.12 Scheduled Meetings and Planning Time for P. K. Yonge Faculty.

(a) There will be a required seven (7)-day planning program before the start of classes in the Fall semester. Two (2) of those seven (7) days are designated for full-day, organized professional learning and school improvement activities.

(1) For the five (5)-day pre-planning program, required meetings and in-service training shall not exceed a total of ten-and-a-half (10.5) hours for the planning program.

(2) Highest priority shall be given to individual and team/department preparation time.

(b) Faculty Meetings, and Planning/Conference Days During Academic Year.

(1) Faculty meetings shall be held during the work day. Faculty members present at the meeting may vote to extend the meeting beyond the work day.

(2) Faculty Planning/Conference Days. Faculty planning days are designed to permit additional planning, preparation, parent conferences, professional learning, exchange of ideas, appraisal conferences, and other school-related business.

a. Faculty planning days shall be six (6) hours in length, exclusive of lunch. If lunch is an administratively scheduled activity, it is subsumed within the six (6) hours. Scheduling and duration of lunch periods shall be determined after consultation with the faculty.

b. The principal shall provide faculty members with no less than

five (5) days notice of any required activity that will occur on a planning day.

  (c) Personal Planning time. During the regular school year, faculty members shall be provided an average of three hundred (300) minutes per week for planning. If the planning time is noncontiguous, it shall be scheduled in time blocks of no less than forty-five (45) minutes.

   (1) The University may designate a portion of such time for administrative uses such as required professional learning or a faculty meeting. Notice of such use of planning time shall be given at least five (5) days in advance.

   (2) A portion of the time may be set aside for team planning, with members of the team determining how much will be team planning.

   (3) Additional planning time shall be scheduled for faculty members assigned to teach three or more un-related academic classroom assignments.

  (d) Changes in teaching assignments for P. K. Yonge faculty members often involve significant changes in the courses or grade levels taught and the classrooms in which teaching takes place. An appropriately certified faculty member who volunteers shall be considered for such changes.

14.13 Equipment for P. K. Yonge Faculty. No faculty member shall be required to purchase supplies, textbooks, materials, or equipment from personal funds. The principal or designee shall discuss supply and material needs with each faculty member and shall secure for the faculty member's classroom use reasonable supplies and materials.

**ARTICLE 15**
**OFFICE SPACE AND SAFE CONDITIONS**

15.1    Office Space.

(a)        To the extent possible, The University shall provide each faculty member with office space and office equipment commensurate with assigned responsibilities. Such equipment shall normally include a telephone, a computer, and an internet connection.

(1)        Each tenured or tenure-accruing full-time faculty member shall be provided with an enclosed individual office that has a door lock, except in a circumstance where to do so would not be reasonably possible.

(2)        Non-tenure-accruing faculty members and part-time faculty members in a department or equivalent unit may be provided office space on a shared basis if it is not possible to provide individual offices, or if such faculty volunteer to share office space.

(3)        Full-time faculty members who provide confidential counseling services with the title psychologists, psychiatrists, student counseling specialists or other mental health clinical faculty shall be provided with an enclosed individual lockable office, except in a circumstance where to do so would not be reasonably possible.

(b)        Each faculty member shall, consistent with building security, have reasonable access to the faculty member's office space and laboratories, studios, music rooms, and the like used in connection with assigned responsibilities. This provision may require that campus security provide access on an individual basis.

(c)        Change in Office Space. A faculty member shall be notified, if practicable, at least one (1) month prior to a change in the faculty member's office location or a planned alteration to a faculty member's office that impedes the faculty member's work effectiveness. The faculty member shall be provided the reason(s) necessitating the change or alteration. The University shall provide assistance in moving University supplies and equipment.

15.2    Safe Conditions. Whenever a faculty member reports a condition that the faculty member feels represents a potential violation of safety or health rules and regulations, the appropriate administrator shall investigate such conditions. Upon conclusion of the investigation, the appropriate administrator shall inform the faculty member of what action is being taken, if action is necessary. No faculty member shall suffer an adverse employment action for making a report under this section.

**ARTICLE 16**
**TRAVEL**

16.1    Professional Meetings.

    (a)    Faculty members may attend professional meetings, conferences, and other professional activities, with the approval of the chair or supervisor of the department or equivalent unit whether or not they receive University funding to attend. Approval to attend such activities shall not be unreasonably denied.

    (b)    Faculty members must initiate a Travel Authorization Request (TAR) and receive their chair's approval prior to any business-related travel.

    (c)    Allocations of travel funds to department faculty members shall be determined by the chair in accordance with posted written policies jointly developed and agreed to by the chair and department faculty (by a majority vote).

16.2    Reimbursement. The reimbursement rate for expenses in connection with meetings, conferences, or other professional activities shall as specified by Florida law, up to the amount of funding available under department policies.

16.3    Travel Advances. To the extent permitted by law, the University shall provide travel advances, upon request, of up to eighty (80) percent of budgeted expenses for authorized travel.

**ARTICLE 17**
**SUMMER APPOINTMENTS AND ASSIGNMENTS**

17.1    Policy.

(a)        Summer appointments are separate and distinct from the nine (9)-month academic year appointment.

(b)        The summer course schedule shall be developed in light of faculty expertise, student demand, and program and curricular needs of the department, college, and University. The chair or designee who schedules summer courses shall consult with faculty members about which courses they are available to teach.

(c)        Summer appointments shall be offered not later than five (5) weeks prior to the beginning of the appointment, if practicable. No nine (9)-month faculty member shall be required to accept a summer appointment.

(d)        The offering of summer appointments to faculty members, including the determination of which faculty members are qualified to teach any particular course, shall be made by the chair.

17.2    Summer Appointments.

(a)        The summer instructional appointment includes the normal activities related to the course, such as appropriate course/instructional preparation, lecturing, supervision, grading, and appropriate availability for consultations and conferences with students in the course. The summer instructional appointment does not include other credit-generating activities (such as thesis or dissertation supervision, directed individual studies, supervised teaching or research/scholarship/creative activities, or supervision of student interns).

(b)        Changes in Appointment. When a course is cancelled, the University may offer a new appointment to a faculty member.

17.3    Compensation.

(a)        A faculty member's summer employment contract shall specify the total compensation provided for the appointment.

(1)        For each three-credit-hour course appointment during the summer, a faculty member shall receive 12.50% of the faculty member's academic year rate of pay.

(2)        For each four-credit-hour course appointment during the summer, a faculty member shall receive 16.66% of the faculty member's academic year rate of pay.

(3)        Compensation for courses that are other than three (3) or four (4) credit hours shall be prorated accordingly.

(4)        Units may elect rates of pay that exceed the above.

(b)        Other credit-generating activities such as thesis or dissertation supervision, directed individual studies, supervised teaching or research, or supervision of student interns,

as well as research or service activities, may be assigned by the University during the summer term. However, no faculty member shall be required to undertake such assigned other credit-generating activities, or assigned research or service activities, without compensation for that specific activity in addition to the compensation provided for the faculty member's summer instructional appointment.

(c)        Compensation for summer pay includes retirement compensation.

(d)        Any individual directed study courses, supervision of graduate students, student teacher supervision and off-book courses shall be exempt from the rates above. Appropriate stipends may be included. These stipends will be reported to UFF-UF as part of the annual salary report.

(e)        Payments for low enrollment courses, off-book programs, UF OnLine, and studio courses shall be determined by each college, upon recommendation of the appropriate faculty committee and the College.

(f)        Nine (9)- or ten (10)-month faculty members who, for three (3) or more consecutive years, derive more than thirty percent (30%) of their income from summer teaching or employment within their department may apply to convert their position into a twelve (12)-month appointment. This provision does not apply to PKY faculty members. Such application is subject to the University's approval.

17.4      P. K. Yonge. Faculty members with a summer instructional appointment will be paid at their salaried hourly rate and shall include two (2) days of the pre-summer course planning and one (1) hour of planning time per instructional day.

**ARTICLE 18**
**FACULTY MEMBER PERFORMANCE EVALUATIONS AND EVALUATION FILE**

18.1     Performance evaluations are intended to communicate to a faculty member a qualitative assessment of performance of assigned duties by providing written feedback. Each faculty member's performance shall be evaluated annually. Faculty shall be evaluated according to the approved standards and procedures, provided that those standards and procedures were in place prior to the beginning of the evaluation period. Exempt from such evaluations are those whose employment is ending before the next annual evaluation.

18.2     Sources of Evaluation.
        (a)     Faculty Annual Report. Every year, each faculty member shall submit to the chair a report of the faculty member's activities in teaching, research/scholarship/creative activities, service, and other University duties.
                (1)     The University shall specify the required format and minimum content of the faculty annual report, consistent with the provisions of Sections 18.5 through 18.7.
                (2)     The annual report shall include any interpretive comments and/or supporting data that the faculty member deems appropriate in evaluating the faculty member's performance.

        (b)     The person responsible for completing the annual evaluation shall also consider appropriate information from the following sources: immediate supervisor, peers, students, faculty member/self, other university officials who have responsibility for supervision of the faculty member, and individuals to whom the faculty member may be responsible in the course of a service assignment. Any materials used in the evaluation process submitted by persons other than the faculty member shall be shown to the faculty member, who may attach a written response.

        (c)     University Required Student Evaluations. The tabulated results and written comments of student evaluations of classroom instruction shall be available to the faculty member no later than thirty (30) days following the end of classes in the semester in which the evaluation occurred.

18.3     Observation/Visitation. The University may conduct classroom observation or visitation in connection with the faculty member's evaluation.
        (a)     The chair shall notify a faculty member at least fifteen (15) days in advance of the date and time of any direct classroom observation(s) or visitation(s). If the faculty member determines that this date is not appropriate because of the nature of the class activities scheduled for that day, the faculty member may suggest a more appropriate date or dates.

        (b)     Notwithstanding the above, if the chair has received a complaint or other information that gives rise to immediate concerns about the conduct of the class, the chair may observe or visit the class at any time without notice to the faculty member.

(c)      A written report of the observation/visitation shall be submitted to the faculty member within two (2) weeks of the observation/visitation. The faculty member shall be offered the opportunity to discuss the report with the evaluator prior to its being finalized and placed in the employee's evaluation file and may submit a written reply, which shall be attached to the report. If the course involved was assigned to the faculty member with less than six (6) weeks' notice, the report shall include this information.

(d)      Peer Assessment. A faculty member has the right to have a peer or colleague to observe/visit the faculty member's teaching and to have an assessment of that observation/visitation included as part of the faculty member's annual report. The chair shall invite the peer evaluator, who may be within the University, a retired colleague, or a colleague in the same discipline from another university.

18.4     Evaluation Rating Categories. Each faculty member's performance of assigned duties shall be evaluated according to rating categories defined by the chair and the faculty of the department. This definition shall identify for each assignment area some representative examples of the achievements or performance characteristics that would earn each performance evaluation rating, consistent with a faculty member's assigned duties.

18.5     University Criteria for Annual Performance Evaluations. The annual performance evaluations shall be based upon assigned duties and shall consider the nature of the assignments and quality of the performance in terms, where applicable, of:
(a)      Teaching effectiveness, including effectiveness in presenting knowledge, information, and ideas by means or methods such as lecture, discussion, assignment and recitation, demonstration, laboratory exercise, practical experience, student evaluations, assessment of and engagement with student work, supervision of graduate students, and direct consultation with students. The evaluation shall include consideration of:
(1)      Effectiveness in presenting knowledge and skills, and effectiveness in stimulating students' critical thinking and/or creative abilities, the development or revision of curriculum and course structure, and adherence to accepted standards of professional behavior in meeting responsibilities to students.
(2)      Other assigned university teaching-related duties.
(3)      Any relevant materials submitted by the faculty member such as class notes, syllabi, student exams and assignments, a faculty member's teaching portfolio, results of peer evaluations of teaching, and any other materials relevant to the faculty member's instructional assignment.
(4)      All information available in forming an assessment of teaching effectiveness.

(b)      Contribution to the discovery of new knowledge, development of new educational techniques, and other forms of research/scholarship/creative activity.
(1)      Evidence of research/scholarship/ creative activity, either print or electronic, shall include, but not be limited to, published books; chapters in books; articles and papers in professional journals; musical compositions, paintings, sculpture; works of performing

art; papers presented at meetings of professional societies; reviews, and research and creative activity that has not yet resulted in publication, display, or performance.

(2)     The evaluation shall include consideration of the quality and quantity of the faculty member's research/scholarship and other creative programs and contributions during the evaluation period, and recognition by the academic or professional community of what has been accomplished.

(c)     Service within the university and public service that extends professional or discipline-related contributions to the community; the State, including public schools; and the national and international community. Such service includes contributions to scholarly and professional conferences and organizations and unpaid positions on governmental boards, agencies, and commissions that are beneficial to such groups and individuals.

(d)     Participation in the governance processes of the institution through significant service on committees, councils, and senates, and the faculty member's contributions to the governance of the institution through participation in regular departmental or college meetings.

(e)     Service for UFF may require a significant commitment of time and shall be acknowledged in the annual evaluation.

(f)     Other assigned university duties, such as advising, counseling, supervision of interns, and academic administration, or as described in a position description.

18.6     Department Clarifications of University Criteria for Annual Performance Evaluations. The chair and the faculty in each department/unit shall develop and maintain written clarifications of the University criteria for annual performance evaluations, in terms tailored to the department's discipline(s), faculty positions (i.e., tenured or tenure-earning, non-tenure-earning, library faculty), and assigned duties. Such discipline-specific written clarifications shall be approved according to the provisions of ARTICLE 9, BYLAWS GOVERNING TERMS AND CONDITIONS OF EMPLOYMENT.

(a)     These discipline-specific clarifications shall

(1)     Take into consideration the department's mission and the reasonable expectations for the different ranks;

(2)     Be adaptable to various assigned duties, so that department faculty have an equitable opportunity to earn merit increases, regardless of their assignments; and

(3)     Be detailed enough that a reasonable faculty member should not be uncertain or confused about what performance or accomplishment is sufficient in teaching, research/scholarship/creative activity, and service to earn each performance evaluation rating. The clarifications shall identify for each assignment area some representative examples of the achievements or performance characteristics that would earn each performance evaluation rating.

(b)     With respect to research/scholarship/creative activity, each department/unit

shall develop discipline-specific clarifications that are consistent with the University's publicly articulated mission. These discipline-specific clarifications must also address how the department values various research/scholarship/creative activities and the outlets in which candidates might be reasonably expected to publish, exhibit, or perform.

(c)      The departmental clarifications for the annual evaluation rating categories shall assume that the period over which a faculty member's performance is evaluated is the preceding year. However, the department chair and faculty member may agree to an evaluation period for research/scholarship/creative activity of up to three (3) years.

(d)      The discipline-specific clarifications must be consistent with the criteria and procedures described in Sections 18.2 through 18.5.

(e)      The procedures, criteria, and clarifications described in Sections 18.2 through 18.6 shall be the sole basis for the annual faculty performance evaluation.

18.7      Annual Evaluation Process. The annual evaluation assesses an employee's performance of assigned duties consistent with the criteria specified in Section 18.5 and in departmental by-laws.

(a)      The annual evaluation shall be conducted in the Spring semester, and shall include evaluation of assigned duties for the Fall and Spring semesters of the current academic year and the preceding Summer terms, if the faculty member had an appointment in a summer term.

(b)      The chair shall provide to his/her department faculty the form or format for submission of a faculty member's annual report no later than January 15.

(c)      Each faculty member shall submit to the chair the faculty member's annual report no later than April 15.

(d)      Faculty committees or other individuals submitting evaluative data that may be relevant to the annual evaluation shall report to the chair no later than May 15.

(e)      The chair's evaluation shall identify any major performance deficiencies and, if any such deficiency has been identified, shall provide the faculty member with written feedback designed to assist the faculty member in improving his/her performance.

(f)      No later than July 15 the chair shall provide to the faculty member the written annual evaluation, and shall attach to the annual evaluation a copy of the faculty member's annual report. A faculty member may grieve an annual evaluation under the auspices of ARTICLE 28 any time after the date of presentation but no later than August 31.

(1)      The faculty member shall be offered the opportunity to discuss the evaluation with the evaluator prior to its being finalized.

(2)      The evaluation shall be signed and dated by the person performing the

49

evaluation and by the faculty member being evaluated, who may attach a concise comment to the evaluation.

(g)    The above deadlines do not apply to P.K. Yonge. P.K. Yonge deadlines shall be in accordance with state schedules for such.

(h)    Nothing prohibits the chair from modifying the annual evaluation based on a faculty member's written response to the evaluation. A copy of the revised evaluation shall be provided to the faculty member. The faculty member may append a response to the final evaluation.

18.8    Sustained Performance Evaluations. Tenured faculty members shall receive a sustained performance evaluation once every seven (7) years following the award of tenure or their most recent promotion. The purpose of this process is to evaluate sustained performance during the previous six (6) years of assigned duties. A faculty member who has received satisfactory annual evaluations during four (4) or more of the previous six (6) years, including one (1) or more of the previous two (2) years, shall be rated satisfactory in the sustained performance evaluation.

(a)    Only tenured faculty and the chair may participate in the development of applicable procedures. Sustained performance evaluation procedures shall ensure involvement of peers at the department level.

(b)    The procedures for the sustained performance evaluation shall be made available to department faculty and included in the department's bylaws.

(c)    The documents contained in the faculty member's evaluation file shall be the sole basis for the sustained performance evaluation.

(d)    A faculty member may attach a concise response to the evaluation.

(e)    A performance improvement plan resulting from a Sustained Performance Evaluation shall be developed only for those faculty members whose performance is identified through the sustained performance evaluation as being consistently unsatisfactory in one (1) or more areas of assigned duties.

(f)    The faculty member and their chair shall work in concert to set expectations and develop strategies for the performance improvement plan. The plan shall include specific performance targets and a reasonable time period for achieving the targets. If the faculty member and the chair are unable to reach agreement on a plan, the dean shall resolve the issues in dispute.

(1)    With approval of the Dean, the University shall provide specific resources identified in an approved performance improvement plan.

(2)    The chair shall meet periodically with the faculty member to review progress toward meeting the performance targets.

(3)    It is the responsibility of the faculty member to attain the performance

targets specified in the performance improvement plan. If the plan identifies specific deadlines for attaining performance targets and the faculty member fails to attain the targets by the deadlines, the department/unit has the responsibility to take appropriate actions.

18.9    Proficiency in Spoken English.

(a)    A chair, who as part of the annual evaluation, or upon receipt of a complaint, identifies a faculty member to be potentially deficient in English oral language skills, may require the faculty member to take an English language proficiency test.

(b)    Faculty may continue to be involved in classroom instruction up to one (1) semester while enrolled in appropriate English language instruction.

(c)    Faculty who score below a minimum score specified by the University shall be assigned appropriate non-classroom duties for the period of oral English language instruction provided by the University. When such faculty member is eligible to return to classroom instructional duties the faculty member shall not be disadvantaged by the fact of having been determined to be deficient in oral English language skills.

(d)    It is the responsibility of each faculty member who is found, as part of the annual evaluation, to be deficient in oral English language skills, to take appropriate actions to correct these deficiencies. To assist the faculty member in this endeavor, the University shall provide appropriate oral English language instruction without cost to such faculty members for a period consistent with their length of appointment and not to exceed two (2) consecutive semesters. The time the faculty member spends in such instruction shall not be considered part of the individual assignment or time worked, nor shall the faculty member be disadvantaged by the fact of participation in such instruction.

(e)    If the University determines, as part of the annual evaluation, that one (1) or more administrations of a test to determine proficiency in oral English language skills is necessary, the university shall pay the expenses for up to two (2) administrations of the test. The faculty member shall pay for additional testing that may be necessary.

18.10    Employee Assistance Program. Neither the fact of a faculty member's participation in an employee assistance program nor information generated by participation in the program, shall be used as evidence of a performance deficiency within the evaluation process described in this Article, except for information relating to a faculty member's failure to participate in an employee assistance program consistent with the terms to which the faculty member and the University have agreed.

18.11    Evaluation File.

(a)    Policy. There shall be one (1) official evaluation file, containing a dated copy of all documents used in the assignment and evaluation process, other than evaluation for tenure or promotion, except for course materials, publications, public speeches/presentations, or papers presented at conferences. When evaluations and other personnel decisions are made,

other than for tenure or promotion, the only documents that shall be considered are those contained in the official evaluation file, as well as the faculty member's course materials, publications, public speeches/presentations, or papers presented at conferences that are referenced in the official evaluation file.

(1)     The department chair shall be the custodian of the evaluation file, and a notice specifying the location of faculty evaluation files shall be posted in each department/unit.

(2)     Documents shall be placed in the evaluation file upon receipt. The faculty member shall be notified when the document is placed in the evaluation file.

(3)     No adverse employment action shall be taken against the faculty member based upon material in the faculty member's evaluation file that has not been provided to the faculty member or to which the faculty member has not had an opportunity to attach a response.

(b)     Access. A faculty member may examine the evaluation file, upon reasonable advance notice, during the regular business hours of the office in which the file is kept, normally within the same business day, and under such conditions as are necessary to ensure its integrity and safekeeping.

(1)     Upon request, a faculty member may paginate with successive whole numbers the materials in the file, and may attach a concise statement in response to any item therein. The University may paginate the materials in the file and shall notify the faculty member when that pagination will take place.

(2)     Upon request, a faculty member shall be provided one (1) free copy of any material in the evaluation file. Additional copies may be obtained by the faculty member upon the payment of a reasonable fee for photocopying.

(3)     A person designated by the faculty member may examine that faculty member's evaluation file with the written authorization of the faculty member concerned, and subject to the same limitations on access that are applicable to the faculty member.

(c)     Indemnification. UFF agrees to indemnify and hold the University harmless from and against any and all liability for any improper, illegal or unauthorized use by UFF of information contained in such evaluation files.

(d)     Anonymous Material. There shall be no anonymous material in the evaluation file except for numerical summaries of student evaluations that are part of a regular evaluation procedure of classroom instruction and/or written comments from students obtained as part of that regular evaluation procedure. If written comments from students in a course are included in the evaluation file, all of the comments obtained in the same course must be included.

(e)     Peer Committee Evaluations. The chair and other faculty of a department may develop a procedure for peers to evaluate the performance of faculty members, consistent with other provisions of this Agreement. This procedure shall be approved by the chair and other faculty and included in the department bylaws. The procedure shall identify how faculty will be involved in the process, how the faculty member will receive feedback on the peer evaluation,

and whether the evaluation will be included in the faculty member's official evaluation file.

(f)       Removal of Contents. Materials shown to be contrary to fact shall be removed from the file. This section shall not authorize the removal of materials from the evaluation file when there is a dispute concerning a matter of judgment or opinion rather than fact. Materials may also be removed pursuant to the resolution of a grievance. Materials removed from the evaluation pursuant to this section shall be placed in a separate file with the notation of the reason for removal from the evaluation files.

(g)       Use of Evaluative Material.

(1)       Information reflecting the evaluation of a faculty member's performance shall be available for inspection only by the faculty member, the faculty member's representative, university officials who use the information in carrying out their responsibilities, peer committees responsible for evaluating the faculty member's performance, and arbitrators or others engaged by the parties to resolve disputes, or others by court order. Such limited access status shall not, however, apply to summary data, by course, for the common "core" items contained in student course evaluations that have been made available to the public on a regular basis.

(2)       In the event a grievance is filed, the University, UFF grievance representatives, the arbitrator, and the grievant shall have the right to use, in the grievance proceedings, copies of materials from the grievant's evaluation file.

**ARTICLE 19**
**TENURE AND PROMOTION**

19.1      Definition and Policy. Tenure and promotion are critical decisions for the University and for faculty members. In some instances, such as assistant professors seeking tenure and promotion to associate professor, the reviews occur simultaneously. In other instances, only one review (tenure or promotion) occurs. This Article covers the processes, procedures, and criteria used in making the decisions on tenure and/or promotion.

(a)      Tenure is one of the principal means by which the quality of the University is developed and maintained. Tenure is attained by the faculty member through distinction in teaching, research/scholarship/creative activity, and/or service to the University and the profession. The granting of tenure is a more critical action than promotion, for it represents a long-term commitment by the University to the individual. The decision to award tenure represents a positive evaluation of the faculty member's total value to the University and potential for the future as evidenced by the faculty member's record.

(1)      A faculty member who has been awarded tenure shall have the status of a permanent member of the faculty and remain in the continuing employment of the University until the faculty member resigns or retires; is dismissed for cause under the provisions of ARTICLE 27, DISCIPLINARY ACTION AND JOB ABANDONMENT; or is discontinued from employment pursuant to the layoff provisions of ARTICLE 30, LAYOFF AND RECALL.

(2)      Tenure shall be in an academic department or other appropriate administrative unit. With the written approval of the University, the tenure of a faculty member may reside in a center or institute when the research, teaching, and other duties of the faculty member necessitate such a designation.

(3)      The same process and procedure shall be applied in cases involving both tenure and promotion. In the case of promotion to Associate Professor with tenure the same criteria shall be applied.

(4)      The faculty member's rank, years in rank, or amount of approved leave taken shall not be considered in determining whether the candidate receives tenure.

(5)      If a faculty member is considered for tenure at a time other than the last year of the tenure probationary period, the expectations of performance shall be identical to those that would be applicable to that faculty member in the faculty member's last year of the probationary period unless the criteria for tenure have changed as stipulated in Article 19.6.

(6)      Upon nomination by the President or designee and approval by the Board of Trustees, tenure shall be granted.

(7)      Tenure upon Appointment. The Board of Trustees may grant tenure to a faculty member at the time of initial appointment at the request of the faculty of the affected department(s), the chair and the dean.

a.      Requests for tenure upon appointment shall be submitted to the President (or designee) with supporting documentation, including the assessment of the appropriate departmental or unit faculty as stipulated in Article 19.10(c).

b.      If the President (or designee) approves the request, the letter of offer of appointment to the nominee shall address the tenure issue by indicating that the recommendation for tenure will be sent to the Board of Trustees for its consideration and

decision. The tenure recommendation shall be acted upon at the first Trustee meeting immediately following the acceptance of employment.

      (8)     Tenure shall not extend to administrative appointments.

         a.     Tenured faculty members appointed to administrative positions shall retain tenure in the faculty rank.

         b.     If a tenure-accruing faculty member is appointed to serve in academic-administrative classifications or administrative positions, he or she shall be eligible for tenure only in the faculty rank.

     (b)     Promotion is the appointment of a faculty member to a higher academic rank in recognition of distinguished performance. Promotion is attained through distinction in teaching, research/scholarship/creative activity, and/or service to the University and the profession.

      (1)     Promotion shall be through an academic department or other appropriate administrative unit, and faculty members shall carry their rank with them if they change departments.

      (2)     If there has been no previous promotion at the University, the promotion decision shall include an assessment of the faculty member's accomplishments prior to employment at the University.

      (3)     In promotion cases involving tenured faculty members, the decision shall be primarily on assessments of the faculty member's performance since the last promotion.

      (4)     All of the faculty member's scholarly publications and other research/scholarship/creative activity shall be appropriate to consider in assessing whether the faculty member fulfills the criteria.

      (5)     The same criteria shall be applied in making or evaluating recommendations in both tenure and promotion judgments.

      (6)     The faculty member's years in rank or amount of approved leave taken shall not be considered in determining whether the candidate receives a promotion.

      (7)     An eligible faculty member may initiate the application for promotion whenever the faculty member believes he/she has met the criteria for promotion by notifying the department chair. Faculty members being considered for promotion may withdraw from consideration without prejudice.

      (8)     Consideration for promotion during an administrative appointment shall be based on the faculty duties and shall not be based on the administrative portion of the assignment.

      (9)     No promotion decision shall be based on an assessment that employs factors not identified in, or standards conflicting with, the established written criteria specified by the University and clarified in writing by the faculty of the appropriate department in terms tailored to the department disciplines .

19.2    Eligibility.

     (a)     Faculty members with the rank of Assistant Professor, Associate Professor, Professor, Assistant Librarian, Associate Librarian, Librarian, Assistant Curator, Associate

Curator, or Curator shall be eligible for tenure. The University may designate other positions as tenure-accruing.

(b)     Faculty members with the rank of Assistant Professor, Associate Professor, Clinical Assistant Professor, Clinical Associate Professor, Assistant Librarian, Associate Librarian, Assistant Curator, Associate Curator, University School Instructor, University School Assistant Professor, University School Associate Professor, Lecturer, Senior Lecturer, Assistant Engineer, Associate Engineer, Assistant Scholar, Associate Scholar, Assistant Scientist, and Associate Scientist shall be eligible for promotion.

(c)     Faculty members with the rank of Assistant In_____and Associate In_ _____may apply for promotion. For this title series, the Dean makes the final decision on promotion.

19.3    Tenure Probationary Period.
(a)     A faculty member in a tenure-accruing position shall be considered and recommended for tenure or given notice of non-renewal by the end of the tenure probationary period pursuant to the non-renewal provisions of this Agreement.

(b)     "Tenure probationary period" is defined as that period of academic service in a tenure-accruing position at the University of Florida by the end of which the faculty member must be recommended for tenure or given notice of non-renewal. The tenure probationary period for each faculty member in a college shall be as follows:

College of The Arts—7 years
College of Business Administration—7 years
College of Design, Construction and Planning—7 years
College of Education—6 years
College of Engineering—6 years
College of Health and Human Performance—7 years
College of Journalism and Communications—6 years
College of Liberal Arts and Sciences—7 years
Florida Museum of Natural History—6 years
University Libraries—7 years

(c)     No faculty member shall be required to apply for tenure earlier than the end of the probationary period, although any faculty member may apply as soon as the faculty member has met the criteria for tenure. A faculty member must request to be nominated for tenure no later than July 1 of the last year of the tenure probationary period.

(d)     Definition of Qualifying Service.
(1)     One (1) year of academic service for those on academic year appointments shall mean employment at 1.0 FTE during academic year beginning with the Fall term. Employment for one semester shall constitute one-half year of academic service for those

on academic-year appointments. One (1) year of service for those on twelve (12)-month appointments shall mean employment at 1.0 FTE for the year. A twelve (12)-month faculty member should be employed by November 7 for the employment to count as one (1) year of eligibility.

(2)      Faculty members on a less than 1.0 FTE appointment shall earn credit toward tenure and/or qualifying service on a pro-rated basis.

(3)      Time spent under joint appointment or exchange, on a duly established personnel exchange program, or on a special assignment for the benefit of the University, shall be considered a part of the tenure probationary period, unless there is an agreement to the contrary between the faculty member and the University prior to the commencement of the joint appointment, exchange, or special assignment.

(4)      A semester in which a faculty member is on a leave of absence shall not be considered a part of the tenure probationary period unless the primary purpose of the leave is to conduct research or there is an agreement to the contrary in writing between the faculty member and the Office of the Provost prior to the commencement of the leave.

(5)      A semester in which a faculty member is on reduced full-time equivalent (FTE) compensated leave shall not be considered a part of the tenure probationary period unless the primary purpose of the leave is to conduct research or there is an agreement to the contrary in writing between the faculty member and the Office of the Provost prior to the commencement of the leave.

(6)      Except as noted above, a faculty member on unpaid leave for ten (10) or more business days during a semester shall not have that semester counted toward the tenure probationary period, unless mutually agreed otherwise by the faculty member and the University.

(e)      Faculty appointed to a tenure-accruing position at less than 1.00 full-time equivalent (FTE) shall be awarded tenure at the percentage of FTE assigned at the time of the initial appointment in the tenure-accruing position.

19.4      Extension of the Probationary Period.

(a)      A one (1)-year extension of the probationary period shall be granted when:

(1)      The faculty member becomes a biological or adoptive parent, or otherwise has significant care responsibilities for a newborn, a newly adopted child, or a child received into a licensed family foster home or any other situation in which a faculty member, domestic partner, or spouse becomes a legal guardian of a child; or

(2)      The faculty member cares for an "immediate family member" who is seriously ill for an extended period and for whom the faculty member has significant care responsibilities.

(b)      Any faculty member requesting an extension of the probationary period must make such request in writing to the faculty member's department chair. The submission may be made at any time, but no later than March 1 prior to the final year of the probationary period. The written request must set forth the circumstances and include appropriate supporting documentation. Recommendations from the department and college level must indicate

agreement or disagreement with the request and shall be forwarded to the Provost who has final authority to approve or disapprove the request, but a request made under Section 19.4(a) shall be disapproved only if the requirements of Section 19.4(a) are not met or if appropriate documentation is not furnished if requested.

(c)     In addition to the above, in exceptional circumstances a faculty member may request a one (1)-year extension of the probationary period to allow the candidate to demonstrate professional excellence and capacity for future academic productivity. Such application shall be made before the President's final decision on the tenure nomination.

(d)     The maximum extension of the probationary period that a faculty member can obtain under Section 19.4(a) is two (2) years.

19.5     Criteria. The awarding of tenure or promotion shall be a result of meritorious performance and shall be based on established written criteria specified by the University and clarified in writing by the faculty of the appropriate department in terms tailored to the department disciplines.

(a)     The criteria for the granting of tenure or promotion shall be relevant to the performance of the work that the faculty member has been assigned to do and to the faculty member's responsibilities as a member of the University community.

(b)     These criteria recognize three (3) broad categories of academic service as follows:

(1)     Instruction, including regular classroom teaching, laboratory, field, clinical, and performance instruction, serving on or directing thesis or dissertation committees, and other instructional activities;

(2)     Research or other creative activities, including scholarly publications; and

(3)     Professional or public service.

(c)     In most cases, tenure or promotion requires distinction in two (2) of the three (3) categories, one of which shall be the one designated as the faculty member's primary responsibility. In the case in which a non-tenure accruing faculty member's assignment is exclusively or almost exclusively in one category, distinction must be demonstrated in this category alone. "Distinction" in the categories shall be defined by each college and clarified in writing by the faculty of the appropriate department in terms tailored to the department disciplines and consistent with University standards.

(d)     Department Clarifications of University Criteria. The chair and the faculty in each department shall develop and maintain written clarifications of the University's tenure and promotion criteria in terms tailored to the department's discipline(s) and assigned duties and consistent with University standards. Such discipline-specific written clarifications shall be approved according to the provisions of ARTICLE 9, BYLAWS GOVERNING TERMS AND CONDITIONS OF EMPLOYMENT.

(1)      These discipline-specific clarifications shall

a.      Be adaptable to various assigned duties;

b.      Be detailed enough that a reasonable faculty member should be informed about the performance or accomplishment expectations necessary to earn tenure or promotion, assuming that the accomplishments are of sufficient quality; and

c.      Identify some representative examples of the achievements or performance characteristics that would qualify for tenure or promotion if the requirement of distinction were met.

(2)      With respect to research/scholarship/creative activity, these discipline-specific clarifications shall address how the department values these activities and the outlets in which candidates might be reasonably expected to publish, exhibit, or perform.

(e)      In assessing whether the faculty member has satisfied the criteria, the quality of the faculty member's performance shall be evaluated by the procedures outlined in this Article and Article 18.5 related to Faculty Member Performance Evaluations and Evaluation File. The decision shall take into account annual assignments and annual performance evaluations.

(f)      These criteria shall be available in the department and college offices and posted on the department and college websites. All such criteria shall also be provided to UFF.

19.6      Changes in Criteria for Tenure and Promotion. The University may modify the criteria for tenure and promotion so long as UFF has been notified of the proposed changes and offered an opportunity to bargain such changes.

(a)      Changes to discipline-specific departmental clarifications of the University criteria shall be developed and approved according to the BYLAWS Article.

(b)      Changes in criteria, including the discipline-specific departmental clarifications of those criteria, shall not become effective until one (1) year following adoption of the changes, unless mutually agreed to in writing by UFF President and the University. The date of adoption shall be the date on which the University President or designee approves the changes.

(c)      Effect on Faculty Members. If a faculty member has at least three (3) years of tenure-earning credit as of the date on which the new tenure and promotion criteria are adopted, the faculty member shall be evaluated under the criteria as they existed prior to modification, unless the faculty member notifies the University prior to commencement of the tenure or promotion consideration that the faculty member chooses to be evaluated under the modified criteria.

19.7      Progress Toward Tenure. Midterm Review Assessing Progress Toward Tenure. A special midterm review shall be conducted for faculty members during the third year of the tenure probationary period. The purpose of this appraisal shall be to assess the faculty member's progress toward meeting the criteria for tenure and to provide assessments, suggestions, and guidance to assist the faculty member in fulfilling the University's tenure criteria.

(a)      Faculty members of each department shall develop a procedure for conducting

the review. This procedure must:

(1)      Identify how the tenured faculty members of the department will be involved in the appraisal and how the faculty member will be provided feedback regarding the analysis of progress toward tenure; and

(2)      Include an evaluation by the department chair and the dean of the faculty member's progress toward meeting the criteria for tenure.

(b)      The faculty member under review shall compile an appraisal dossier containing the same kind of information as would be in a tenure dossier but without letters of evaluation. The department chair shall provide to the faculty member the following materials for inclusion in the dossier:

(1)      Annual Assigned Activity, including the proportions of the faculty member's assignments, reported on the annual activities report that have been devoted to teaching, scholarship and service;

(2)      Tenure Criteria for the University and the department's written discipline-specific clarifications of those criteria;

(3)      Peer evaluations; and

(4)      The faculty member's Annual Evaluations.

(c)      Tenured faculty members of the appropriate department shall review the appraisal dossier and meet with the department chair to assess whether the faculty member under review is making satisfactory progress toward tenure, according to the kinds of expectations and indications of success that are appropriate at this point in the tenure probationary period.

(d)      No later than the end of the semester, the results of the review shall be shared with the faculty member. These results shall include any recommendations about how the faculty member might improve his/her performance and tenure dossier and what assistance might be available in the department, college, and University to address candidate needs and improve performance. Upon request, the faculty member shall be provided the opportunity to meet with the chair and/or the dean to discuss the review.

(e)      The appraisal process shall be confidential to the extent permitted by law and internal to the department and the college office. Consequently, the appraisal shall not be placed in the faculty member's evaluation file and shall not be included in the faculty member's subsequent tenure dossier.

19.8      Non-Tenure Track Progress Toward Promotion. While there is no probationary period for promotion within the non-tenure accruing ranks, progress through the ranks for non-tenure track faculty should generally follow the same period of academic service in a position at the University of Florida as for tenure-track faculty.

(a)      Criteria for Promotion. All departments that employ non-tenure track faculty members shall develop criteria for promotion specific to non-tenure track faculty within that department. These criteria shall be incorporated into the department's bylaws and comply with

relevant promotion guidelines outlined in this Article. Non-tenure track faculty shall be permitted to vote on these criteria for promotion, regardless of their voting rights in other departmental matters.

(b)     Progress-to-Promotion (PtP) Review: All departments that employ non-tenure track faculty shall develop a progress-to-promotion (PtP) review process. A description of this process shall be incorporated into the department's bylaws and comply with relevant review guidelines outlined in this Article. Non-tenure track faculty shall be permitted to vote on this process, regardless of their voting rights in other departmental matters.

(1)     The purpose of this appraisal shall be to assess the faculty member's progress toward meeting the criteria for promotion and to provide assessments, suggestions, and guidance to assist the faculty member in fulfilling the University's, College's, and Department's criteria. A faculty member who declines to be reviewed under this PtP process must do so in writing by submitting a letter to their chair/director by January 10th.

(2)     The faculty member under review shall compile an appraisal dossier containing the same kind of information as would be included in the promotion dossier minus external letters of evaluation. The department chair shall provide to the faculty member the following materials for inclusion in the dossier:

a.     Annual Assigned Activity, including the proportions of the faculty member's assignments, reported on the annual activities report that have been devoted to teaching, scholarship, and service;

b.     Departmental criteria for promotion;

c.     Peer evaluations; and

d.     The faculty member's Annual Evaluations.

(3)     The PtP review process must:

a.     Identify, when applicable, how the tenured faculty members of the department will be involved in the appraisal of non-tenure track faculty members and how the faculty member under review will be provided feedback regarding progress toward promotion; and

b.     Include an evaluation by the faculty member's department chair and dean concerning their progress toward meeting promotion criteria.

(4)     Faculty members senior in rank (including both tenure-track and non-tenure track faculty) and eligible to vote on promotion within the appropriate department shall review the appraisal dossier and meet with the department chair to assess whether the faculty member under review is making satisfactory progress toward promotion, according to the kinds of expectations and indications of success that are appropriate at this point in faculty service.

(5)     The results of the review shall be shared with the faculty member no later than six months after the start of the process. These results shall include any recommendations about how the faculty member might improve their performance and promotion dossier and what assistance might be available in the department, college, and University to address candidate needs and improve performance. Upon request, the faculty member shall be provided the opportunity to meet with the chair and/or the dean to discuss the review.

(6)     The appraisal process shall be confidential to the extent permitted by law

and internal to the department and the college office. Consequently, the appraisal shall not be placed in the faculty member's evaluation file and shall not be included in the faculty member's subsequent promotion dossier.

19.9   Initiation of the Tenure or Promotion Review Process.

(a)      The department chair shall initiate the tenure or promotion nomination upon written request. A faculty member shall apply no later than July 1 for tenure or promotion consideration.

(b)      The process begins when the appropriate department chair notifies the faculty member of his/her nomination or the faculty member provides the department chair with written notification of candidacy.

(c)      Faculty eligible for tenure or promotion shall be provided with the URL of the department's written clarifications of the University criteria, "The University's Guidelines and Information Regarding the Tenure, Permanent Status and Promotion Process," and other materials, information, and forms that are used in the preparation of the dossier.

(d)      The department chair shall inform the nominated faculty member about deadlines in the review process.

(e)      Outside Letters of Evaluation. The University shall solicit evaluation of the candidate's research/scholarship/creative activities from qualified scholars in pertinent disciplines outside the University.

(1)      The candidate shall submit a list of names to the chair. The chair shall be responsible for choosing the individuals who will be requested to submit letters of evaluation, provided that at least one-half of the evaluators who agree to write letters come from the candidate's list. If an insufficient number of individuals agree to serve as evaluators, the candidate shall submit additional names, as necessary.

(2)      The chair shall send the same standard solicitation letter to the qualified scholars as necessary. The letter shall have appended to it the University criteria and the department's written discipline-specific clarifications. The evaluators will be asked to assess the candidate's research performance in order to determine whether it

a.      Satisfies the University criteria for tenure or promotion as clarified in writing by the candidate's department;

b.      Represents a significant contribution to the field; and

c.      Is comparable to the research performance of successful tenure or promotion candidates at the same stage in their careers at comparable public research universities.

(3)      All solicited letters that have been received must be included in the tenure dossier.

(4)      Candidates must, in writing, either waive or decline to waive the right to view the letters of evaluation before such letters are solicited. Letters of evaluation must be available to the candidate for review unless the candidate executes a written waiver of her/his

right to view the solicited letters of evaluation. No candidate shall be penalized for declining to waive this right.

       (5)     The evaluators also shall be notified whether the candidate has or has not waived the right to view the letters.

       (6)     While the standard number of letters is not fewer than five (5), nor more than six (6), a college may elect to require a different number of outside letters, provided that all of the following conditions are met:

       a.     Any change in the number of required outside letters must be voted on in a publicly noticed meeting and approved by a two-thirds majority of the tenured and tenure-accruing faculty in the college.

       b.     The range in the new number of required outside letters must remain no more than one (1), e.g., "no fewer than three and no more than four." The number of names submitted by the candidate shall be adjusted to be one (1) more than the top of the range.

       (f)     Tenure or Promotion Dossier.

       (1)     The only documents, information, or materials that shall be considered in making a tenure or promotion recommendation are those included in the dossier.

       (2)     The department chair shall advise the candidate in the preparation of the dossier. However, it shall be the responsibility of the faculty member to see that the dossier is complete and contains all the information that the faculty member believes is pertinent to the nomination.

       (3)     The dossier shall consist of the following stipulated materials, plus any other evidence the candidate chooses to present to support the candidacy. The candidate shall ensure that the dossier includes all of the materials required in this subsection and that the materials are in the following format, which may be further specified in the "Guidelines and Information Regarding the Tenure, Permanent Status and Promotion Process" provided that such specifications are consistent with the provisions of this Agreement:

1. Nominee information cover page;
2. Brief description of job duties;
3. Areas of specialization;
4. Assigned activity;
5. Educational background;
6. Employment;
7. Year tenure was awarded;
8. The university's tenure criteria, the college's clarification of those criteria, and the appropriate department's applicable written discipline-specific clarifications of those criteria;
9. Teaching, advising, and instructional accomplishments;
10. Teaching evaluations;
11. Educational portfolio;
12. Graduate committee activities;
13. Contribution to discipline narrative;
14. Creative works or activities;

15. Patents and copyrights;

16. Publications;

17. Lectures, speeches, or posters presented at professional conferences/meetings;

18. Contracts and grants;

19. Service Narrative;

20. University governance and service;

21. Consultations outside the university;

22. Editor of a scholarly journal, service on an editorial advisory board, or reviewer for a scholarly journal;

23. International activities;

24. Extension program;

25. Clinical service or clinical activities;

26. Service to schools;

27. Membership and activities in the profession;

28. Honors;

29. Chair's/director's letter;

30. Dean's letter;

31. Sample letter to evaluators and bio-sketches of individuals writing solicited letters of evaluation;

32. Letters of evaluation;

33. Copies of the last five annual letters of evaluation, where applicable; and

34. Further information (any additional materials that the candidate believes is pertinent).

(4) Any documents that have been added to the dossier after the commencement of consideration shall be appended at the end of the dossier and shall indicate the individual who requested the additional document, the date the document was added, and the reasons why the document was included. If the chair or the dean revises his/her letter, the revised letter replaces the previous one. Only the revised letter is available for subsequent levels of review, and the candidate may append a response to the revised letter.

(5) The contents of the dossier shall be available for inspection only by the candidate, University officials who use the information in carrying out their responsibilities, the faculty who are charged with the responsibility of evaluating the candidate's performance, and pursuant to Florida law.

(g) Candidate's Verification of the Dossier. Before there can be a consideration of a candidacy for tenure or promotion, the candidate must review the dossier to ensure that it is complete and contains all the information that the candidate believes is pertinent to the candidacy, and certify completeness in the online system.

(1) Prior to the review of the nomination and at any point in the review process, the candidate shall have the right to review the contents of the dossier and may attach a concise written response to any material in it. If the candidate has waived the right to review the letters of evaluation, these shall not be made available to the faculty member.

(2)     The candidate shall verify (electronically) the completeness of the dossier prior to the department review.

(3)     After the verifying statement(s) have been signed, a copy of the completed dossier shall be available to the candidate, except that if the candidate has waived the right to see letters of evaluation such letters will not be available to the candidate.

(h)     Alterations to the Dossier.

(1)     After the candidate's verification of the dossier, no materials shall be added to, deleted from, or changed in the dossier without the candidate's consent, except for:

a.     Information as specified above, which may have been inadvertently omitted or incorrectly entered;

b.     The written assessments and recommendations of faculty committees and administrators who are charged with making recommendations regarding the candidate's application, and the candidate's response to these, if any; and

c.     Clarification, documentation or validation of assertions made by the candidate, when requested in writing by official reviewing faculty committees and administrators.

(2)     Candidates shall not be required to provide additional information or materials clarifying areas that are not referenced in Sections 19.9(f) and 19.9(h)(1), above, nor shall candidates be penalized or disadvantaged for refusing to provide such unrequired information or materials.

(3)     The candidate may add, delete, or change materials that directly pertain to the dossier by supplying a copy to the appropriate administrator, provided that after any such alteration the dossier contains all of the required materials. The date of inclusion or alteration in dossier shall be recorded in the dossier.

(4)     If any material is added to, deleted from, or changed in the dossier by anyone other than the candidate after the commencement of the consideration process, including results of the assessments and copies of both the chair's and the dean's letters, a copy of any such additions, deletions, or changes, other than letters of evaluation to which the faculty member has waived the right to review, shall be available to the candidate as soon as entered into the on-line system. Within ten (l0) days of receipt of the material, the candidate may supply a concise response, which shall be added to the tenure dossier. The dossier shall not be forwarded until either the candidate submits a response, indicates in writing that he/she will not be making a response, or until ten (10) days have elapsed from the date of the candidate's receipt of additional or changed material, whichever occurs first.

(5)     Except by consent of the candidate, there shall be no anonymous material in the dossier except for numerical summaries of student evaluations that are part of the regular evaluation procedure of classroom instruction and/or written comments from students obtained as part of that regular evaluation procedure. If written comments from students in a course are included in the dossier, all of the comments obtained in the same course must be included.

(6)     Materials in the file shown to be contrary to fact shall be corrected before a review of the file can continue. This section shall not authorize the alteration of materials in the evaluation file when there is a dispute concerning a matter of judgment or

opinion.

19.10     Tenure or Promotion Review and Recommendation Procedures. Recommendations for the awarding of tenure or promotion shall proceed through the following levels of review: eligible department faculty, department chair, college Tenure and Promotion Committee, dean (or director in the case of the Florida Museum of Natural History), and the University Academic Personnel Board, and President or designee. At all levels the participants shall be provided with the University criteria, clarifications of the criteria by the College, and departmental discipline-specific clarifications of the criteria. Recommendations by the President or designee to grant tenure shall be forwarded to the Board of Trustees for final decision. All recommendations in this process, along with any candidate responses to those recommendations, shall be included in the dossier prior to the dossier being forwarded to the next review step.

(a)     Faculty and administrators participating in a review are advised to consult the TENURE AND PROMOTION Article. The administrator at each level shall be responsible for ensuring that the review at that level is conducted in a manner consistent with the provisions of the TENURE AND PROMOTION Article.

(b)     The dossier must be forwarded to each level of review unless the candidate withdraws.

(c)     Review and Assessment by Department Faculty.
(1)     If a department uses a committee to provide a written assessment of the candidate's qualifications for tenure or promotion, the department committee shall submit its written assessment to the department chair, who shall give a copy to the candidate. The candidate shall have seven (7) days from receipt of the written assessment to append a written response. The chair shall share the committee's written assessment and the candidate's written response with the faculty before they meet to discuss and provide an assessment, by secret poll, of whether or not the candidate meets the criteria for tenure or promotion.
(2)     The eligible faculty members of the department shall review the dossier and any materials referenced in it and shall meet to discuss the nomination. After the discussion, eligible departmental faculty must provide an assessment, by secret poll, of whether or not the candidate meets the criteria for tenure or promotion. In tenure cases, only tenured faculty members may register an assessment; in promotion cases, only those with a rank above the candidate may register an assessment. The chair shall not participate in the secret poll. The chair's evaluative letter of 19.10(c)(4) and 19.10(d) serves as her/his vote.
(3)     If department policy provides for input from another unit in which the candidate holds an appointment, whether it is in the form of written comments or assessments by secret poll, that input shall be advisory only.
(4)     The chair shall report the departmental assessments on the Nominee Information Cover Sheet of the dossier (i.e., for, against, abstaining, and absent). The number of faculty providing assessments for, against, abstaining, and absent shall equal the total number of faculty members of the department eligible to participate in this process according to this collective bargaining agreement.

66

(d)        Department Chair's Review and Recommendation. After reviewing the candidate's dossier, the department chair shall submit an evaluative letter assessing the candidate's qualifications with reference to the department's written discipline-specific clarifications of the University's tenure criteria and make a positive or a negative recommendation. The chair's letter may explain or clarify such issues as exceptional assignments, unique contributions or unusual assessments.

(1)        The candidate shall have ten (10) days from receipt of the department chair's letter to submit a written response before the dossier moves to the next level.

(2)        The candidate's dossier shall be forwarded to the College Tenure and Promotion Committee for consideration.

(e)        Review by the College Tenure and Promotion Committee.

(1)        The Committee shall be comprised of tenured faculty members in the college. No less than one-half of the committee members shall be elected by the tenured faculty members of the college. Only those with a rank above the candidate may vote in promotion cases.

(2)        The College Tenure and Promotion Committee shall review the candidate's dossier and report on its strengths and weaknesses of the record in terms of the University's criteria and the appropriate department's applicable written discipline-specific clarifications of those criteria.

(3)        Evaluations of a candidate's performance shall be based on the candidate's assigned duties.

(4)        If there are questions about a dossier, the Committee through its secretary shall notify the chair and the candidate, so they may respond.

(5)        The Committee shall provide recorded individual assessments to the dean as part of its fact-finding and consultative role.

a.        An individual assessment shall consist of a committee member's indicating whether or not the candidate meets the University standards for tenure or promotion in terms of the College's clarifications of those standards, and the appropriate department's applicable written discipline-specific clarifications of those standards as approved by the College.

b.        The individual faculty members making the assessment shall not be identified.

(6)        After reviewing each candidate's dossier, including the written assessments and recommendations of the department chair, members of the College Tenure and Promotion Committee shall meet with the dean to share their assessments.

(h)        Dean's Review and Recommendation.

(1)        After reviewing the candidate's dossier the dean shall submit an evaluative letter assessing the candidate's qualifications for tenure or promotion in terms of the University's criteria, the College's clarification of those criteria, and the department's written discipline-specific clarifications of those criteria and make a positive or a negative recommendation. The dean's letter shall explain or clarify such issues as exceptional assignments, unique contributions, or unusual assessments.

(2)      The dean shall enter the letter into the online promotion and tenure system, which will make it immediately available to the candidate and the chair.

(3)      The candidate shall have ten (10) days from receipt of the dean's letter to request a meeting with the dean or submit a written response.

(4)      The dean shall not forward the dossier until either the candidate submits a response, indicates in writing that he/she will not be making a response, or the ten (10) day period for responding expires, whichever occurs first. The dean must sign the nomination indicating endorsement or lack of endorsement for the nomination before it can be forwarded to the University Academic Personnel Board.

(i)      Review by the University Academic Personnel Board.

(1)      The Academic Personnel Board shall serve in a fact-finding and consultative role. It shall assess the candidate's dossier according to the criteria and report its assessment to the President or designee.

(2)      If there are questions about a dossier, the Academic Personnel Board shall notify electronically those affected.

(3)      The candidate's dossier shall be forwarded to the President or designee for consideration.

(j)      President's Review and Recommendation.

(1)      After reviewing the candidate's dossier and consulting with the Academic Personnel Board, the President or designee shall make a final determination regarding whether to nominate the candidate for tenure to the Board of Trustees.

(2)      After reviewing the candidate's dossier and consulting with the Academic Personnel Board, the President or designee shall make the final decision regarding whether to promote a candidate.

(3)      The President or designee shall notify the dean of a potential negative decision, who shall notify the department chair and the candidate not less than ten (l0) days before the President's or designee's official notification of the decision on tenure or promotion.

19.11   Tenure and/or Promotion Decisions.

(a)      Tenure. By the end of the tenure probationary period, a faculty member shall be awarded tenure, be given notice that further employment will not be offered pursuant to the non-renewal provisions of this Agreement, or resign. The Board of Trustees shall make the final decision to award tenure. Faculty members who withdraw from consideration during the last year of the probationary period will be non-renewed unless the chair concurs in a resignation.

(b)      Promotion. The President or designee shall make the final decision whether to promote a candidate, except for those in the Assistant In_____series, which shall be decided by the dean.

(c)      Faculty members being considered for tenure or promotion may withdraw from consideration provided that the withdrawal is made before the President's official notification

of the decision. Except for candidates in their final year of the probationary period, such withdrawal shall be without prejudice.

(d)      Tenure decisions shall normally be made at the June Trustees meeting, and tenure or promotion will be effective on July 1 for twelve (12)-month faculty members and at the beginning of the academic year for nine (9)- and ten (10)-month (academic-year) faculty members.

(e)      Decisions on tenure as a condition of employment shall normally be made at the Trustees meeting immediately following the acceptance of employment.

(f)      Explanation for denial. The faculty member shall be notified in writing, by the President or designee immediately, or as soon thereafter as possible, of the final action taken on the nomination for promotion. If the faculty member is denied promotion, the notice shall include an explanation of the reason(s) for the denial. This "explanation" shall be defined using the standard dictionary definition: "a statement or account that makes something clear."

(g)      Promotion and Tenure Materials and Discussions. All records reflecting evaluations of employee performance compiled for promotion and/or tenure, including records of any discussions of these evaluations, shall be regarded as "limited access records" (see FS 1012.91 Personnel records for reference) and shall be made known only to those individuals who are required to participate in making recommendations or making the decision unless otherwise required by law. All such discussions shall be considered confidential. If witness to a potential violation (whether a violation of a University regulation or policy, a CBA provision, state or federal law, or other violation), that individual shall not be subject to discipline for reporting potential violations to the appropriate body (including but not limited to HR, UFF, EEOC, ADA office). This language shall not be construed as a waiver of any bargaining unit member's right to grant access to their personnel records to a representative of their choosing (e.g., UFF, legal counsel).

**ARTICLE 20**
**SABBATICALS AND PROFESSIONAL DEVELOPMENT PROGRAMS**

20.1     Sabbaticals. The parties agree that research and development programs are intended to advance the abilities of faculty members and to strengthen the university as well. Such programs contribute significantly to the quality and success of research universities. Sabbaticals are granted to tenured faculty members to permit them to engage in intensive programs of research and/or study. Sabbaticals constitute a research assignment and are granted to faculty members to enable them to further their research or other creative activities, to improve teaching skills, to enhance the university's distinction and a faculty member's value to the university. Sabbaticals are granted in a process described in this Article.

20.2     Sabbatical Eligibility. Full-time tenured faculty members with at least six (6) years of full- time service at the University who have not taken a sabbatical within the last six (6) years are eligible for sabbaticals. A faculty member may apply for a sabbatical in the year prior to eligibility, provided that the faculty member is eligible when the sabbatical is taken.

20.3     Sabbatical Allocations.
        (a)       The University will allocate one hundred forty (140) semester units of sabbatical each fiscal year. The University will distribute this sabbatical allocation to each of the colleges in proportion to the number of eligible faculty. The University shall notify UFF at the same time as the colleges of the allocation of the sabbatical units.

        (b)       All applications shall be for a one (1)-semester sabbatical.

        (c)       In limited circumstances, a second sabbatical semester shall be awarded, from those allocated, for exceptional projects if approved by the dean.

        (d)       A candidate may make a separate case for an additional semester in the initial application by describing the specific value the additional semester of sabbatical research would add to the proposed project, and how it would benefit the department and the University.

        (e)       If there are additional available semester allocations after the one-semester sabbaticals have been awarded, recommended second-semester sabbaticals shall be awarded if approved by the dean.

20.4     Applications for sabbaticals shall be submitted to the faculty member's department chair by October 15. Final decisions shall be made by January 15. The application and description of sabbatical research shall include the following:
        (a)       applicant's name; applicant's department;

        (b)       number of years of full-time service at the University;

(c)      semester(s) that the sabbatical is requested for;

(d)      dates of previous sabbaticals, including any deferred sabbaticals;

(e)      a statement of no more than 750 words describing the planned activities, specific results anticipated from the sabbatical, and any anticipated income, particularly if the proposed research plan involves appointment at another academic institution.

20.5     Process for Review of Sabbatical Applications and Descriptions of Proposed Research Plan

(a)      The department chair or director shall make a recommendation on whether the university should award a proposed sabbatical. The chair or director shall also make a recommendation on an additional semester of sabbatical research for an exceptional project if they determine it adds sufficient value and benefit to the department and the University.

(b)      The college committee (described in Section 20.6 below) shall make a recommendation to the dean on whether the university should award a proposed sabbatical. If there are sabbatical allocations remaining after all one-semester sabbaticals are awarded, the committee shall also make a recommendation on an additional semester of sabbatical research for an exceptional project if they determine it adds sufficient value and benefit to the department and the University.

(c)      The dean may fund a proposed sabbatical, refer it back to the faculty member for re-submission, or deny. Before denying a proposed sabbatical that has been supported by both the chair and the college committee, the dean shall consult with the chair and the committee. The dean shall notify the faculty member in writing of the denial for the sabbatical, with reasons.

(d)      A faculty member denied a sabbatical is free to submit a new application the following year.

(e)      Any College allocation not used because a dean denied a proposal shall be added to the following year, unless otherwise allocated.

(f)      If there are more recommended sabbaticals than available allocations, those individuals with the most years of service since a previous sabbatical shall be granted the sabbatical. In the event that the seniority provision requires a decision between those with identical seniority, the college committee shall rank order only those applications.

(g)      At its discretion, the University may award more than one hundred forty (140) semester units in a given year.

20.6     College Committees on Sabbaticals. Each College shall have a sabbatical committee elected by and from the fulltime tenured faculty members in the College. Its primary

responsibility is to assess whether proposed research plans meet the standards.

20.7    Terms and conditions of sabbaticals. The following terms and conditions apply:

(a)    A faculty member and the University may agree to a different schedule than the traditional one (1)- or two (2)-semester sabbatical during a single academic year. Included options are sabbaticals spread over two (2) academic years or a sabbatical at half pay. A one (1)- semester sabbatical, for example, may be at half pay, spread over two (2) semesters.

(b)    A faculty member must notify the chair and the dean by January 31 that the faculty member accepts or declines the awarded sabbatical. The faculty member may re-submit at a later time without prejudice.

(c)    A sabbatical may be postponed for a semester or a year, either at the request of the faculty member or by the University. The period of postponement shall be credited for eligibility for a subsequent sabbatical.

(1)    Staffing problems may, on occasion, require the University to postpone an awarded sabbatical. In such instances the faculty member will be provided with his/her sabbatical the following semester or year, or another time agreed to by the faculty member and the University.

(2)    When a faculty member requests the postponement, the faculty member does not reapply but simply takes the sabbatical at a time approved by the chair and dean.

(d)    A faculty member compensated through a contract or grant may receive a sabbatical if the contract or grant allows such and the faculty member meets all other eligibility requirements.

(e)    A faculty member must return to the University for at least one (1) academic year following the completed sabbatical. Return to the University of salary received during the sabbatical is required if the faculty member fails to meet this obligation. The University may waive this requirement.

(f)    Contributions to retirement shall be continued on a basis proportional to the salary received.

(g)    Contributions made to employee insurance programs and any other employee benefit programs shall be continued during the sabbatical.

(h)    While on sabbatical, a faculty member shall be permitted to receive funds for travel and living expenses, and other sabbatical-related expenses from sources other than the University such as fellowships, grants-in-aid, and contracts and grants, to assist in accomplishing the purposes of the sabbatical. Receipt of funds for such purposes shall not result in reduction of the faculty member's University salary.

(i)      Grants for such financial assistance from other sources may or may not be administered through the University.

(j)      If financial assistance is received in the form of salary, the University salary shall normally be reduced by the amount necessary to bring the total income of the sabbatical period to a level comparable to the faculty member's current year salary rate. In certain instances, the University may waive this requirement because of special costs associated with the sabbatical.

(k)      Employment unrelated to the purpose of the sabbatical is governed by the provisions of ARTICLE 26, OUTSIDE ACTIVITY AND CONFLICT OF INTEREST.

(l)      Upon completion of the sabbatical, a faculty member shall provide the University with a written report addressing the results of the sabbatical. Accruing eligibility for a future sabbatical will not begin until appropriate report has been submitted.

20.7     Professional Development Program.   The University will provide professional development awards for those not eligible for sabbaticals. Such awards are for professional renewal, study, formal education, certification, research, teaching improvement, or other experiences of professional value.

20.8     Professional Development Program Eligibility. Full-time faculty members with six (6) or more years of service at the University shall be eligible for the professional development program, except those members who are serving in tenure-accruing or tenured positions. All PKY faculty members are included in this group. Once eligible, faculty members may receive a professional development award once every six (6) years of fulltime service.

20.9     Each year, the University shall make available awards for one (1) semester at full pay or a mutually acceptable alternative for each twenty (20) eligible faculty members, subject to the eligibility, application, and selection criteria set forth in this Article. Professional Development Awards shall be divided among the colleges according to their proportion of eligible faculty.

20.10    Professional development assignments normally are one (1) semester in length, but individuals may propose alternative approaches (a summer stipend, support for other professional development activities that do not fit a standard semester schedule, internship support).

20.11    Applications for the professional development program shall be submitted to the faculty member's department chair by October 15. Final decisions shall be made by January 15. Each application shall include the following:

(a)      applicant's name; applicant's department;

(b)      semester(s) that the award is requested for; dates of previous awards;

(c)      a statement of no more than 750 words describing the planned activities, specific results anticipated, and any anticipated income.

20.12   Process for Review of Proposals.
(a)      The department chair shall make a recommendation on whether the university should support the proposal.

(b)      The college committee (described in 20.14 below) shall make its recommendations on whether the university should grant the award.

(c)      The dean will make decisions on which proposals to approve and which to deny.

(d)      A faculty member denied for whatever reason is free to submit a new proposal the following year.

20.13    Terms and conditions. The terms and conditions for the professional development programs shall be the same as for sabbaticals as specified in Section 20.7.

20.14    College Committees on Professional Development Program. Each college shall have professional development program committee elected by and from the fulltime faculty members in the College. Its primary responsibility is to make recommendations on proposals. A college may have a single committee for both sabbaticals and professional development leaves, provided that in considering professional development leaves there are members from that employee group.

20.15   Study Leave for those not tenured or in tenure-accruing positions.
(a)      Job-Required. A faculty member required to take academic course work as part of assigned duties shall not be required to charge time spent attending classes during the work day to accrued leave.

(b)      Job-Related. A faculty member may, at the discretion of the University, be permitted to attend up to six (6) credits of course work per semester during work, provided that:
(1)      That the absence will not interfere with the proper operation of the work unit.
(2)      The course work would improve the productivity of the department; and
(3)      The faculty member's work schedule can be adjusted to accommodate such job-related study without reduction in the total number of work hours required per pay period, or the faculty member uses accrued leave or takes approved leave without pay for the hours of absence.

20.16    Annual Report. Not later than April 30 of each year, the University shall provide a report, by college, of the sabbatical and professional development program results. The report

shall include the following information (separated into sabbaticals and professional development awards):

    (a)   Number of faculty members eligible;

    (b)   Number of applications;

    (c)   Number of one (1)- and two (2)- semester sabbaticals awarded;

    (d)   Number accepted;

    (e)   Number accepted but deferred; and

    (f)   Number recommended by faculty committee and chair and denied by dean.

**ARTICLE 21**
**OTHER LEAVES**

21.1    Policy.
        (a)    Faculty members will have legitimate reasons to take leave and shall not be penalized or disadvantaged for having taken leave.
                (1)    The duration of a leave may vary from a few hours to a year or more (if extended by the University).
                (2)    Leaves may be with pay or without pay or a combination of the two through the intermittent use of accrued leave.
                (3)    Leaves include paid time off , approved worker's compensation leave, FMLA qualifying leave, and service-related disability leave. They may be taken as needed but must be reported to and, where applicable, approved by the appropriate supervisor and entered as leave into the time reporting system.

        (b)    Retirement and Contributions and Credits During Paid Leaves.
                (1)    Contributions to the faculty member's retirement programs shall be continued on a basis proportional to the University salary received during paid leaves.
                (2)    During an approved leave of absence for parental, medical (including family medical), or military reasons, an employee may use accrued leave in order to continue the contributions to employee benefits and other payroll-deducted expenses.
                (3)    Faculty members who participate in the Florida Retirement System shall have full-month service credit during the months they are in pay status.

        (c)    Employer Contributions to Benefit Plans. Contributions made by the University to the employee insurance programs and other employee benefits shall be continued during paid leaves.

        (d)    No faculty member on paid leave may be employed simultaneously by another employer unless the faculty member complies with requirements in State law and this Agreement for extra compensation, outside employment/activities, and conflict of interest.

        (e)    All other leaves are granted at the discretion of the appropriate administrator. However, permission shall not be unreasonably withheld.

21.2    Holidays.
        (a)    A faculty member shall be entitled to observe all official holidays designated in accordance with University regulations.

        (b)    Faculty members shall also be entitled to use accrued paid time off or unpaid leave to observe the religious holidays of their respective faiths.

(c)      A faculty member required to perform duties on holidays shall have the faculty member's schedule adjusted to provide equivalent time off, up to a maximum of eight (8) hours for each holiday worked.

(d)      If a faculty member who has performed duties on a holiday terminates employment prior to being given time off, the faculty member shall be paid, upon termination, for the holiday hours worked within the previous twelve (12) month period at the faculty member's last regular pay rate.

21.3      Requests for a Leave or Extension of Leave of One (1) Semester or More.
(a)      For a leave of one (1) semester or more, a faculty member shall make a written request. The request shall be made not less than one hundred twenty (120) days prior to the beginning of the proposed leave, or in the case of twelve-month faculty, six (6) months prior to the date the leave is requested.

(b)      For an extension of a leave of one (1) semester or more, a faculty member shall make a written request not less than sixty (60) days before the end of the leave.

(c)      The University shall approve or deny such request in writing not later than thirty (30) days after receipt of the request.

21.4      Accrual during Leave with Pay.
(a)      Faculty members on sabbatical or professional development leaves shall accrue normal leave credits.

(b)      In all other instances, faculty members on paid leave shall accrue leave in proportion to the pay status.

(c)      Accrued leave shall be credited on the last day of each pay period.

21.5      Return from Leave.
(a)      A faculty member who returns from an approved leave of absence shall be returned to the same or equivalent position in the same class and work location, including the same shift or equivalent schedule, unless the University and the faculty member agree in writing to other terms and conditions.

(b)      The salary of the faculty member shall be adjusted to reflect all non-discretionary increases distributed during the period of leave.

21.6      Family and Medical Leave Entitlements.
(a)      The Family and Medical Leave Act of 1993 is a federal law designed to provide protected leave to eligible employees when leave is required due to qualifying events or conditions for either themselves or an immediate family member.

(1)    Definitions. An "immediate family member" shall be defined as a faculty member's spouse, domestic partner, great-grandparent, grandparent, parent, brother, sister, child, grandchild, great-grandchild, or the great-grandparent, grandparent, parent, brother, sister, child, grandchild, or great-grandchild, of the faculty member's spouse or domestic partner, or the spouse or domestic partner of any of them. An "immediate family member" shall also include an individual for whom the faculty member, domestic partner, or spouse is the current legal guardian or holds medical power-of-attorney, or other dependent or relative who lives in the faculty member's household. A "parent" shall be defined as the biological, adoptive, step or foster parent of a faculty member or an individual who stood in loco parentis to a faculty member when the faculty member was a child. A "child" shall be defined as a biological, adopted, or foster child, a stepchild, a legal ward, or a child of a person standing in loco parentis. The term "seriously ill" or "serious health condition" shall be defined as an injury, impairment, or physical or mental condition that involves inpatient care in a hospital, hospice, or residential medical care facility; or continuing treatment by a health care provider.

(b)    The University complies with the federally mandated Family Medical Leave Act of 1993 enacted by the Department of Labor, which is referenced in Regulation 1.201 and the University FMLA policy.

(c)    If any provision of Section 21.6 is inconsistent with or in contravention of the Family Medical Leave Act of 1993 then such provision shall be superseded by the laws or regulations referenced above, except to the extent that the collective bargaining agreement or any employee benefit program or plan provides greater family, parental, or medical leave rights to an eligible faculty member.

21.7    Parental Leave.

(a)    A faculty member shall be granted a parental leave not to exceed six (6) months when the faculty member becomes a biological parent or a child is placed in the faculty member's home pending adoption, or the faculty member otherwise has significant care responsibilities for a newborn, a newly adopted child, or a child received into a licensed family foster home or any other situation in which a faculty member, domestic partner, or spouse becomes a legal guardian.

(b)    Paid Parental Leave Program. Effective January 1, 2021, a faculty member shall be provided with up to eight (8) weeks of paid parental leave for the birth or adoption of a child or the initial placement of a child in the foster care of the employee. Employees may also use their personal accrued leave, unpaid leave, or a combination of paid and unpaid leave so long as the total parental leave period, including the paid parental leave does not exceed a total of six (6) calendar months. For faculty within their first twelve (12) months of employment, they may use up to 8 weeks of additional advanced leave if they have fewer than 320 hours of accrued paid time off. Faculty are immediately eligible for these paid parental leave benefits. They must be used within twelve (12) months of the birth or placement of a child and can only be used once every twenty-four (24) months. Faculty who have an advanced leave balance

associated with the previous parental leave policy will have the remainder of their advanced leave balance forgiven.

(c)     The period of parental leave shall be determined by the faculty member in consultation with the University. Upon approval by the University, the dates and other conditions of the leave shall be provided to the faculty member in writing.

(d)     At the end of the approved parental leave, a faculty member may request a part-time leave for one (1) year. The University shall grant such request, unless it determines that granting such leave would be inconsistent with the best interests of the University. If a faculty member plans to use a combination of accrued paid leave and unpaid leave, such request shall include the specific periods for each type of leave requested.

(e)     Any illness caused or contributed to by pregnancy shall be treated as a temporary disability, and the faculty member shall be allowed to use accrued paid time off or medical leave account time when such temporary disability is certified by a health care provider.

(f)     During the terms of this agreement, either party may elect to re-open article 21.7(b) for negotiations.

21.8     Leaves Due to Illness or Injury. Illness or injury is defined as any physical or mental impairment of health, including such an impairment proximately resulting from pregnancy, which does not allow a faculty member to fully and properly perform the duties of the faculty member position. When a faculty member's illness or injury may be covered by the Americans with Disabilities Act, the provisions of Public Law 101-336 shall apply.

21.9     Paid Time Off (PTO). PTO is provided to leave accruing faculty to help balance work and personal life. PTO must be accrued before being taken.

(a)     Accrual of Paid Time Off (PTO)

(1)     A full-time 10 and 12-month faculty member shall accrue ten (10) hours of PTO for each biweekly pay period, or the number of hours directly proportionate to the number of days worked during less than a full-pay period. A maximum of 480 PTO hours may be accrued. Any hours in excess of 480 shall be transferred to the employee's medical leave account bi-weekly. A part-time 10 and 12-month faculty member shall accrue PTO at a rate directly proportionate to their FTE.

(2)     A full-time 9-month faculty member and P.K. Yonge Developmental Research School faculty member shall accrue four (4) hours of PTO for each biweekly pay period, or the number of hours directly proportionate to the number of days worked during less than a full-pay period. A maximum of 480 PTO hours may be accrued. Any hours in excess of 480 shall be transferred to the employee's medical leave account bi-weekly. A part-time 9-month faculty member and P.K. Yonge Developmental Research School faculty member shall accrue PTO at a rate directly proportionate to their FTE.

(3)      PTO leave-accruing faculty must accurately reflect hours worked and type of leave used. Employees must report all leave used, to include leave without pay, within the pay period in which the leave was used. If an employee is not able to report time within the pay period in which the leave is used, the leave must be reported before the end of the following pay period.

(b)      Types of Paid Time Off (PTO).

(1)      Planned PTO is scheduled leave that is taken after approval is received from the employee's immediate supervisor.

(2)      Unplanned PTO is unscheduled or unexpected leave that is not pre-approved.

(c)      A continuous period of PTO commences with the first day of absence and includes all subsequent days until the faculty member returns to work. Saturdays, Sundays, and official holidays observed by the State shall not be counted unless the faculty member is scheduled to perform services on such days. During any seven (7) day period, the maximum number of days of PTO charged against any faculty member shall be five (5).

(d)      Certification. Employees may be required to submit documentation from a health care provider:

(1)      For four (4) or more consecutive unplanned workdays.

(2)      When employees call in sick after they have requested and been denied Planned PTO.

(3)      When a pattern of absences is documented and the faculty member is absent without the supervisor's knowledge or approval.

(e)      Transfer of Credits.

(1)      The University maintains reciprocal arrangements with certain universities and state agencies that permit new faculty members to transfer up to 80 hours of paid time off. Such election shall be made within thirty-one (31) days of employment.

(f)      Payment for Unused Paid Time Off (PTO).

(1)      Upon termination from a 10 and 12-month faculty position, the University shall pay the faculty member for up to a lifetime maximum of three hundred fifty-two (352) hours of unused paid time off at the calendar-year rate the faculty member was accruing as of the faculty member's last day of work.

(2)      Upon entering into the Deferred Retirement Optional Program (DROP), available to faculty enrolled in the State of Florida Pension Plan, a 10 and 12-month faculty member may elect to be paid up to the maximum payment allowed for the faculty member's unused paid time off. Such payment, along with any additional payment to be received upon separating from the University (end of DROP), shall not exceed the maximum payment associated with the faculty member's established pay plan upon entering DROP.

(3)      Upon layoff, a 10 and 12-month faculty member shall be paid for up to three hundred fifty- two (352) hours of unused paid time off. For faculty members who are re-

employed by the University within three hundred sixty-five (365) days after a formal layoff, all unused vacation leave PTO shall be restored to the faculty member, provided the faculty member requests such action in writing and repays the full amount of any leave payment received at the time of layoff.

(4)     In the event of the death of a 10 and 12-month faculty member, payment for all unused PTO at the time of death shall be made to the faculty member's estate.

21.10   Medical Leave Account. The medical leave account is designed to provide employees with access to leave for extended use in the event of a serious medical condition as defined by the Family Medical Leave Act of 1993.

(a)     Effective January 1, 2021, all hours currently in the employee's sick leave account will be converted to the medical leave account with the exception of eighty (80) hours which will be transferred into the employee's paid time off account.

(b)     Uses of Medical Leave Account:

(1)     Subsequent time away from work following the eight (8) weeks of parental leave, up to a total away of six (6) months.

(2)     To care for employee's own serious medical condition or the serious medical condition of an immediate family member.

(c)     Medical Certification. Medical certification from a health care provider will be required if an employee is accessing their medical leave account for their own serious medical condition or the serious medical condition of an immediate family member. The University reserves the right to request a second opinion from a healthcare provider if there is reason to doubt the validity of the medical certification.

(d)     Payment for Unused Medical Leave Account Time.

(1)     Upon separation, a faculty member with ten (10) or more years of creditable service who was hired prior to April 1, 2010, shall be paid for one-fourth of unused medical leave account time up to a total of four hundred eighty (480) hours. A faculty member hired on or after April 1, 2010, shall not be paid for any unused medical leave account time upon separation and such leave shall be forfeited.

(2)     Upon layoff, a faculty member with ten (10) or more years of State service who was hired prior to April 1, 2010, shall be paid for unused medical leave account time as described above. For a faculty member who is re-employed by the university in a leave-accruing position within three hundred sixty- five (365) days following layoff, all unused medical leave account time shall be restored to the faculty member, provided the faculty member requests such action in writing and repays the full amount of any lump sum leave payments received at the time of layoff.

(3)     All payments for unused medical leave account time shall be made in lump sum and shall not be used in determining the average final compensation of a faculty member in any State administered retirement system. A faculty member shall not be carried on the payroll beyond the last official day of employment.

(4)     In the event of the death of a faculty member with ten (10) or more years of State service who was hired prior to April 1, 2010, one-fourth of unused medical leave account time up to a total of four hundred eighty (480) hours shall be paid to the faculty member's estate.

21.11     Other Types of Medical Leaves.

(a)     Additional Medical Leave. Up to six (6) months of leave may be granted to an eligible faculty member for the faculty member's serious personal health condition or when the faculty member needs to care for an immediate family member with a serious health condition as defined by the FMLA. Medical certification must be provided.

(1)     Paid Medical Leave. After 12 months of continuous service, a faculty member is eligible for eight (8) weeks of paid medical leave. Prior to accessing the paid medical leave, the faculty member must first use eighty (80) hours of PTO. This leave may be used in one-week increments and is available once every twenty-four (24) months.

a.     During the terms of this agreement, either party may elect to re-open article 21.11(a) for negotiations.

(2)     The faculty member shall use accrued paid leave during any additional medical leave. Thereafter, the medical leave shall be unpaid leave. This leave may be extended up to one (1) year for extenuating circumstances.

(b)     Workplace Injury Leave under the Workers' Compensation Law. Workplace injury leave is a benefit available to leave-accruing employees only and shall be used to compensate these employees for a portion of their wages lost due to work-related illnesses or injuries compensable under Florida's Workers Compensation Law. Faculty members will be provided with the same benefits as other employees. Employees who are unable to work due to compensable workers' compensation injuries and are receiving salary indemnification benefits shall not be eligible for holiday pay or accrual of special compensatory leave.

(c)     Compulsory Medical Leave.

(1)     Placing Faculty Member on Compulsory Medical Leave.

a.     If a faculty member is unable to perform assigned duties due to illness or injury, medical certification may be required to affirm the faculty member's ability to carry out one or more of the essential functions of the job within the meaning of the Americans with Disabilities Act (ADA). The health care provider may be chosen and paid by the University or chosen and paid by the faculty member as long as such provider is acceptable to the University. If the University agrees to accept the faculty member's choice of a health care provider, it may not then require another University-paid examination.

b.     The health care provider shall submit to the University the appropriate medical certification(s).

c.     If the medical examination confirms that the faculty member is unable to perform assigned duties, the University shall place the faculty member on compulsory medical leave.

(2)     Conditions of Compulsory Medical Leave.

a.       Written notification to the faculty member placing the faculty member on compulsory medical leave shall include the duration of the compulsory leave period and the conditions under which the faculty member may return to work. These conditions may include the requirement of the successful completion of, or participation in, an appropriate program of rehabilitation or treatment, and follow-up medical certification(s) by the health care provider, as appropriate.

b.       The compulsory medical leave period may be paid leave or unpaid leave.

c.       Unless agreed otherwise, the University shall return the faculty member to same or equivalent position in the same classification and work location, including to the faculty member's previous duties, if possible, or to equivalent duties, upon completion of the approved leave period and upon receipt of a current medical certification that the faculty member is able to perform assigned duties.

(3)       Duration. Compulsory leave shall be for a period not to exceed the duration of the illness or injury or one (1) year, whichever is less.

(4)       Failure to Complete Conditions of Compulsory Leave or Inability to Return to Work. If the faculty member fails to fulfill the terms and conditions of a compulsory leave and/or is unable to return to work and perform appropriate assigned duties at the end of a leave period, the University shall advise the faculty member, as appropriate, of the Florida Retirement System's disability provisions and application process, and may, based upon the University's needs:

a.       offer the faculty member part-time employment or modified duties;

b.       place the faculty member in unpaid leave status in accordance with Section 21.12 or extend such status; or

c.       release the faculty member from employment, notwithstanding any other provisions of this Agreement.


21.12     Administrative Leaves. Faculty members provided paid administrative leave shall not exceed forty (40) hours during the work week. Administrative leave shall not be accrued and shall also not affect accrued leave balances.

(a)       Jury Duty and Court Appearances.

(1)       A faculty member who is summoned as a member of a jury panel or subpoenaed as a witness in a matter not involving the faculty member's personal interests, shall be granted leave with pay and any jury or witness fees shall be retained by the faculty member; leave granted hereunder shall not affect a faculty member's PTO balance.

(2)       An appearance as an expert witness for which a faculty member receives professional compensation falls under ARTICLE 26, OUTSIDE ACTIVITY AND CONFLICT OF INTEREST, relative to outside employment and conflict of interest. Such an appearance may necessitate the faculty member requesting PTO or may necessitate the faculty member seeking an adjustment of the work schedule.

(3)       If a faculty member is required, as a direct result of the faculty member's employment, to appear as an official witness to testify in the course of any action as defined in

83

Section 92.142(2), Florida Statutes, such duty shall be considered a part of the faculty member's job assignment, and the faculty member shall be paid per diem and travel expenses.

(4)     A faculty member involved in personal litigation during work hours must request PTO or must seek an adjustment to the work schedule.

(b)     Leave Pending Investigation. The Office of Human Resource Services in conjunction with the Office of the Provost may place a faculty member on leave pending investigation when there is reason to believe that a faculty member's actions or presence on the job would adversely affect the orderly conduct and processes of the University and/or jeopardize the safety or welfare of the faculty member, colleagues, other employees or students. The leave pending investigation shall commence when the faculty member is provided with a written notice. The leave shall be with pay, with no reduction of accrued leave.

(c)     Leaves for military service, Florida Disaster Volunteer, Civil disorder or disaster, disabled veterans, athletic competition and Official Emergency Closings shall be in accordance with University of Florida regulations and policies and federal and state law.

21.13    Personal Leave.

(a)     P.K. Yonge Faculty Members. A faculty member employed at the P.K. Yonge Developmental Research School may be granted five (5) days (non-cumulative) of leave per year for emergencies or for other personal reasons.

(1)     Except in the case of emergency, the faculty member shall provide at least two (2) days' notice of the intended leave.

(2)     Faculty members shall not be required to give reasons for personal leave except that the leave is for personal reasons.

(3)     One (1) day shall be administrative leave and four (4) days shall be taken from PTO.

(4)     If a faculty member requests personal leave on a day immediately preceding or following a holiday or vacation period, they must request leave at least ten (10) days in advance.

a.     Administration will determine if coverage is available for a requested leave date immediately preceding or following a holiday or vacation period.

b.     If the day preceding or following a holiday or vacation period is categorized as a Teacher Workday, faculty may submit a request to use a personal leave day pending approval from administration. If a leave day is used during a Teacher Workday, faculty are expected to meet the published deadlines for grade entry and parent conferences.

(b)     Twelve-month Faculty Members. Faculty members who are normally employed under fully scheduled workdays shall earn four (4) personal leave days in proportion to their FTEs per fiscal year in addition to the University holidays.

(1)     Such personal leave days shall be credited to eligible faculty members on December 1 of each year.

(2)     Personal leave days must be taken in full-day increments (that is, as an 8-hour day for full-time faculty members, as a 4-hour day for .50 FTE faculty members) on business days between the dates December 26 and December 31, inclusive.

(3)     Essential personnel who are required to work between December 26 and December 31 shall have their schedules adjusted to provide equivalent paid leave time within December 2 and June 30 of the current fiscal year based on departmental need.

(4)     Cash payment is not provided for unused personal leave days. Any unused personal leave days expire at the end of each fiscal year.

21.14    Unpaid Leave.

(a)     Granting. Upon request of a faculty member by completing the Extended Leave of Absence form, the University shall grant a leave without pay for a period not to exceed one (1) year unless the University determines that granting such leave would be inconsistent with the best interests of the University. Such leave may be extended upon mutual agreement.

(b)     Retirement Credit. Retirement credit for such periods of unpaid leave shall be governed by the rules and regulations of the Division of Retirement and the provisions of Chapter 121, Florida Statutes.

(c)     Accrual of Leave and Holiday Pay. While on unpaid leave, the faculty member shall retain accumulated PTO, but shall not accrue PTO nor be entitled to holiday pay.

(d)     Benefit Premiums. Faculty members on unpaid leave will be responsible for the delivery of the entire cost of the employee portion of benefit premiums to the vendors unless they use accrued paid leave as provided in subsection 21.14(e) below.

(e)     A faculty member may combine unpaid and paid leave as follows:

(1)     Notwithstanding the provisions of Section 21.9 regarding the use of PTO, a faculty member may use any type of accrued paid leave in an amount necessary to cover the faculty member's contribution to the State insurance program, other UF-sponsored insurance programs, and for other expenses.

(2)     Normally the use of accrued paid leave during a period of unpaid leave for medical reasons shall be approved for up to six (6) months, but may be approved for up to one (1) year for the serious health condition of the faculty member or a member of the faculty member's immediate family.

(3)     The employer contribution to the State insurance program shall continue for the corresponding payroll periods.

(4)     A faculty member's request for the use of accrued paid leave during a period of unpaid leave shall be made at the time of the faculty member request for the leave. Such request shall include the amount of accrued paid leave the faculty member wishes to use during the approved period of unpaid leave. If circumstances arise during the approved leave that causes the faculty member to reconsider the combination of leave with and without pay, the faculty member may request approval of revisions to the original approval.

(f)     Salary Adjustment. While on such leave, a faculty member shall also be eligible to participate in any special salary incentive programs. The salary of a faculty member returning from unpaid leave shall be adjusted to reflect all non-discretionary increases distributed during the period of leave as well as any increases earned from salary incentive programs.

21.15   Compensatory Leave. Regular compensatory leave shall not be transferred to an employee transferring to a faculty position. As a result, each supervisor shall make a reasonable effort, whenever practical, to allow an employee to use regular compensatory leave credits as requested before that employee transfers to a faculty position.

**ARTICLE 22**
**INTELLECTUAL PROPERTY**

22.1    Definitions. The following definitions shall apply in ARTICLE 22:
　　　　(a)    "Intellectual property" means any work or invention.

　　　　(b)    "Faculty member" or "creator" means a member of the bargaining unit who creates a work or invention. "Creator" shall also mean other University personnel who create a work or invention.

　　　　(c)    A "work" means any copyrightable material, that is, any material fixed in a tangible medium of expression from which it can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Such copyrightable material includes, but is not limited to, such things as printed material, computer software or databases, audio and visual material, circuit diagrams, architectural and engineering drawings, lectures, musical or dramatic compositions, choreographic works, pictorial or graphic works, and sculptural works. Instructional material, as defined in Section 22.1(f), below, is included in the definition of a "work." A "work" does not include any patentable material, which patentable material is encompassed within the definition of an "invention" in Section 22.1(d), below.

　　　　(d)    An "invention" means any discovery, invention, process, composition of matter, article of manufacture, design, model, technological development, biological material, strain, variety, culture of any organism, or portion, modification, translation, or extension of these items, and any mark and/or directly related know-how used in connection with these items. It includes, but is not limited to, such things as new or improved devices, systems, circuits, chemical compounds, or mixtures and directly related know-how.

　　　　(e)    "Instructional technology," as used in this Article, means the form of an "invention" that is substantially new technology and is used to deliver instructional material, as distinct from the application of existing technology to deliver such instructional material.

　　　　(f)    "Instructional material," as used in this Article, means the form of a "work" (i.e., copyrightable) that includes materials delivered through the use of existing or new technology such as video and audio recordings, motion pictures, film strips, photographic and other similar visual materials, live video and audio transmissions, computer programs, computer-assisted instructional course work, programmed instructional materials, three-dimensional materials and exhibits, web pages, and combinations of the above materials that are prepared or produced in whole or in part by a faculty member and that are used to assist or enhance instruction.

　　　　(g)    "Independent efforts" with regard to a work means that the ideas for the work came from the faculty member and the work was not made with the use of University support. The University is not liable for any opinions expressed in such works.

(h)      "University support" means the use of University funds or more than the incidental use of University personnel, facilities, equipment, materials, or technological information in the creation of a work or invention and includes such support provided by outside sponsors when it is arranged, administered, or controlled by the University.

(i)      "Distance learning" means learning in a course that is rarely or never conducted with the instructor and the student in the same general physical space simultaneously.

(j)      "Gross revenue" means (1) proceeds from the sale, lease, transfer, or other conveyance of any interest in an invention or work owned by the University and (2) license issue fees, option fees, running royalties, minimum royalties, equity and other ownership interests, and any other remuneration paid to the University by a licensee of an invention or work, except that such equity or other ownership interests, or portion thereof, shall not be considered "gross revenue" unless and until the equity or other ownership interests, or portion thereof, are sold or liquidated by the University.

(k)      "Development expenses" means all monies paid by the University and UFRF for goods and services to protect, develop, and/or enhance the marketability or any other aspect of a work or invention, including, but not limited to, patent-filing fees, intellectual property protection and patent enforcement and defense expenses, marketing expenses, patent maintenance, consulting fees, prosecution expenses, expenses incurred in dealing with equity and other ownership interests, travel, attorneys' fees, commercialization expenses, and research costs. Not included as development expenses are salaries and general operating expenses of University administrative personnel.

(l)      "Net adjusted income" means gross revenues less any foreseeable development expenses University deems necessary to defend or maintain a work or invention and its improvements.

(m)      "Program" means the specific University research program within which an invention or work was developed.

(n)      "Office of Technology Licensing" or "OTL" means the designee responsible for all matters relating to patents, trademarks, and copyrights as related to the identification, protection, and commercialization of works and inventions owned by the University.

(o)      "UFRF" means the University of Florida Research Foundation, Inc., a direct support, not-for-profit organization authorized by the Trustees to promote, encourage and provide assistance to the research activities of University faculty, staff, and students, primarily through the facilitation of technology transfer.

(p)      "Sponsored agreement" means any award from an outside sponsor to support

research or any other University activity, whether such support is through a grant, contract, cooperative agreement, or any other means.

22.2    Policy.

(a)    Statement of Principles. Research is undertaken to create new knowledge, to stimulate a spirit of inquiry, to solve problems, and to educate students. Adequate recognition of and incentive to potential inventors through the sharing of the financial benefits resulting from the transfer and development of patentable inventions and other marketable forms of intellectual property encourages the creation of such intellectual property and serves the public interest. The research and teaching missions of the University always take precedence over patent considerations. While the University recognizes the benefits of patent development, it is most important that the direction of University research not be established or unduly influenced by patent considerations or personal financial interests.

(b)    Authority and Responsibilities. Section 1004.23, Florida Statutes, and the Board of Governors' delegation to the University of Florida Board of Trustees, authorizes the University to establish regulations and procedures regarding the works and inventions of its personnel, including regulations and procedures regarding patents, copyrights, and trademarks. The University has the authority to agree to the terms of this Article, and any regulations and procedures applied to in-unit faculty shall be consistent with the terms of this Article.

(c)    Faculty Authority and Responsibilities. Intellectual property created, made, or originated by a faculty member shall be governed by the terms of this Agreement, including but not limited to this Article and ARTICLE 26, OUTSIDE ACTIVITY AND CONFLICT OF INTEREST. The faculty member shall also be governed by the University implementing procedures concerning works and inventions of University personnel unless the procedure is inconsistent with the terms of this Agreement.

(d)    When a faculty member is acting in the capacity of Principal Investigator of a research project, the faculty member shall be granted the right, within the conditions set forth in this Article and in any applicable sponsored agreement and federal and state laws and regulations and with the proper administrative approval, to raise resources from sponsors, shall be responsible for properly utilizing the resources obtained from the sponsors, and for executing the sponsored research.

22.3    Rights to Working Papers. Except as otherwise required by the Florida Sunshine Law and other applicable federal and state laws, federal and state regulations, or the terms of any applicable sponsored agreements, faculty members shall have the right to control of their personal correspondence, notes, unpublished drafts, and other working papers.

22.4    Works.

(a)    Faculty Exclusive Ownership Rights.

(1)    A work made in the course of independent efforts is the property of the faculty member, who has the right to determine the disposition of such work and the revenue

derived from such work.

(2)        In accordance with academic tradition, and unless required by federal and state laws, federal and state regulations, or the terms of any applicable sponsored agreements, the University shall not assert rights to the following works:

a.        Scholarly or artistic works, regardless of their form of expression, for which the intended purpose is to disseminate the results of academic research, scholarly study, or artistic expression, such as books, monographs, articles, bibliographies, poems, novels, dramatic works, pictorial or sculptural works, films, videotapes, musical compositions, or other scholarly or artistic expressions in any medium;

b.        Instructional material, except if the University either (1) expressly commissioned the faculty member in writing to produce, or participate in the production of, the work with University funds for a specific University purpose; or (2) expressly assigned the faculty member in writing to produce, or participate in the production, of the work. The University may grant a non-exclusive license to the faculty member who is the author of instructional materials for the use of that portion of the materials. The non-exclusive license must be negotiated as set forth in writing and must be limited to noncommercial educational uses. That such a license is not granted shall not be deemed a violation of this Collective Bargaining Agreement.

c.        Works made without University support, as defined in Section 22.1(h), above. If the terms of a sponsored agreement or applicable federal and state laws and federal and state regulations require publication of articles in specified ways or in specified places, the terms of this subsection 22.4(a)(2) shall not be construed to relieve the faculty member of these publication obligations.

(b)        Works Owned by the University. The following works are owned by the University. The faculty member shall share in the proceeds from such works, pursuant to Section 22.7(a):

(1)        Instructional material if the University has either (a) expressly commissioned the faculty member in writing to produce, or participate in the production of, the work with University funds for a specific University purpose; or (b) expressly assigned the faculty member in writing to produce, or participate in the production of, the work. The creation, use, and revision of such works shall be governed by Section 22.4(f).

(2)        Works whose authorship cannot be attributed to one or a discrete number of authors but rather result from simultaneous or sequential contributions over time by multiple faculty, staff, and/or students, such as software tools developed and improved over time by multiple faculty, staff, and/or students. However, the mere fact that multiple individuals have contributed to the creation of a work shall not cause the work to become a work owned by the University.

(3)        Any other works made with University support, as defined in Section 22.1(h), above.

(c)        Disclosure. Upon the creation of a work and prior to any publication, the faculty member shall disclose to the Office of Technology Licensing any work that was made in the course of University-supported efforts, together with an outline of the project and the

conditions under which it was done. However, consistent with the provisions of Section 22.4(a)(2), faculty members need not disclose works referenced in subsections 22.4(a)(2)a–22.4(a)(2)c, immediately below, unless the work raises a possible conflict of interest pursuant to ARTICLE 26:

   (1) Books, monographs, articles, bibliographies, poems, novels, dramatic works, pictorial or sculptural works, films, videotapes, musical compositions, or other scholarly or artistic expressions in any medium; and similar works, the intended purpose of which is to disseminate the results of academic research or scholarly work;

   (2) Instructional material except for works described in Section 22.4(b)(1); or

   (3) Works made without University support, as defined in Section 22.1(h), above.

   (4) Exception: Even if a work is not required to be disclosed under this Article, the work must still be disclosed pursuant to ARTICLE 26 if its production, dissemination, or use raises a possible conflict of interest.

  (d) Review. The Office of Technology Licensing shall assess the relative equities of the faculty member and the University in the work. If the University wishes to assert its interest in the work, the Office of Technology Licensing shall inform the faculty member as soon as practicable but in no case later than sixty (60) days after disclosure to the OTL.

  (e) The allocation of proceeds resulting from works owned by the University shall be as set forth in Section 22.7(a) below.

  (f) Creation, Use, and Revision of Certain Works Owned by the University. With respect to any work that represents instructional materials owned by the University pursuant to Section 22.4(b)(1), the terms of any agreement entered into by the University concerning the work must be consistent with the terms of any sponsored agreement supporting the creation of the work and applicable laws.

   (1) The University shall make reasonable efforts to negotiate the terms listed as a, b, and c below in any agreement concerning the work with any third party, including but not limited to any licensee, assignee, or publisher of the work, insofar as such terms are consonant with the terms of any sponsored agreement supporting the creation of the work and applicable laws. That any or all of these terms are not included in the agreement with the third party shall not be deemed a violation of this Collective Bargaining Agreement.

    a. That the faculty member be identified as an author of the work, including, if the work is materially altered at the time of its assignment, initial licensing, or initial publication, the right to decide whether to allow the author's name to be displayed in association with the work;

    b. That the faculty member may freely reproduce the work without paying any licensing fees to use in academic teaching, research, or university service whether at the University of Florida or another tax-exempt academic or research institution; and

    c. That the faculty member may freely use the work in pursuit of

one's profession, such as during expert witness testimony or in consulting.

(2)        Other rights and protections for the faculty member may be agreed to by mutual consent of the faculty member and the University, provided that they are consonant with the terms of the UFBOT-UFF Collective Bargaining Agreement, any sponsored agreement supporting the creation of the work, any agreement, license, assignment, publishing or other agreement entered into by the University concerning the work, and applicable laws. Such rights granted to the faculty member may include:

a.        borrowing portions of the work for use in compilations, other composite works, or new projects;

b.        making derivative works, such as translations, videotaped versions, and film scripts;

c.        adding to the work or updating the content of the work; and

d.        approving decisions related to the publishing or display of new versions of the creator's work or new works based on the creator's work.

(g)        Release of Rights. The faculty member shall assist the University in obtaining releases from persons appearing in, or giving financial or creative support to, the development or use of works in which the University has asserted an interest.

(h)        Reconveyance of Copyright to the Faculty Member.

(1)        When copyright is assigned to the University in full or in part because of the provisions of this Article, the creator of the copyrighted material may request of the Director of the Office of Technology Licensing that ownership be returned to the faculty member.

(2)        Such request may be granted if it does not

a.        violate any legal obligations of or to the University;

b.        limit appropriate uses of the materials by the University;

c.        create a conflict of interest for the faculty member; or

d.        otherwise conflict with specific goals of the University.

(3)        Such request shall also be granted if the faculty member establishes that the University has willfully misrepresented to the faculty member's substantial detriment the necessity or cost of development expenses.

22.5    Instructional Technology and Related Instructional Materials.

(a)        The University and UFF recognize the increasing development and use of technology, and related instructional materials, such as videotapes, interactive television, and computer software, to support teaching and learning and to enhance the fundamental relationship between the faculty member and the student.

(1)        Instructional technology may be used to deliver distance learning.

(2)        The University and UFF affirm that instructional technology and related instructional materials should be used to the mutual benefit of the University and the faculty member.

(3)        Development of new technology for use in delivering instructional material is an invention covered by Section 22.6, and is distinguished from the use of existing or

new technology to deliver instructional material, which are works covered by Section 22.4.

(b)      When the University assigns a faculty member to develop or provide instruction through the use of instructional technology or instructional material specifically designed to be used with such instructional technology, including but not limited to distance learning, the University shall provide to such faculty member:

(1)      Training and resources to support the assignment for adaptation of instructional material to instructional technology; and

(2)      Additional compensation if the assignment is an overload assignment and/or adjustment in a faculty member's assignment.

(c)      Property Rights and Releases. Provisions governing the intellectual property rights of faculty and releases to be obtained when the University has asserted an interest in instructional materials constituting a work are contained in Section 22.4, above.

22.6    Inventions.

(a)      Faculty Exclusive Ownership Rights.

(1)      An invention made outside the field or discipline in which the faculty member conducts research, teaching, and/or service activities for the University (which shall include any enhancements, adaptations, or improvements of inventions previously disclosed, or that were required to be disclosed, hereunder) and for which no University support has been used is the property of the faculty member, who has the right to determine the disposition of such invention and revenue derived from it.

(2)      However, the faculty member and the University may agree that the patent for such invention be pursued by the University and the proceeds shared.

(b)      University-Supported Efforts. An invention that is made by using University support, as defined in Section 22.1(h), is the property of the University. In addition, an invention made within the field or discipline in which the faculty member conducts research, teaching, and/or service activities for the University (which shall include any enhancements, adaptations, and improvements of inventions previously disclosed or that were required to be disclosed hereunder) is the property of the University. The faculty member shall share in the proceeds from any invention that is the property of the University pursuant to this Article.

(c)      Disclosure.

(1)      A faculty member shall fully disclose to the Office of Technology Licensing any invention that the faculty member develops, makes or reduces to practice while a faculty member of the University of Florida.

a.      The disclosure shall include an outline of the project and the conditions under which it was conducted.

b.      If the faculty member wants the University to attempt to patent the invention, the faculty member shall explain why it has sufficient commercial potential to warrant the University investment in the patent process.

(2)      With respect to inventions made during the course of an approved

outside activity when the University has specifically waived its rights to any inventions as part of their approval of the outside activity under Article 26.4, the faculty member may delay such disclosure, when necessary to protect the outside employer's interests, until the outside employer has made the decision whether to seek a patent.

(d)       Review.

(1)       If the University wishes to assert its interest in the invention, the Office of Technology Licensing shall inform the faculty member in writing as soon as practicable but in no case later than one hundred twenty (120) days after the faculty member's disclosure to the OTL.

a.       If the faculty member desires a preliminary, non-binding assessment of the University interest, the faculty member shall make a written request for such assessment at the time of filing the disclosure.

b.       Such preliminary assessment shall be provided within sixty (60) days, and such assessment shall not be binding upon OTL or the University.

(2)       The OTL shall conduct an investigation that shall assess the respective equities of the faculty member and the University in the invention, and determine its importance and the extent to which the University should be involved in its protection, development, and promotion.

(3)       The OTL shall determine whether sponsored agreements require the University to take ownership of the invention.

(e)       If the University asserts an interest in an invention and the faculty member disputes the University interest, the faculty member may seek to resolve the matter pursuant to ARTICLE 28, GRIEVANCE PROCEDURE AND ARBITRATION. During the pendency of the grievance, the invention will be assigned to the University which will take appropriate steps to protect it. If the grievance and any appeal or other legal proceedings end with a determination that the faculty member is the owner of the invention, the University shall transfer ownership of the invention to the faculty member and none of the costs incurred by the University in the dispute or for the protection of the invention prior to the transfer shall be assessed against the faculty member.

(f)       Release of Rights.

(1)       In the event a sponsor under a sponsored agreement has been offered the option to apply for the patent to an invention or other rights in an invention, the University will use its good offices in an effort to obtain the sponsor's decision regarding the exercise of such rights within the period set forth in the sponsored agreement.

(2)       At any stage of making the patent applications, or in the commercial application of an invention, if the University has not otherwise assigned to a third party the right to pursue its interests, the University may elect to withdraw from further involvement in the protection or commercial application of the invention. At the request of the faculty member in such case, and subject to any applicable sponsored agreement or law, the University shall transfer the invention rights to the faculty member, in which case the invention shall be the faculty member's property and none of the costs incurred by the University shall be

assessed against the faculty member unless they are development expenses deducted from gross revenues received by the University prior to the transfer.

(3)     All assignments or releases of inventions, including patent rights, by the University to the faculty member shall contain the provision that such invention, if patented by the faculty member, shall be available royalty-free for governmental purposes of the State of Florida and in connection with federally-sponsored research, the United States, and for teaching and research purposes for all tax-exempt educational and research institutions, unless otherwise agreed in writing by the  University.

(4)     If the University ownership interest in an invention is waived, the creator must disclose the potential conflict of interest created by the creator's ownership of the invention when proposing research to be conducted using University resources that could reasonably appear to influence the financial value of the invention. In such case the University through the creator and appropriate administrators, may establish the means to manage any conflict of interest that exists in conducting the research.

(g)     It is the policy of the University that in general research results should be publishable, and publication of such results in appropriate venues is encouraged. However, if the publication of research results may reveal an invention in which the University has an interest, faculty members must ask OTL for advice on how and when to publish the results in order that patent protection for the invention is not compromised.

(h)     Voluntary Surrender of Patent Interests. A faculty member and the University may agree to surrender any interests that the faculty member and the University might have to any part of any prospective invention to any outside organization, if the faculty member and the University deem such surrender to be in the best interests of the University and if such surrender is allowable under applicable law and sponsored agreements and such surrender does not impair the intellectual property rights of other employees, students, and other third parties. All faculty members and other University employees involved must agree to the surrender of the patent rights subject to the concurrence of the University in each case.

22.7   Division of Proceeds.

(a)     With regard to any work or invention owned by the University and subject to the requirements of any applicable sponsored agreements, the net adjusted income shall be distributed as follows:

(1)     Schedule A: Up to $500,000:
40% to the individual creator(s) 10% to the University program(s)
7.5% to the creator(s)'s department
7.5% to the creator(s)'s college
35% to the University

(2)     Schedule B: $500,000 or over:
25% to the individual creator(s)
10% to the University program(s)
10% to the creator(s)'s department
10% to the creator(s)'s college

45% to the University

(3)    Notwithstanding the above, all net adjusted income from the University sale or liquidation of equity or other ownership interests originally paid to the University by a licensee in lieu of cash royalties or license fees shall be distributed according to Schedule B. The decision as to when to sell, exchange or convert equity interests resides with the University in its sole discretion.

(4)    The division of proceeds set forth in this Section 22.7(a) does not apply to any works or inventions that are the subject matter of any license agreement or other transaction entered into by the University or UFRF before July 15, 1997, and the proceeds in such cases shall continue to be distributed pursuant to the University of Florida Patent Policy dated February 1993 or any previous agreement entered into by the creator and the University.

(b)    Distributions of income shall be made semiannually on or before June 1 and December 1 of each year.

(1)    The University may, at its sole judgment, withhold or delay distribution of any income if there is a foreseeable development expense yet to be incurred.

(2)    In instances where funds are held because of foreseeable development expenses or where expenses exceed revenue, an accounting of such shall be sent to the creator's department and college indicating the amounts received for the current six-month period and the amount of the anticipated expense or deficit.

(3)    Once expenses are known with certainty, any excess withholding shall be distributed.

(c)    Payments of the portion allocated to the creator(s) must be made to creator(s) individually and cannot be assigned by the creator(s) to other parties or entities. The only exception shall be that after a creator's death, appropriate notification by the personal representative of the creator's estate, and court approval, if necessary, payment shall be made to the creator's heirs or devisees.

(d)    In the event there are multiple creators for an invention or work, the creators' share shall be divided equally among all creators unless the creators agree among themselves to a different division.

(1)    If the creators agree among themselves to a different split, OTL must be notified in writing at least one month prior to the date of the first income distribution as to the agreed upon division of income.

(2)    The portions distributed to the academic units, which are the academic units of the creator(s) at the time of the creation of the invention or work, shall be pro-rated when more than one unit is involved.

(3)    The University shall make the final decisions on the pro-ration of such portions to academic units.

(e)    In the case of licenses or other transactions involving multiple inventions or works, the University shall resolve any potential conflicts concerning the applicable distribution schedules after reviewing the technologies involved.

(f)      That portion allocated to the program (or programs) remains under the control of the University. If there is more than one program in which the invention or work was developed, the program portion will be pro-rated as determined by the University. If a creator should leave the University, the portion allocated to the creator's program shall be allocated to that program as long as the program exists and consists of research in the same area as that conducted by the creator prior to leaving the University. If the program ends, the portion allocated to the program shall be allocated to the University. Any determinations regarding the distribution of the program portion of net income shall be at the sole discretion of the University.

22.8    Other Requirements.

(a)      A faculty member and the University shall not commit any act that would tend to defeat the University's or the faculty member's interest in a work or invention. The University shall neither require nor pressure a faculty member to waive the faculty member's intellectual property rights, nor shall the University retaliate against a faculty member who declines to waive or otherwise exercises intellectual property rights in accordance with this Agreement as long as the intellectual property rights of the University, other employees of the University, students, and other third parties are unimpaired or not at risk of impairment. Any such waiver shall be in writing and signed by the faculty member.

(b)      In accordance with recognized scientific research procedures and sponsored agreement requirements, faculty members are required to record all research data and information accurately and clearly and to keep all such data in a permanent and retrievable form. In addition, with regard to a patentable invention, original laboratory data must be kept for the life of the patent.

(c)      Faculty members must securely store tangible property (such as biological materials, chemical compounds, and computer discs) related to an invention or work to which the University has asserted or may assert ownership rights.

(d)      Faculty members who leave the University shall be permitted to copy their laboratory notebooks and take the copies with them, or take samples of tangible property with them, although they are required to maintain the confidentiality of the data contained within the notebooks or the tangible property. The original notebooks and other research data will remain at the University.

(e)      The University and the faculty member shall document the terms of any such transfer of tangible property.

22.9     Execution of Documents. Upon employment the faculty member shall be provided with a copy of this Article and shall sign an agreement recognizing the terms of this Article.

**ARTICLE 23**
**OTHER FACULTY MEMBER RIGHTS**

23.1     Constitutional Rights of Faculty. Nothing in this Agreement shall be understood to diminish the constitutional rights faculty members have as citizens of the United States or the State of Florida, or to diminish the right of such faculty member to exercise those rights. Any alleged violation of such rights shall not be subject to the grievance and arbitration procedure of this Agreement, but shall be subject to vindication only by a court of competent jurisdiction.

23.2     Limitation on Personal Liability.

        (a)     If a faculty member is sued for an act, event, or omission which may fall within the scope of Section 768.28, Florida Statutes, the faculty member should notify the General Counsel's office as soon as possible after receipt of the summons commencing the action in order that the University may fulfill its obligation. Failure to notify the University promptly may affect the rights of the parties.

        (b)     For information purposes, the pertinent language of Section 768.28(9), Florida Statutes, is reproduced below, as follows:

No officer, employee, or agent of the State or of any of its sub-divisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event or omission of action in the scope of her or his employment or function, unless such officer, employee or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton or willful disregard of human rights, safety or property.

23.3     Free University Courses.

        (a)     Full-time faculty members may enroll for up to six (6) credit hours of instruction at the University per term (Fall, Spring, or Summer) without payment of tuition or fees, subject only to the restrictions listed in subsections 23.3(a)(1) through 23.3(a)(4), below. Visiting faculty members are excluded under this section, but faculty members who are on sabbaticals or on professional development or grants-in-aid leave are included.

                (1)     To qualify for this benefit, the faculty member must have completed six (6) months of continuous employment and be employed by the University on the date the course begins. Faculty members with a principal place of employment outside of Alachua County are eligible to apply for enrollment in up to six (6) hours of instruction per semester at the state university in Florida closest to the place of employment.

                (2)     The following types of courses are excluded: thesis, dissertation, internships, directed individual study, individual performance courses, non-credit courses, and sponsored credit programs, off-book programs, and some distance education course offerings.

                (3)     If a faculty member enrolls for a course that meets during hours of the faculty member's regularly scheduled duties, all time taken during that period, including time taken in traveling to and from classes, shall be charged to annual or compensatory leave or leave without pay, unless the work schedule has been adjusted to accommodate the class, subject to approval by the appropriate supervisor. Supervisors shall endeavor to rearrange the

teaching schedules of faculty members who wish to take a class.

(4)    In order for a course to qualify under this provision, the faculty member must complete all required forms.

(b)    A faculty member may attend any University course on a non-credit and space available basis, subject to the instructor's permission.

(c)    The benefits under this section shall not be treated in accordance with the University's section 127 Plan.

23.4    The University shall provide faculty the same benefits it provides to all employees for: tuition exchange benefits, parking, and bus service. The University shall consult with UFF prior to making changes in these benefits.

**ARTICLE 24**
**SALARIES**

24.1     Policy. The University and UFF agree that salary is an important factor in the recruitment and retention of faculty members and an incentive for meritorious performance in research/scholarship/creative activity, teaching, and service.

24.2     Effective Date. All salary increases and adjustments referenced in this Article shall become effective retroactive to the beginning of the faculty member's annual appointment, unless otherwise specified below.

24.3     Promotion Increases. Promotions made to the rank of Associate Professor, Clinical Associate Professor, Associate Curator, Senior Lecturer, Associate in_____, Associate Scholar, Associate Scientist, Associate Engineer, Associate University Librarian, Professor, Clinical Professor, Curator, Master Lecturer, Senior Associate in_____, Scholar, Scientist, Engineer, or University Librarian shall be in accordance with the provisions of ARTICLE 19. Promoted faculty shall receive a promotion salary increase of nine percent (9.0%) of their base salary.

24.4     General Salary Increases.
        (a)     General salary increases are effective October 1.

        (b)     In each year of this agreement the University shall provide a raise pool allocated between merit and across- the-board as follows:

|  | Merit | Across-the-board |
|---|---|---|
| 2021-2022 | TBD | TBD |
| 2022-2023 | TBD | TBD |
| 2023-2024 | TBD | TBD |

        (c)     Such increases, if any, are applied after a promotion increase.

        (d)     Faculty who have been appointed to the University Term Professorship shall finish their appointed terms and receive the full $15,000 amount associated with the program. Should the program be reinstated, faculty in the bargaining unit shall be eligible.

        (e)     The parties agree to re-openers of Articles 24.4, 24.5, and 24.7 for 2021-2022, 2022-2023, and 2023-2024 in accordance with the provisions of ARTICLE 33, at a time mutually agreeable to the parties.

        (f)     Salaries for P.K. Yonge faculty are addressed in 24.7.

        (g)     With respect to the merit portion of any raises:
                (1)     In any year in which a merit raise is provided each department or

100

equivalent unit shall be allocated a merit pool using the base salaries of all bargaining unit faculty members in the unit as of May 15. Chairs or equivalent supervisors who are in the bargaining unit are excluded from those eligible. The chairs (by college) shall form a separate merit pool, and the dean shall make merit raise decisions for the chairs.

      (2)     Eligibility. To be eligible, the employee must have, at a minimum, a satisfactory evaluation and been employed by the University for at least one (1) semester. Visiting faculty members or faculty members who have been issued a notice of non-renewal or layoff in accordance with this Agreement or who have resigned for any reason are not eligible.

      (3)     Qualifying Criteria for Merit Increases. Merit increases must be determined using existing criteria which have been established by the faculty, chair, and dean of each unit, consistent with the terms and provisions of this Agreement.

      a.     Merit salary increases shall be distributed to faculty members who qualify under the unit's criteria. In determining who receives a merit increase, the chair or equivalent supervisor shall consult with the unit's committee responsible for merit pay considerations.

      b.     The number of merit increases shall not be limited by any quota.

      c.     The chair and the merit pay committee shall attach the unit's merit criteria and distribution system to the determined list of merit increases that are forwarded to the dean.

      d.     The dean shall review the unit's merit increase decisions to ensure that they are consistent with the unit's criteria for merit salary increases. The dean may send the proposal back to the department for reconsideration, along with the noted concerns where there appears to be an inconsistency between the criteria and the recommendations.

      e.     Notwithstanding other provisions of this agreement, department merit procedures and tenure and promotion criteria shall be used for merit raises. In addition, notwithstanding other provisions of this agreement, all activities in research, teaching, and service for the three (3) previous years shall be considered for merit pay raises.

24.5     Administrative Discretionary Salary Adjustments. Subject to any qualifying provisions specified below, the University may in appropriate circumstances adjust the salary of a bargaining unit member for merit, market equity adjustments, verified counteroffers, salary compression/inversion, increased duties and responsibilities, special achievements, and similar special circumstances. These increases may occur at any time.

      (a)     The parties agree that the total funds for such salary adjustments shall be not more than one percent (1.0%) annually, based on the total base salary rate of members of the bargaining unit as of August 30.

      (b)     Salary Increases for Increased Duties and Responsibilities. Faculty members in the bargaining unit who are assigned administrative duties and responsibilities, such as department chairs, center directors, program directors, heads of equivalent administrative units, or department graduate or undergraduate coordinators, may receive a discretionary salary increase or supplement for the length of their administrative appointment.

      (c)     Report of Discretionary Salary Adjustments. On July 30 of each year the

University shall provide the UFF with an electronic copy of the total list of salary increases under Section 24.5 that the University has implemented during the previous fiscal year ending June 30. These lists shall provide the name, rank, and department of the faculty member, the amount of the increase, and the reason for the increase.

24.6     Salary Increases Funded Through Contracts, Grants, or Auxiliary Budgets. The funds available for salary increases to faculty members on contracts, grants, or auxiliary budgets, as a percentage of their collective base salary rate, shall be equivalent to the funds available for salary increases to faculty on Educational and General (E&G) funding, as a percentage of their collective base salary rate, provided that such salary increases are permitted by the terms of the contract or grant.

24.7     Salary Increases for P. K. Yonge faculty members.

(a)     Promotions made to the rank of University School Assistant Professor, University School Associate Professor, or University School Professor, shall be in accordance with the provisions of ARTICLE 19. Promoted faculty shall receive a promotion salary increase of nine percent (9.0%) of the faculty member's previous year's base salary plus degree supplement.

(b)     Full-time faculty members who have received a satisfactory annual evaluation and are not in layoff or non-renewal status shall be eligible for salary increases consistent with state policies. In accordance with the provisions of ARTICLE 33, the University and UFF agree to re-open negotiations each year of the contract for the purpose of determining appropriate raises consistent with state regulations and policies. The current framework for a salary schedule is found in APPENDIX E. The difference between the performance adjustments and any general raise shall be paid across the board.

(c)     Salary Supplements. Faculty members shall receive salary supplements for additional duties assigned by the director and as specified in APPENDIX F, under the following conditions:

(1)     Salary supplements may be included for the purposes of calculating retirement benefits but shall not to be included in the base salary rate upon which future salary increases are calculated.

(2)     If the faculty member resigns or is otherwise unable to complete additional duties, the salary supplement will be prorated for the portion of additional duties actually performed.

24.8     Salary Increase Notification.

(a)     Faculty members shall be notified of any merit and market equity salary increases that will be implemented under this Article prior to submission to the payroll department. Upon request, a faculty member shall have the opportunity to consult with the person or committee that makes the recommendation.

(b)     Faculty members shall receive written notice of any salary increase within four

(4) weeks of implementation, including a description of the reason for the raise.

24.9     Notice to UFF.

(a)     Not later than thirty (30) days after the first pay period in which the general merit or across the board salary increases provided in this Article are reflected, the Office of Human Resource Services shall provide the UFF with a salary report in Excel spreadsheet format, listing all in-unit faculty members.

(b)     This report shall include the following information for each faculty member:
(1)     name;
(2)     department and college;
(3)     rank or position including the titles such as "visitor";
(4)     position code;
(5)     percentage FTE appointment;
(6)     annual appointment (9-mo, 10-mo, or 12-mo);
(7)     date of hiring;
(8)     date of most recent promotion;
(9)     years in current rank;
(10)     the faculty member's base salary before this year's salary increases;
(11)     the amount the faculty member received from each salary increase category, including any promotion increase or any other adjustments; and
(12)     the new base salary rate after the salary increases described above.

(c)     A copy of the annual salary increases referenced in this Article shall simultaneously be available to all faculty.

(d)     Upon notification to UFF, all faculty within the bargaining unit will be provided with digital access by the University and notified that the report is available for their review.

24.10     Type of Payment for Assigned Duties.

(a)     Duties and responsibilities assigned by the University to a faculty member that do not exceed the available established FTE for the position shall be compensated through the payment of Salary, not OPS.

(b)     Duties and responsibilities assigned by the University to a faculty member that are in addition to the available established FTE for the position shall be compensated through OPS, not Salary.

24.11     Grievability.

(a)     Except for grievances alleging discrimination under the NONDISCRIMINATION Article, the only issue to be addressed in a grievance alleging violations of this Article is whether the University properly applied the procedures set forth in this Article. If an arbitrator finds that the procedures have not been properly applied, the arbitrator shall identify the failure and remand the matter to the University for proper application of the procedures and recalculation

of the salary increase or salary level.

(b)      If a faculty member seeks redress of an alleged violation of this Article by filing a grievance under the provisions of ARTICLE 28, GRIEVANCE PROCEDURE AND ARBITRATION, the faculty member must file a grievance within forty-five (45) days after the first paycheck that is affected by the alleged violation.

24.12    Other Faculty Award Programs. The University shall continue to provide one-time awards, which do not increase the faculty member's base salary, under the same programs and on the same basis as in the past.

**ARTICLE 25**
**BENEFITS**

25.1     The State of Florida administers both retirement and health insurance programs for state employees, including University of Florida faculty. The University shall provide to faculty members both retirement and insurance programs under the provisions of State law.

25.2     With respect to retirement programs, both the Optional Retirement Program and the Florida Retirement System shall be available in accordance with state law.

25.3     In addition to the State insurance programs, the University offers domestic partners health coverage. Bargaining unit faculty members are eligible to elect this option on the same terms and conditions available to other University employees.

25.4     Neither the University nor UFF shall interpret the provisions in Section 25.1 as waiving, nor shall they in any way be deemed to waive, any rights either party may have to bargain with respect to the impact of any change in state program offerings.

25.5     New program offerings or the reduction or elimination of existing programs by the University that affect members of the bargaining unit shall be the subject of collective bargaining.

25.6     The University recognizes that faculty members may wish to adjust their workload as they near retirement, and that individual faculty member needs may vary. Any phased retirement proposal requested by a faculty member may not contravene other provisions of the collective bargaining agreement and is subject to written approval by the respective dean.

25.7     The University may offer retirement incentives. The University shall consult with UFF before implementing any such incentives.

25.8     Retirement Credit. Retirement credit for faculty members who are authorized by the University to take uncompensated or partially compensated leaves of absence shall be granted in accordance with State law that exists at the time leave is granted.

25.9     Benefits for Retired Faculty members.
           (a)        Subject to University policies, faculty members who retire from the University shall be eligible on the same basis as bargaining unit faculty members to receive the following benefits:
                              (1)     Retired employee identification card;
                              (2)     Use of the University library (i.e., public rooms, lending and research service);
                              (3)     Listing in the University directory;
                              (4)     Placement on designated University mailing lists;

(5)     A University parking decal;

(6)     Use of University recreational facilities (retired faculty members may be charged fees lower than those charged to bargaining unit faculty members for the use of such facilities);

(7)     The right to enroll in courses without payment of fees, on a space available basis;

(8)     A mailbox in the department/unit from which the faculty member retired, subject to space availability;

(9)     University e-mail address;

(10)    A Gatorlink account; and

(11)    All eligible retirees may elect to continue to participate in the State administered insurance plans. Retired faculty members of any State-administered retirement system are entitled to health insurance subsidy payments in accordance applicable state laws with the exception of retirees who participated in the Optional Retirement Program.

(12)    Faculty members who have Graduate Faculty status may keep that status upon retirement and may participate in accordance with department and graduate school policies.

(b)     Health Insurance Premiums. At retirement, faculty members have the option of remaining in the health insurance plans offered by the University after retirement governed by eligibility criteria from the State of Florida.

25.10   Pre-tax Programs. To the extent permissible by federal or state law the University shall continue to provide pre-tax programs for faculty members.

25.11   Employee Assistance Program. If the University considers revisions to the EAP, it shall consult with UFF

**ARTICLE 26**
**OUTSIDE ACTIVITY AND CONFLICT OF INTEREST**

26.1     Policy.

(a)     When properly approved and managed, the University of Florida and UFF-UF agree that Outside Activities may support faculty professional growth and reputation, create and disseminate new knowledge and ideas, and further the University's mission of excellence in education, research, and service. A faculty member's primary professional obligations are to maintain the highest ethical and professional standards and, as an agent of the University, act in its best interests. Faculty members may engage in approved Outside Activity, including employment, and hold Financial Interests as long as the activities and interests are in accordance with the law and do not conflict with their University duties and responsibilities.

(b)     All employees of the University are bound to observe, in all official acts, the standards of ethics set out in the Code of Ethics for Public Officers and Employees of the State of Florida (Chapter 112, Part III, Florida Statutes) and the advisory opinions rendered with respect thereto. Other provisions of laws and regulations of the State of Florida govern obligations and responsibilities of faculty members who receive State compensation in addition to their annual salary. It is prohibited to use a proxy to engage in actions that a faculty member is prohibited from engaging in under the laws and other authorities referenced in this paragraph.

(c)     This Article shall not be used to deny or retaliate against the legitimate exercise of rights protected by this Agreement, including but not limited to the rights protected by ARTICLE 10, ACADEMIC FREEDOM AND RESPONSIBILITY and ARTICLE 22, INTELLECTUAL PROPERTY.

(d)     Requirements for reporting of Outside Activities in any form or context, including any requirements for reporting of Outside Activities undertaken during leaves, shall follow the general provisions of this Article and applicable state law. Modifications to reporting requirements may be necessitated from time to time to conform to state and federal laws. Refinements to UF's bargained policies shall follow ARTICLE 8, UNIVERSITY OF FLORIDA REGULATIONS AND POLICIES of this agreement.

26.2     Definitions.

(a)     "Inside Activity" shall mean any activity a faculty member does as part of their assigned research, clinical, teaching, or service responsibilities including University activities that form the basis for supervisory assessment of their University job performance.

(b)     "Outside Activity" is any activity undertaken by the faculty member that is not an Inside Activity.

(c)     "Institutional Expertise" shall mean a faculty member's teaching, research or clinical expertise in their University discipline.

(d)     "Reporting Household" shall mean a spouse, domestic partner, dependent child or stepchild or any Relative (as defined in Florida Statute 112.312) who shares a household with the faculty member.

(e)     "Private Interest" is a concrete Financial Interest, or other material or tangible interest, including compensated or uncompensated relationships, held by or inuring to a faculty member or Reporting Household member, and arising from the faculty member's Outside Activity.

(f)     "Entity" shall mean any business, company, or other organization, whether public or private, including without limitation any partnership, corporation, limited liability corporation, unincorporated association, or other institution or organization, whether for-profit or not-for-profit.

(g)     "Conflict of Interest" shall mean a Private Interest, or relationship to a relative, that would reasonably appear to (a) adversely influence a faculty member's actions, judgement or decisions, required to carry out Inside Activities or (b) create an unlawful conflict with the faculty member's position as a public employee, as decreed by state or federal law, which includes a situation in which regard for a private interest leads to disregard of a public duty or interest.

(1)     A faculty member's exclusive ownership of Works or Inventions - as detailed in Article 22.4(a) and 22.6(a) - does not constitute a Conflict of Interest. However, the exercise of such rights requires disclosure for the purpose of determining a related Conflict of Interest as detailed in 26.2(k).

(h)     "Conflict of Commitment" shall mean Outside Activities whose time of occurrence or duration would hinder the faculty member from carrying out Inside Activities.

(1)     Outside Activities undertaken entirely during a time when the faculty member has no Inside Activities shall not constitute Conflicts of Commitment although they may constitute Conflicts of Interest. Outside Activities that shall not constitute Conflicts of Commitment include Outside Activities undertaken entirely when the faculty member is not on appointment or contract with the university, such as Outside Activities undertaken by Faculty on 9 or 10 month contracts who have no summer appointment under the provisions of ARTICLE 17 or those undertaken when the faculty member is on appointment but conducted during times or frequencies that do not interfere with the faculty member's Inside Activities.

(i)     "Financial Interest" shall mean any Private monetary or equity Interest which would create a Conflict of Interest.

(j)     An "Investigator" shall mean the principal Investigator, co-principal Investigator, or any other employee responsible for the design, conduct, or reporting of the proposed or funded research or educational activities.

(k)      "Reportable Outside Activity" shall mean any Financial Interest or Outside Activity that is required to be disclosed to the University through the UFOLIO system (APPENDIX G), for the purpose of evaluation of Conflict of Interest, as provided in Items 1 to 11 below. However, Reportable Outside Activities reported through UFOLIO may additionally be evaluated for Conflict of Commitment.

(1)      Management or Material Interest: An employee must report a management position (e.g., officer, director, partner, proprietor) held or material interest (more than a 5% ownership interest) owned by themselves, anyone in the Reporting Household, and any Relative (as defined in Florida Statute 112.312) whose position or interest is known to the employee, in an Entity that enters into any agreements or contracts with University (e.g., service agreements, leases, sales agreements).

(2)      Publicly-Traded Entity Payments/Ownership: An employee must report receipt of payments from or an ownership interest of $5,000 or more (including shares, partnership stake, or derivative interests such as stock options) in a publicly-traded Entity by the employee or anyone in the Reporting Household where the payments or ownership interest reasonably appear to be related to the employee's Inside Activities or Institutional Expertise. This does not include an ownership interest managed by a third party, such as a mutual or retirement fund.

(3)      Privately-Held Entity Ownership: An employee must report any ownership in a privately held Entity by the employee or a member of the Reporting Household, where the ownership interest reasonably appears to be related to the employee's Inside Activities or Institutional Expertise.

(4)      Public Office/Candidate: An employee must report if the employee is a candidate for public office or holds public office.

(5)      Outside Teaching Appointments: An employee must report if the employee has or is seeking approval to hold an additional (to their UF appointment) teaching appointment with an outside Entity, in the area of their Institutional Expertise that represents a Private Interest.

(6)      Outside Research: An employee must report if the employee oversees or conducts or is seeking approval to conduct any research in the general area of their Institutional Expertise at, or receive any research resources or funding from or through, any Entity other than the University. Research by Investigators conducted at Entities as part of a University sponsored project or research funding received by the University is subsumed under Inside Activity and hence does not need to be disclosed in UFOLIO.

(7)      Classroom Works: An employee must report if the employee requires or seeks approval to require students to purchase works to be used in the employee's classroom when such works were created, authored or co-authored (e.g., textbook(s), computer software, electronic or digital media) by the employee or employee's spouse and for which the employee or their spouse will receive, or anticipate receiving payment, loan, subscription, advance, deposit of money or service or anything of monetary value.

(8)      Royalties/Copyright/Licensing Income (according to ARTICLE 22 for faculty in the bargaining unit): An employee must report if the employee receives royalties, licensing fees, and/or copyright income in the area of their Institutional Expertise of $5,000 or more, annually from an Entity other than the University.

(9)     Expert Witness/Legal Consulting: An employee must report if the employee serves or seeks approval to serve as an expert witness and/or engage in consulting in the area of their Institutional Expertise or Inside Activities in a legal matter like a lawsuit or a potential lawsuit.

(10)     Professional Services Related to Institutional Expertise: An employee must report if an employee provides or seeks approval to provide professional services to an outside Entity in the area of the employee's Inside Activities or Institutional Expertise that represent a Private Interest.

(11)     Leadership Roles: An employee must report if the employee has a senior management, administrative, or leadership role, that represents a Private Interest, with an outside Entity related to the employee's Inside Activities or Institutional Expertise where the employee makes executive business and/or financial decisions on behalf of the outside Entity.

(12)     Innovation Inducement Cash Value Prize: An employee must report if they choose to participate, as an Outside Activity, in a competition, with a prize amount greater than $5000, in the area of their Institutional Expertise.

(l)     "Non-reportable Outside Activities" include, but are not limited to:

(1)     Any activity that is described as not reportable in APPENDIX G (UFOLIO); or

(2)     Reporting for required jury duty; or

(3)     Serving in the United States Armed Forces or other branches of the military; or

(4)     Participating in scientific or educational conferences, invited colloquia or other events while representing the University, subsumed under Inside Activities; or

(5)     Performing unpaid peer review, conference committee or journal editorial duties while representing the University, subsumed under Inside Activities;

(6)     Research activities approved and coordinated through the University including research by Investigators conducted at Entities as part of a University sponsored project or research funding received by the University, subsumed under Inside Activities; or

(7)     Reviewing proposals for a federal or state government sponsor or a domestic non-profit organization, subsumed under Inside Activities; or

(8)     Writing or editing activities that are subsumed under Inside Activities; or

(9)     Membership in an academic or professional society (however, serving on the Board or carrying a fiduciary role requires disclosure); or

(10)     Receiving honors, academic awards, or an honorary degree from a non-profit institution that are not cash value prizes as set forth in 26.12, subsumed under Inside Activities; or

(11)     Taking Sabbatical or Professional Development Leave, subsumed under Inside Activities; or

(12)     Serving as a program manager for a federal agency or working on an assignment through the Intergovernmental Personnel Act or a related federal program, subsumed under Inside Activities; or

(13)     Participating in the Fulbright (Scholar) Fellowship program, subsumed under Inside Activities; or

(14)    Serving as an external member of a thesis, dissertation, or promotion committee, subsumed under Inside Activities.

(m)    "Other Disclosable Activities" shall mean Non-reportable Outside Activities that taken alone or together could represent a Conflict of Commitment.

(n)    "Permissible Conflict" shall mean an approved Conflict of Commitment or Conflict of Interest that must be managed as the faculty member engages in the corresponding Outside Activity.

26.3    Intellectual Property Conflicts.

(a)    Faculty Intellectual Property disclosure requirements and the University's ownership rights to inventions and works are outlined in this Article and ARTICLE 22.

(1)    Faculty-Created Course Materials. The University and UFF acknowledge that under law faculty members may benefit financially from their intellectual property, including but not limited to instructional materials assigned for use by their students. If, in a University of Florida course or program, a faculty member requires use of instructional materials or other resources in which that faculty member or the faculty member's spouse/domestic partner or dependent child has a Financial Interest, the following conditions shall apply:

(b)    The faculty member shall report the required use of books, supplies, or other instructional resources at the University when there is a financial benefit to the faculty member or the faculty member's spouse or domestic partner or minor child. Such required materials or resources must be

(1)    Selected for academic reasons independent of any financial gains for the individual faculty member;

(2)    The original work of the faculty member and not solely a collection of the works of others;

(3)    Offered at the fair market price;

(4)    Under copyright, patent, or trademark, and published or produced by an incorporated or registered publisher, company, or Entity and their use does not require the user to waive any intellectual property rights; and

(5)    Adopted consistent with the Florida Code of Ethics for Public Officers and Employees and the Board of Governors Regulation 8.003.

(c)    Such required materials or resources also must not include sale, separate from the textbook or workbook, of exams, quizzes, required assignments, extra-credit assignments, and other general course information and evaluative materials that are customarily available in the textbook or workbook or are customarily made available to students free of charge.

(d)    The faculty member or Reporting Household may receive no financial benefit from instructional materials and other resources the faculty member assigns that have not

been adopted for use in the national higher education market unless the use of the materials best serves the academic interests of the class under the circumstances.

(e)     All students must be provided with a free copy of the course syllabus at http://syllabus.ufl.edu/ that includes an accurate description of the course materials and clearly indicates which materials are required and which are recommended for the course as well as details about exams and other assignments, how grades will be assigned, and any attendance policy.

(f)     If, upon the disclosure by the faculty member, the conditions in Sections 26.3(a)–26.3(c), above, are satisfied, then the required use of instructional materials in which the faculty member has a Financial Interest shall not be interpreted to be an Impermissible Conflict of Interest.

26.4     Reporting, Review, and Communication Timeline and Procedure for Reportable Outside Activities.

(a)     Faculty must disclose Reportable Outside Activities through the UFOLIO system. Faculty must receive approval through the UFOLIO System prior to commencing such activities. UFOLIO, including FAQ and other information, can be accessed here: https://compliance.ufl.edu/ufolio/ Reportable Outside Activities must be disclosed through UFOLIO at the following times:

(1)     Upon initial hiring or engagement with the University;

(2)     Prior to acquiring, prior to engaging in, prior to committing to engage in, or implementing a material change to a Reportable Outside Activity; a faculty member may resubmit a Reportable Outside Activity in UFOLIO even if it was previously denied, provided the reason for denial was based on insufficient disclosure, or there is a change in the faculty member's Inside Activities or Institutional Expertise.

(3)     Prior to entering a relationship, including a familial relationship, which could reasonably be perceived as creating a Conflict of Interest; and

(4)     At least annually, when requested by the University, even if attesting to no change from previous disclosures or no disclosures.

(b)     The only questions the faculty member must answer in the UFOLIO system can be found in APPENDIX G of this Collective Bargaining Agreement. However, if the reviewer cannot make a determination to approve without additional information or clarification and a faculty member declines or is unable to provide the information or clarification within the timeframe in 26.4(c), the approver may deny the activity for insufficient disclosure of information.

(c)     Once submitted in UFOLIO, disclosures should be reviewed, and a determination of either approval or denial should be issued within thirty (30) days, along with a written explanation of a denial. The written explanation should provide a reason for the determination and indicate whether the denial is based on Insufficient disclosure, or Impermissible Conflict of Interest or Impermissible Conflict of Commitment. However, requests for clarifications,

112

communications between supervisors and the Conflict of Interest Program, approvals for exemptions from applicable provisions of the Florida Code of Ethics for Public Employees, or ancillary reviews by other University offices may result in longer review times. Review status is viewable in UFOLIO at all times. If a decision has not been made by Day 30, a faculty member may allow the review process to continue or request and will receive a determination regarding the disclosure within 72 hours.

(d)     If the expected or estimated compensation for Reportable Outside Activities is $5,000 or more, the faculty member must report the expected or estimated amount of compensation and may be required to provide formal documentation of the number of compensated hours as relevant to the specific Reportable Outside Activity in 26.2(k) and APPENDIX G.

(e)     Advisory Opinion. A faculty member may request an advisory opinion from the Florida Commission on Ethics (http://www.ethics.state.fl.us/) about how Art. II, Sec. 8, Fla. Constitution or the Florida Code of Ethics applies to the faculty member's situation.

26.5     Reporting, Review, and Communication Timeline and Procedure for Other Disclosable Activities.

(a)     The faculty member shall disclose Other Disclosable Activities to their chair or director in the manner specified by the chair or director. Such manner must, at a minimum, require that the chair or director is informed of the full extent of the Other Disclosable Activity and time commitment prior to approval. Within thirty (30) days of receiving this information, the chair or director, in consultation with Assistant Vice President for Conflicts, must provide either a written approval of the activity or provide a written determination of Permissible or Impermissible Conflict of Commitment, along with a reason for the determination detailing why the time or duration of the activity could hinder the faculty member from carrying out their Inside Activities. Failure to provide such a determination shall constitute approval by the University. However, if the activity results in documented performance deficiencies in the faculty member's Inside Activities it may be subsequently disallowed.

(b)     The faculty member is not required to disclose amounts of compensation but may be required to provide formal documentation of the number of compensated hours.

26.6     Review and Adjudication Authorities.

(a)     For Reportable Outside Activities disclosed through UFOLIO the Assistant Vice President for Conflicts of Interest and, depending upon the type of activity or interest, other applicable designated University officials will determine whether the activity constitutes a Permissible Outside Activity with or without an approved Conflicts management plan or is an Impermissible Conflict of Interest. The direct supervisor will be consulted for determining Conflict of Commitment.

(b)     For Other Disclosable Activities, the faculty member's direct supervisor, in consultation with Assistant Vice President for Conflicts, will determine whether the activity

constitutes a Permissible Outside Activity with or without an approved conflicts management plan or is an Impermissible Conflict or Commitment.

      (c)      Determinations in 26.6(a) and 26.6(b) must be made in accordance with the definitions of Conflicts of Interest or Conflict of Commitment and may not be arbitrary, capricious, discriminatory or retaliatory.

      (d)      The faculty member and the University have a shared responsibility to identify any Permissible or Impermissible Conflict of Commitment and manage the conflict appropriately according to the provisions of 26.7.

      (e)      Advisory Opinion. A faculty member may request an advisory opinion from the Florida Commission on Ethics (http://www.ethics.state.fl.us/) about how Art. II, Sec. 8, Fla. Constitution or the Florida Code of Ethics applies to the faculty member's situation.

26.7     Resolving Conflicts of Interest and Conflicts of Commitment.
      (a)      Conflicts of Interest or Conflict of Commitment are prohibited unless they are determined to be Permissible by the University and managed.

      (b)      Faculty must adhere to the highest ethical and professional standards. Potential conflicts must be disclosed as set forth in this ARTICLE 26. If faculty have questions concerning a potential Conflict of Interest or Conflict of Commitment, they must first discuss these concerns with their chair or director.

      (c)      If any questions arise regarding a potential Conflict of Interest or Conflict of Commitment, the Conflict of Interest Program or immediate supervisor, as applicable, should bring the matter to the attention of the faculty member involved as soon as possible so that it can be determined whether and what type of disclosure is required, whether there is a conflict and if the conflict is permissible.

      (d)      The Assistant Vice President for Conflicts of Interest and, depending upon the type of activity or interest, other applicable designated University officials and/or direct supervisor may require a faculty member to enter into a reasonable and appropriate monitoring plan to allow for a Permissible Conflict of Interest or Permissible Conflict of Commitment. Immediately following a determination of Permissible Conflict of Interest or Permissible Conflict of Commitment and adoption of the monitoring plan if applicable, a faculty member is permitted to engage in the disclosed Outside Activity. The faculty member is responsible for managing the conflict, working in conjunction with their chair or director.

26.8     Violations.
      (a)      The University may take administrative or progressive disciplinary action concerning violations of this Article, as set forth in ARTICLE 27, DISCIPLINARY ACTION AND JOB ABANDONMENT.

(b)     Failure to Disclose.

(1)     Failure to disclose a Reportable Outside Activity by a respective deadline shall result in a written notification from the University, with copies to the faculty member's chair or director and dean, directing the faculty member to complete the disclosure within ten (10) business days. Upon receipt of written notification the faculty member must cease the activity. The faculty may choose to discontinue the activity with no further disclosure or may seek approval to continue the activity.

(2)     Failure to disclose more than ten (10) business days following the receipt of a delinquency notification shall result in a written reprimand from the University, with copies to the faculty member's chair or director and dean, indicating the faculty member must complete the disclosure within ten (10) business days.

(3)     If a faculty member fails to disclose more than ten (10) business days following receipt of a written reprimand, the University may take additional administrative or progressive disciplinary action against the faculty member as set forth in ARTICLE 27.

(4)     Failure to disclose a Reportable Outside Activity or failure to make a truthful disclosure of Reportable or Other Disclosable Outside Activity may subject the faculty member to administrative or progressive disciplinary action as set forth in ARTICLE 27.

(c)     Faculty commencing a Reportable or Other Disclosable Outside Activity before receiving approval or determination of Permissible Conflict as required herein may be subject to administrative or progressive disciplinary action as set forth in ARTICLE 27.

26.9     Grievance Procedure.

(a)     A faculty member may grieve the University's determination that a faculty member failed to disclose an Outside Activity, or the University's failure to provide a determination within the timelines set forth in 26.4 and 26.5, or the denial of an Outside Activity citing insufficient disclosure or Impermissible Conflict, or the monitoring plan required to manage a Permissible Conflict or any other violation of this Article.

(1)     The process and deadline for filing a grievance based on the University's determination that a faculty member failed to disclose, or failed to make a truthful disclosure of an Outside Activity or any other violation of this Article leading to discipline shall be in accordance with ARTICLE 28.

(2)     The process and deadline for filing any other grievance challenging the denial of an Outside Activity, including for insufficient disclosure, or challenging the monitoring plan required to manage a Permissible Conflict shall be in accordance with ARTICLE 28 in all respects, except as follows (in 26.9(a)(2)a - 26.9(a)(2)e), unless mutually agreed otherwise. For specificity, where an administrator has made a reasonable judgment involving the exercise of permissible discretion related to an Outside Activity, the arbitrator shall not substitute the arbitrator's judgment for that of the administrator.

a.     The grievance shall immediately go to Step 3 Grievance Review in accordance with ARTICLE 28;

b.     The hearing shall be by video conference within twenty (20) days whenever feasible; extensions not to exceed ten (10) additional days shall be granted if the UFF-UF or the University can demonstrate in writing that the deadline is unfeasible;

115

      c.      No transcript of the hearing shall be made;

      d.      No post-hearing briefs shall be filed;

      e.      The arbitrator shall make every effort to render a decision within ten (10) business days of the hearing

26.10    Use of University Resources.

      (a)      "Incidental Use" of University facilities, equipment or services. Use of university facilities, equipment or services for personal use and/or use in Outside Activities is prohibited. The University recognizes that sometimes faculty may incidentally use university facilities, equipment or services for personal use and does not seek to discipline faculty for incidental use. Incidental Use must not adversely affect the performance of employee's university duties or the university's operations, must be extremely limited in duration and frequency and must be restricted to matters that cannot be addressed during non-working time.

      (b)      A faculty member engaging in any Outside Activity shall not make more than Incidental Use the facilities, equipment, or services of the University in connection with such Outside Activity without prior approval of the University or designee. Approval for the use of University facilities, equipment, or services may be conditioned upon reimbursement for such use.

26.11    No University Affiliation.

      (a)      A faculty member engaging in Outside Activity does so as a private citizen and shall not represent himself or herself to the outside employer or other recipient of services as engaging in such Outside Activity as an employee, agent, or spokesperson of the University except when specifically authorized in writing by the University to do so.

26.12    Cash Value Prizes. "Cash Value Prizes" are awards of cash exceeding $5000 that recognize work performed in the area of a faculty member's University expertise. Cash Value Prizes are distinct from grants, contracts, or gifts that are awarded in advance for proposed work. Cash Value Prizes generally fall into two main categories: (a) Innovation Inducement Prizes, which are awarded to winners of competitions including challenge prizes by Federal or non-profit Agencies requiring the attainment, within a specific time frame, of specific material, technology translation, or commercialization goals; and (b) all other Cash Value Prizes, including recognition prizes for research, scholarly or artistic accomplishments such as the Nobel prizes, the Fields medal, Clay Millennium prize, National book award, or Pulitzer prize.

      (a)      Innovation Inducement Prizes. Faculty wishing to compete for Innovation Inducement Prizes may do so as one of the following.

      (1)      An Outside Activity (which requires timely approval as outlined in the Collective Bargaining Agreement) that does not make more than Incidental Use of University facilities, equipment, or services including graduate student and research staff time. Pursuit of an Innovation Inducement Prize within a faculty member's area of expertise and/or using results from the faculty member's previous work at the University does not itself constitute a Conflict within the meaning of this Article. Monies awarded from the prize competition shall be the property of the faculty member.

        (2)        An Inside Activity. With assigned effort to participate in the prize competition and approval by the chair/director, a faculty Investigator may use University facilities, equipment, or services, including graduate students research administration staff time.

                a.        If the prize is successfully obtained, the faculty Investigator shall be given the choice to treat the prize as described below.

                1.        The Prize amount will be treated as net adjusted income and paid out in the same ratios as outlined under the terms of Article 22.7(a) but into residual funds (212). The creator(s) are the prize winners and their share will be paid as a lump sum additional pay. The "University program" shall be interpreted as the team of faculty who won the prize, and the funds for the "University program" shall be deposited into the residual accounts of these faculty.

                2.        The Award amount will be accounted for as an extramural award to the University but immediately transferred as: 65.6% to prize winners personal residual (fund 212) account. The remainder is journaled in the University's F&A holding project for return at the end of the fiscal year as all indirect costs are returned each year (10% additional to the PI/winner, 7.5% to the department, remainder to the college who will pay RCM to the University). Any allocation of prize funds to the Investigator's research residual account must be used for supporting the research mission of the University, i.e., direct research costs including but not limited to: summer salary, equipment purchases, travel, graduate student support, or other general research activities.

                b.        If the Investigator does not win the prize, the Investigator shall not be held liable for the University resources spent as part of the approved prize-participation budget.

        (b)        All other Cash Value Prizes. Faculty wishing to pursue or accept such prizes, if not prohibited by law, do not need to report such activity as an Outside Activity. The full value of any prize obtained belongs to the faculty Investigator who received the prize.

**ARTICLE 27**
**DISCIPLINARY ACTION AND JOB ABANDONMENT**

27.1     Policy. The purpose of this Article is to provide a prompt and equitable procedure for disciplinary action.

(a)     Just Cause. No faculty member shall be subject to disciplinary action except for just cause. Just cause shall be defined as misconduct or incompetency.

(b)     A faculty member's activities that fall outside the scope of employment shall constitute misconduct only if such activities adversely affect the legitimate and compelling interests of the University.

(c)     Disciplinary Action Other than Termination. The University retains the right to impose disciplinary action other than termination including, but not limited to, suspension with or without pay, provided that the punishment is appropriate to the degree of misconduct. The degree of discipline may be related to behavior or actions subject to discipline. Admonitions, oral reprimands, letters of counseling (including recommended or mandatory participation in an Employee Assistance Program), and similar criticism shall not be considered disciplinary action and shall not be subject to the grievance procedure.

(d)     Due Process.
          (1)     Disciplinary action shall be imposed by the University in accordance with the principles of due process as outlined in this Article and in Article 11.3.
          (2)     No faculty member shall be deprived of pay or benefits resulting from a disciplinary action until after the grievance process ends with an outcome that allows the discipline.

(e)     No provisions in this Article shall be interpreted in a manner that violates a faculty member's rights conferred by this Agreement or by law, nor shall a faculty member be punished for exercising such rights in the performance of University duties.

27.2     Progressive Discipline. Outlined below are the steps for faculty progressive discipline.

(a)     The University may combine or skip steps depending upon the facts of the situation, the nature of the conduct, and any documented past incidents.

(b)     The sanctions for disciplinary actions that may be imposed on a faculty member may include but are not limited to the following:
          (1)     Written reprimand containing a description of the just cause.
                    a.     Written reprimand is distinguished from an informal written or spoken warning.
                    b.     A written reprimand shall be delivered to the recipient and maintained in the faculty member's designated personnel file.
          (2)     Suspension with or without pay for a period of time specified in writing.
                    a.     The written statement of suspension shall include the precise

terms of the suspension. Those terms may include some or all of the following: loss of normal faculty privileges such as access to University property, participation in departmental government, voting rights, administration of grants, supervision of graduate students, loss of parking or library privileges, and use of University administrative staff.

     b.  Suspension as a disciplinary action is to be distinguished from administrative leave, which is a precautionary action.

    (3)  Demotion to the next lower rank or step with corresponding reduction in salary. A faculty member with tenure or with security of employment shall not be demoted to a lower rank without tenure or security employment.

    (4)  Termination.

27.3  Investigation. The investigation of alleged misconduct shall be conducted in as confidential a manner as possible, and in the process of the investigation the alleged misconduct shall be considered in the context of the circumstances.

   (a)  The investigation shall include interviewing the complainant, the accused, any pertinent witnesses, and reviewing any relevant documentation. The accused faculty must be informed that the faculty member has a right to union representation during investigatory questioning that may reasonably be expected to result in disciplinary action. A failure to provide such notice shall not constitute grounds to reverse a disciplinary action; however, it may be used as a factor that the arbitrator may consider when determining whether the disciplinary action imposed is appropriate. The accused shall (1) be informed of the complaint, the complainant, and the time frame of the alleged incident or actions; (2) be provided any documents under review in the investigation and redacted as required by law; (3) be informed within seven (7) days of any expansion of the complaint under review; and (4) have the right to respond to any report of the investigation.

   (b)  Administrative Leave. In the event that the University has reason to believe that the faculty member's actions or presence on the job would adversely affect the orderly conduct and processes of the university, and/or jeopardize the safety or welfare of the faculty member, colleagues, other employees, or students, the faculty member may be reassigned or relieved of duties with pay during the investigation. Administrative leave is not discipline.

27.4  Notice of Intent. When the University has reason to believe that a suspension or termination should be imposed, the University shall provide the accused faculty member with written notice of the proposed action and the specific reasons for it.

   (a)  Such notice of intent shall be sent by certified mail, return receipt requested, or delivered in person with written documentation of receipt obtained.

   (b)  The faculty member shall be given fifteen (15) days from delivery of the notice in which to respond in writing to the University before the proposed action is taken. The University then may issue a notice of disciplinary action under Section 27.5.

   (c)  If the University does not issue a notice of disciplinary action, no record of the allegation or the investigation shall be retained in the faculty member's personnel file. If an

applicable law requires the university to keep for a specified period the record of a complaint that does not result in disciplinary action, once the end of that period is reached the University shall destroy the record of the complaint.

27.5     Notice of Discipline. If after the investigation and notice of intent process, the University believes that a suspension or termination should be imposed, University shall provide the faculty member with a written notice of disciplinary action.

(a)     All such notices shall be sent certified mail, return receipt requested, or delivered in person to the faculty member with written documentation of receipt obtained.

(b)     All notices of disciplinary action shall include a statement of the reasons for the disciplinary action and a statement advising the faculty member that the action is subject to ARTICLE 28, GRIEVANCE PROCEDURE AND ARBITRATION.

(1)     The Notice of Discipline shall:

a.     Provide notice to the faculty member of the discipline imposed;

b.     Include the date on which the discipline will become effective, provided that in the case of suspension or termination without pay, such pay and benefits shall not be denied until the period for filing a grievance has elapsed and the faculty member has not filed a grievance; and

c.     Contain a statement that if the faculty member wishes to contest the discipline, the faculty member must file a grievance within fifteen (15) days after receipt of the notice.

(2)     A copy of the Notice of Discipline and attachments shall be simultaneously provided to UFF.

27.6     Parameters for Arbitrator's Decision or Award.

(a)     A finding for just cause for discipline must be based only on the evidence presented at the arbitration hearing.

(b)     If the arbitrator does not find that the disciplinary action was based on just cause, the discipline imposed shall be annulled. If the arbitrator concludes that just cause for the disciplinary action has been established but that a different penalty would be more appropriate, arbitrator shall determine a different penalty, which may be more or less severe.

(c)     The decision of the arbitrator shall be binding upon the University, UFF, and the grievant provided that either party may appeal to an appropriate court of law.

(d)     No Further Jeopardy. Following the decision, the faculty member may not be disciplined again for charges arising from the same incident unless new facts or evidence materialize that were not known or reasonably available for discovery prior to the arbitrator's decision.

27.7     Waiver of Discipline. Any time between the notice of discipline and the imposition of any disciplinary action, the University may waive or limit that action on the condition that the

disciplined faculty member performs some reasonable action(s), which shall be specific in writing, to address the harm or to prevent future harm.

(a)     Such actions may include, but are not limited to, monetary restitution, repayment of misappropriated resources, compliance with a commitment not to repeat the misconduct, or other action designed to make whole the injury caused by the faculty member's professional misconduct or to prevent future misconduct.

(b)     If the imposition of the disciplinary action is waived, the subsequent failure to perform the required act or otherwise comply with the conditions of the waiver shall immediately subject the faculty member to the implementation of the underlying discipline without an additional hearing.

27.8    Employee Assistance Program.

(a)     Neither a faculty member's participation in an Employee Assistance Program (EAP), nor information generated by participation in the program, shall be used as a reason for discipline under this Article.

(b)     However, a faculty member's failure to cooperate in a mandatory EAP may serve as ground for disciplinary action.

27.9    Job Abandonment

(a)     If a faculty member is absent without leave for fifteen (15) or more consecutive days, the faculty member may be considered to have abandoned the position and voluntarily resigned from the University. The University will make all good faith efforts to contact the faculty member.

(b)     Notwithstanding (a) above, if the faculty member's absence is for reasons beyond the control of the faculty member and the faculty member notifies the University as soon as practicable, the faculty member will not be considered to have abandoned the position.

**ARTICLE 28**
**GRIEVANCE PROCEDURE AND ARBITRATION**

28.1     Policy. The purpose of the Article is to provide for the consideration and resolution of grievances.

(a)     The procedures in this Article shall be the sole and exclusive method for resolving the grievances of faculty members except where explicitly specified elsewhere in this Agreement. A grievance may have three (3) stages

(1)     Step 1. Hearing by the dean or designee;

(2)     Step 2. Review by the Provost or designee; and

(3)     Step 3. Arbitration.

(b)     The University and UFF agree that problems should be resolved, whenever possible, before the filing of a grievance but within the time limits for filing grievances. Participants are encouraged to informally resolve problems at each step in the grievance process.

(c)     Effect of Reclassifications. A faculty member who is reclassified to an out-of-unit classification shall, until the end of the Fall, Spring, or Summer semester following the semester in which the reclassification becomes effective, retain the right to file a grievance consistent with the provisions of this Article for any act or omission that would have given rise to a grievance had the faculty member remained in the bargaining unit.

(d)     No resolution of any grievance shall be inconsistent with the terms of this Agreement, unless agreed to in writing by the University and UFF.

28.2     Definitions.

(a)     The term "grievance" shall mean a dispute concerning the interpretation or application of a specific term or provision of this Agreement, subject to specific exclusions appearing in other articles of this Agreement.

(b)     The term "grievant" shall mean a faculty member, a group of faculty members, or UFF, who file a grievance.

(c)     A grievance filed by UFF shall be initiated at Step 2.

(d)     The parties may agree to consolidate grievances of a similar nature to expedite the review process.

28.3     Representation.

(a)     UFF shall have the right to represent any faculty member in a grievance filed under this Article, unless a faculty member elects self-representation or to be represented by legal counsel.

(b)        UFF grievance Representatives. UFF shall annually furnish to the Office of the Provost a list of all persons authorized to act as grievance Representatives and shall update the list as needed.

(c)        If a faculty member elects not to be represented by UFF, the University shall inform the UFF Grievance Chair or designee in writing and attach a copy of the filed grievance materials.

(1)        UFF shall have the right to have an observer present at all meetings called for the purpose of discussing such grievance or pre-grievance dispute with the grievant. The UFF Grievance Chair shall be notified in writing at the same time as the other parties of the date, time, and location of all meetings called for the purpose of discussing a grievance dispute.

(2)        UFF shall be sent copies of all decisions at the same time as they are sent to the other parties.

28.4    Appearances.

(a)        The grievant must attend the Grievance Hearing. If the grievant does not attend and has no legitimate excuse for his/her absence, the grievance shall be deemed to be withdrawn.

(b)        If participating in any meetings pursuant to a grievance or arbitration necessitates rescheduling of the faculty member's assigned scheduled duties, as defined pursuant to the ASSIGNMENT OF RESPONSIBILITIES article, the faculty member shall make, with the concurrence of the chair or supervisor, reasonable arrangements for the performance of such duties.

28.5    Burden of Proof.

(a)        In all grievances except grievances involving disciplinary action brought pursuant to ARTICLE 27 the burden of proof shall be on the faculty member.

(b)        In grievances involving disciplinary action, the burden of proof shall be on the University.

28.6    Filing a Grievance. Except as explicitly specified elsewhere in the Agreement, this grievance procedure shall be the sole review mechanism for resolving disputes regarding rights or benefits that are provided exclusively by this Agreement. The filing of a grievance constitutes a waiver of any rights to review pursuant to Chapter 120, Florida Statutes, or to the review of such actions under University procedures that may otherwise be available to address such matters.

(a)        In cases involving disciplinary action, a grievance must be received by the Vice President for Human Resource Services on the form shown in APPENDIX C within fifteen (15) days following receipt of the Notice of Discipline. In all other cases, a grievance must be received no later than forty-five (45) days following the act or omission giving rise to the grievance, or the date on which the faculty member knew or reasonably should have known of such act or omission if that date is later. The faculty member will lose all rights to a review of

the dispute unless the faculty member files a grievance within the time specified. Upon receipt of the grievance, the University shall advise UFF of the dean or designee who will serve as the University representative and hearing officer at Step 1. In the case of discipline involving termination or suspension, any challenge to the university's decision shall be initiated at the arbitration level. The University or UFF may request an assessment meeting in an effort to find a resolution without arbitration. If such assessment meeting is requested, the parties shall participate in the meeting in a good faith effort to resolve the matter. An assessment meeting must be scheduled to occur within ten (10) days of the University's final decision to impose discipline and shall not extend the deadline to request arbitration. The occurrence or non-occurrence of an assessment meeting does not prohibit the parties from making informal attempts to resolve the matter.

      (b)     Forms.

         (1)     Grievance Form. Each grievance must be submitted in writing on the form shown in APPENDIX C, citing which provisions of the Agreement have been violated and identifying any designee. The APPENDIX C grievance form shall be signed by the grievant.

         (2)     Arbitration Form. Each notice of arbitration shall be submitted in writing on the form shown in APPENDIX D.

         (3)     The grievance forms may be filed by means of fax, United States Postal Service, e-mail, or personal delivery. All grievance forms shall be dated when the grievance is received. The date of receipt shall be determined by the date on receipt if the grievance is hand delivered; by the date recorded on the fax if it the grievance is filed by fax; by the date of e-mail, or postmark if the grievance is mailed by United States Postal Service.

         (4)     Amendment of the APPENDIX C Grievance Form. The grievant may amend the APPENDIX C form one time prior to the Grievance Hearing.

         (5)     Only those acts or omissions identified at the initial filing, or added as amendments pursuant to 28.6(b)(4) above, may be considered at arbitration.

      (c)     Deadlines.

         (1)     If any action falls due on a Saturday, Sunday, or Holiday, the action shall be considered timely if it accomplished by 5:00 p.m. on the following business day.

         (2)     If, after the filing of a grievance, a required action on the grievance falls during a time period when the faculty member is on approved leaves pursuant to the provisions of Article 21.6, 21.7, 21.8, 21.12(a)(1), 21.12(a)(3) or 21.12(c), the deadline for such action shall be extended until fifteen (15) days after the faculty member returns from the leave.

         (3)     Upon failure of the University to provide a grievance decision within the time limits provided in this Article, the grievant or UFF, where appropriate, may file an appeal at the next step.

         (4)     Upon the failure of the grievant or UFF, where appropriate, to file an appeal within the time limits, the grievance shall be deemed to have been resolved by the decision at the prior step.

         (5)     All time limits contained in this Article may be extended by mutual agreement of the parties in writing.

(d)        Postponements.

(1)        Except for any grievances alleging in whole or part a violation of ARTICLE 27, the grievant may submit a written request to the hearing officer at the appropriate step for the postponement of any action in processing the grievance formally for a period of up to fifteen (15) days. The initial such request shall be granted.

(2)        Additional extensions may be granted by the hearing officer at the appropriate step.

(3)        The grievant shall have the right to representation by UFF during attempts at informal resolution of a dispute or grievance.

(4)        The grievant may, at any time, terminate the postponement period by giving written notice to the hearing officer at the appropriate step.

28.7     Step 1 Grievance Hearing. The dean or designee shall be the hearing officer at Step 1. The dean or designee shall schedule a Grievance Hearing, which shall take place no later than fifteen (15) days following receipt of the grievance.

(a)        The dean or designee shall provide the grievant and UFF with any additional documents on which the action was based no later than three (3) days prior to the Grievance Hearing, whenever possible. If additional documents become available after the Grievance Hearing, the dean or designee shall offer the grievant and designated UFF representative the opportunity to review and respond to these documents in a continuation of the Grievance Hearing.

(b)        The grievant shall have the right to present any evidence in support of the grievance at the Grievance Hearing.

(c)        Decision. The dean or designee shall render a written decision, stating the reasons for the decision, to the grievant, the grievant's representative, the UFF Grievance Chair, and the Provost or designee within ten (10) days following the conclusion of the  hearing.

(1)        No documents shall be referred to in the decision that have not been provided to the grievant and the UFF representative or the grievant's legal counsel.

(2)        Any new documents presented at the hearing shall be included in the University response.

28.8     Step 2 Grievance Review.

(a)        Review. The Provost or designee shall be hearing officer at Step 2. The deadline for requesting a Step 2 grievance is twenty (20) days following the issuance of the Step 1 decision. The Provost or designee and the representative of the grievant shall meet for the purpose of reviewing the matter no later than ten (10) days following the receipt of the request.

(b)        Decision. The Provost or designee shall issue a written decision, stating the reasons for the decision, to the grievant, the grievant's representative, and UFF Grievance Chair within ten (10) days following the conclusion of the review meeting.

(1)        No documents shall be relied upon in the decision that the grievant and

the UFF representative or the grievant's legal counsel have not had an opportunity to respond to.

(2)     Any new documents presented at the hearing shall be included in the University response.

(c)     In the absence of an agreement to extend the period for issuing the Step 2 decision, UFF may proceed to arbitration if grievant's Step 2 representative has not received the written decision by the end of the 10th day following the conclusion of the Step 2 hearing.

28.9   Arbitration.

(a)     Filing. If the grievance has not been satisfactorily resolved at Step 2, UFF may, upon the request of the grievant, proceed to arbitration by filing a written notice of the intent to do so on the form shown in APPENDIX D.

(1)     Notice of intent to proceed to arbitration must be within forty-five (45) days after receipt of the Step 2 decision or, in the event of suspension or termination, forty-five (45) days from the University's act or omission giving rise to the arbitration. The request for arbitration shall be signed by the grievant and UFF President or designee.

(2)     The grievance may be withdrawn at any time by the grievant or by UFF.

(b)     Stipulation to Issues and Arbitrability.

(1)     The University and UFF shall stipulate to the issue(s) to be arbitrated prior to the arbitration. Only those acts or omissions identified at the initial grievance filing, or added as amendments pursuant to 28.6(b)(4) above, may be considered at arbitration. If a stipulation is not reached, the parties shall provide their recommended issues to the arbitrator, who shall decide the issue(s) to be arbitrated based upon the submitted evidence.

(2)     Arbitrability. Issues of arbitrability shall be bifurcated from the substantive issues(s) and determined by means of a hearing, which may be conducted by conference call. The arbitrator shall have fifteen (15) days from the hearing to render a decision on arbitrability.

(c)     Creation of the Arbitration Panel.

(1)     Designees of the University and UFF shall meet within ninety (90) days after ratification of this Agreement for the purpose of selecting an arbitration panel of no less than six (6) members.

(2)     The panel of six (6) arbitrators shall be determined by the following process. The University and UFF shall each propose six (6) arbitrators. From this list of the twelve (12) names, the parties shall alternately strike names until a permanent panel of six (6) arbitrators has been selected. The right of the first choice to strike from the list shall be determined by a flip of a coin. Arbitrators shall be asked to serve on a rotational basis, the sequence to be determined by lot.

(3)     If the number of arbitrators willing to serve on the panel falls below six (6), the University and UFF shall each submit an additional three (3) names for each vacancy. The striking procedure described above shall be used to bring the total in the panel to six (6),

126

except that the right of the first choice to strike from the list shall go to whichever party went second in the previous panel selection.

(4)     The arbitration panel shall be operative until a successor Agreement is implemented.

(d)     Authority of Arbitrator.

(1)     The arbitrator shall neither add to, subtract from, modify, nor alter the terms or provisions of this Agreement.

(2)     Arbitration shall be confined solely to the application and/or interpretation of this Agreement and the precise issue(s) submitted for arbitration.

(3)     The arbitrator shall refrain from issuing any statements of opinion or conclusions not essential to the determination of the issues submitted. Where an administrator has made a reasonable judgment involving the exercise of permissible discretion, such as subjective evaluative decisions regarding tenure or promotion, the arbitrator shall not substitute the arbitrator's judgment for that of the administrator. Nor shall the arbitrator review such decision except for the purpose of determining whether the decision has violated this Agreement.

(4)     If the arbitrator determines that the Agreement has been violated, the arbitrator shall direct the University to take appropriate remedial action.

(5)     An arbitrator may award back salary and related retirement contributions where the arbitrator determines that the faculty member is not receiving the appropriate salary from the University. The arbitrator may not award other monetary damages or penalties.

(6)     An arbitrator's decision awarding employment beyond the tenure probationary period shall not entitle the faculty member to tenure. In tenure cases in which a substantive violation of this Agreement has been found, the remedy shall be for the grievant to be granted an additional year employment and reconsidered for tenure without prejudice at the earliest opportunity.

(7)     If notice that further employment will not be offered is not given on time, the arbitrator may direct the university to renew the appointment only upon finding that no other remedy is adequate, and the notice was given so late that (a) the employee was deprived of reasonable opportunity to seek comparable employment, or (b) the employee actually rejected an offer of comparable employment which the employee otherwise would have accepted.

(e)     Scheduling of Hearing.

(1)     The arbitrator shall hold the hearing in Gainesville unless otherwise agreed to by the parties. The parties shall provide the arbitrator with the schedules of the grievant, the grievant's representative, the UFF grievance representative (if different from the grievant's representative), the University representatives, and the desired witnesses. The hearing shall commence no later than sixty (60) days after the arbitrator's acceptance of selection, or as soon thereafter as is practicable.

(2)     The arbitrator shall notify all parties of the date, time, and place of the arbitration hearing as soon as possible but in no case later than thirty (30) days before the

hearing date.

(f)     Conduct of Hearing. Except as modified by the provisions of this Agreement, arbitration proceedings shall be conducted in accordance with the rules and procedures of the American Arbitration Association.

(g)     Venue. For purposes of venue in any judicial review of an arbitrator's decision issued under this Agreement, the parties agree that such an appeal shall be filed in the courts in Alachua County, Florida, unless both parties specifically agree otherwise in a particular instance. In an action commenced in Alachua County, neither the University nor UFF will move for a change in venue based upon the defendant's residence in fact if other than Alachua County.

(h)     Retroactivity. An arbitrator's award may or may not be retroactive as the equities of each case may demand, but in no case shall an award be retroactive to a date earlier than one hundred and twenty (120) days prior to the date the grievance was initially filed.

(i)     Fees and Expenses.
        (1)     All fees and expenses of the arbitrator shall be divided equally between the parties. Each party shall bear the cost of preparing and presenting its own case.
        (2)     The party desiring a transcript of the arbitration proceedings shall provide written notice to the other party of its intention to have a transcript of the arbitration made at least one (1) week prior to the date of the arbitration.
                a.     The party desiring such transcript shall be responsible for the scheduling a stenotype reporter to record the proceedings.
                b.     The parties shall share equally the appearance fee of the stenotype reporter and the cost of obtaining an original transcript and one (1) copy for the party originally requesting a transcript of the proceedings.
                c.     The requesting party shall, at its expense, photocopy the copy of the transcript received from the reporter and deliver the photocopy to the other party within five (5) days after receiving the copy of the transcript from the reporter.

(j)     Precedent. No complaint informally resolved, or grievance resolved, shall constitute a precedent for any purpose unless agreed to in writing by the President or designee and UFF acting through its President or designee.

28.10    Decision of the Arbitrator. The arbitrator shall issue the decision within thirty (30) days of the close of the hearing or the submission of briefs, whichever is later, unless additional time is agreed to by the University and UFF.
(a)     The decision shall be in writing and shall set forth findings of fact, reasoning, and conclusions on the issues submitted. The decision shall not refer to any documents other than those presented at the arbitration hearing.

(b)     The arbitrator shall ensure that copies of the decision are sent to the grievant's

representative, the UFF Grievance Chair, and the University's representative.

     (c)     Effect of Decision. The decision or award of the arbitrator shall be final and binding upon the University, UFF, and grievant, provided that either party may appeal to an appropriate court of law a decision that was rendered by the arbitrator acting outside of or beyond the arbitrator's jurisdiction, pursuant to the Florida Arbitration Code, Chapter 682, Florida Statutes.

28.11    Records. All written materials created as a result of a grievance, except decisions resulting from arbitration or settlement, shall be filed in a secure location separate from the evaluation file of the grievant or witnesses.

28.12    Implementation. Upon resolution of the grievance, the parties shall implement the remedy within seven (7) days, unless otherwise provided by the award of the arbitrator or by mutual agreement of the parties.

**ARTICLE 29**
**ACCESS TO DOCUMENTS**

29.1   Board of Trustees and University Documents.

(a)      UFF may make public records requests of the University, which will be handled in accordance with the University's normal public records process, including invoicing where appropriate. In addition to public records requests, UFF may make a request for records under this ARTICLE 29 and the University shall provide UFF with an electronic copy of documents necessary to administer grievances and other provisions of this agreement or otherwise carry out UFF's obligations as the certified bargaining agency for the faculty. Alternatively, the University may provide UFF with the URL address for these materials. The University may request clarification concerning an ARTICLE 29 request. Any disagreement regarding document requests made according to this Article shall be subject to the grievance procedure as laid out in ARTICLE 28, GRIEVANCE PROCEDURE AND ARBITRATION.

(b)      If not available on a web site, University shall provide UFF with an electronic copy of the agenda, supporting materials and minutes of public meetings (including public subcommittee meetings) that bear on the terms and conditions of employment of faculty members.

(c)      The University shall ensure that documents below are available by links on the University web site or in an easily accessible location in Smathers West.
        (1)      agenda and minutes of meetings of the Board of Governors;
        (2)      agenda, supporting materials, and minutes of public meetings of the Board of Trustees and its committees;
        (3)      University regulations;
        (4)      University operating budget and the previous year's expenditure analysis to the extent this is public information;
        (5)      this collective bargaining agreement and all supplements to it;
        (6)      other policies and procedures affecting faculty terms and conditions of employment;
        (7)      minutes of the DRS Advisory Council; and
        (8)      The DRS operating budget.

29.2      Salary Records Access. On September 30 of each year, the University shall provide UFF with an electronic copy of faculty employment records reflecting the salary increases for each in-unit faculty member during the preceding twelve (12) months by each increase category.

29.3      Bargaining Unit Member List. On September 30 of each year, the University shall provide UFF with an electronic spreadsheet including the name, UFID, percentage FTE appointment, date of hiring, department/unit, position code, title/rank (which will include designation as visiting or regular status), date promoted to rank, office location (building name/number and office number), current year salary rate, in-bargaining unit code, e-mail address, contact telephone number, and contact mailing address for each member in the

bargaining unit.

29.4     Not less than annually, UFF shall provide the University's designee for contract administration with the names and email addresses of the union officers and the union representative who is designated to receive documents referred to in this Article. UFF shall notify the designee of any changes to the list of union officers or designated representatives to receive documents.

29.5     Costs. All copies of materials and access to materials discussed in this Article shall be provided without cost.

**ARTICLE 30**
**LAYOFF AND RECALL**

30.1     Layoff.

(a)     When a layoff is to occur as a result of adverse financial circumstances; reallocation of resources; reorganization of degree or curriculum offerings or requirements; reorganization of academic or administrative structures, programs, or functions; or curtailment or abolition of one (1) or more programs or functions; the University shall notify UFF no less than thirty (30) days prior to taking such action.

(b)     Layoff Unit. The layoff unit may be at an organizational level of the university, such as a college/unit, school, department/unit, area, program, or other level of organization as the University deems appropriate.

30.2     Layoff Considerations. The selection of employees in the layoff unit to be laid off will be determined as follows:

(a)     No tenured or permanent status employee shall be laid off if there are non-tenured or non-permanent status employees in the layoff unit.

(b)     No employee in a non-tenured or non-permanent status position in the layoff unit with more than five (5) years of continuous university service shall be laid off if there are any such employees with five (5) years or less service.

(c)     The sole instance in which only one (1) employee will constitute a layoff unit is when the functions that the employee performs constitute an area, program, or other level of organization at the university.

(d)     The provisions of 30.2(a) and 30.2(b) will apply unless the University determines an Affirmative Action employment program will be adversely affected. When an Affirmative Action program has been so affected, the University shall notify UFF in writing.

(e)     Where employees are equally qualified under 30.2(a) and 30.2(b) above, those employees will be retained who, in the judgment of the University, best will contribute to the institutional mission and purpose. In making such judgment, the University shall carefully consider employees' length of continuous university service, and take into account other appropriate factors, including but not limited to performance evaluation by students, peers, and supervisors, and the employee's academic training, professional reputation, teaching effectiveness, research record or quality of the creative activity in which the employee may be engaged, and service to the profession, community, and public.

(f)     No tenured or permanent status employee shall be laid off solely for the purpose of creating a vacancy to be filled by an administrator entering the bargaining unit.

(g)     The University shall notify UFF in writing regarding the use of adjunct and other

132

non-unit faculty in those departments/units where employees have been laid off. The use of adjunct and other non-unit faculty in departments/units where employees have been laid off may be the subject of consultation meetings.

30.3     Alternative/Equivalent Employment. The University shall make a reasonable effort to locate appropriate alternate or equivalent employment for laid-off employees and shall share the results of the effort with the person affected.

30.4     Notice. Employees should be informed of layoff as soon as practicable and, where circumstances permit, employees with three (3) or more years of continuous university service should be provided at least one (1) year's notice; those with less service with at least six (6) months' notice. The University shall consider the normal hiring cycle of the employee receiving the layoff notice in an effort to facilitate successful transition/relocation from the University. Employees who have received notice of layoff shall be afforded the recall rights granted under Section 30.5. Formal written notice of layoff is to be sent certified mail, return receipt requested, or delivered in person to the employee with written documentation of receipt obtained. The notice shall include effective date of layoff; reason for layoff; reason for shortened period of notification, if applicable; a statement of recall rights; a statement of appeal/grievance rights and applicable deadlines for filing; and a statement that the employee is eligible for consideration for retraining for a period of two (2) years following layoff.

30.5   Re-employment/Recall.

(a)       For a period of two (2) years following layoff, an employee who has been laid off and who is not otherwise employed in an equivalent full-time position shall be offered re-employment in the same or similar position at the University should an opportunity for such re-employment arise. It shall be the employee's responsibility to keep the University advised of the employee's current address. Any offer of re-employment pursuant to this section must accepted within fifteen (15) days after the date of the offer. If such offer of re-employment is not accepted, the employee shall receive no further consideration pursuant to this Article. The University shall notify UFF of the opportunity for such re-employment and when an offer of re-employment is issued.

(b)       An employee who held a tenured or permanent status appointment on the date of termination by reason of layoff shall resume the tenured or permanent status appointment upon recall.

(c)       The employee shall receive the same credit for years of service for purposes of layoff as held on the date of layoff.

(d)       Employee Assistance Programs. Consistent with the University's Employee Assistance Program, employees participating in an employee assistance program who receive a notice of layoff may continue to participate in that program for a period of ninety (90) days following the layoff.

30.6     Limitations. The provisions of Section 30.2 through 30.5 of this Agreement shall not apply to employees:

  (a)  On "soft money," e.g., contracts and grants, sponsored research funds, and grants and donations trust funds;

  (b)  On fixed multi-year appointments;

  (c)  On visiting appointments;

  (d)  Who have received notice of non-reappointment; or

  (e)  Who are appointed for less than one (1) academic year.

**ARTICLE 31**
**TOTALITY OF AGREEMENT**

31.1    Limitation.

(a)    The University and UFF acknowledge that during the negotiations that resulted in the Agreement, the University and UFF had the unlimited right and opportunity to present demands and proposals with respect to any and all matters lawfully subject to collective bargaining.

(b)    The University and UFF further acknowledge that all of the understandings and agreements arrived at thereby are set forth in this Agreement, and that it shall constitute the entire and sole Agreement between the parties for its duration.

31.2    Obligation to Bargain Changes. During the term of this Agreement, the University and UFF agree that neither party shall be obligated to bargain collectively with respect to any subject or matter covered by this Agreement. Notwithstanding these limitations, if the University seeks to change a term or condition of employment for faculty, the University shall be obligated to bargain the impact of such change.

**ARTICLE 32**
**SEVERABILITY**

32.1     Invalidation of a Provision of this Agreement.
        (a)        A provision of this Agreement shall be invalid and have no force or effect, if it:
                (1)        Is found to be invalid or unenforceable by final decision of a tribunal of competent jurisdiction, or
                (2)        Is rendered invalid by reason of any subsequently enacted legislation, or
                (3)        Has the effect of rendering the University ineligible for state or federal funding, or
                (4)        Pursuant to Section 447.309(3), Florida Statutes, can take effect only upon the amendment of a law, rule, or regulation and the governmental body having such amendatory powers fails to take appropriate legislative action.

        (b)        If any provision is invalid for the reasons set forth in 32.1(a), it shall not affect the remainder of the Agreement, and all other terms and provisions shall continue in full force and effect.

32.2     Negotiations on Replacement Provisions. If a provision of this Agreement fails for reasons set forth in Section 32.1(a)(1), 32.1(a)(2), or 32.1(a)(3) above, the parties shall immediately enter into negotiations for the purpose of arriving at a mutually satisfactory replacement for such provision.

32.3     Effect of Passage of Law. If any provision of this Agreement is rendered invalid by subsequently enacted legislation that is later wholly or partially overturned through a final adjudication by the highest tribunal having jurisdiction over the University, the University agrees to engage in collective bargaining with UFF regarding the provision with the intent of restoring it consistent with the final adjudication.

32.4     Authority. Except as set forth above, this Article is not intended to cede authority to any party to invalidate any provision of this Agreement. UFF does not concede to the constitutionality of any subsequently enacted legislation that invalidates a term of this Agreement. The University or UFF may choose, but neither is obligated, to challenge said legislation.

136

**ARTICLE 33**
**AMENDMENT AND DURATION**

33.1     Effective Date. The Agreement shall become effective July 1, 2021, and shall remain in effect through June 30, 2024, unless it is extended by mutual agreement of the parties, pursuant to the Public Employees Relations Act (Chapter 447, Part II, Florida Statutes).

33.2     At any time during this contract, the parties may agree to re-open specific articles or sections of articles of the contract. Such re-opener negotiations shall be concluded within ninety (90) days.

33.3     Successor Agreement. Renegotiations for a successor agreement shall begin no later than nine (9) months prior to the end of the ratified Agreement.

33.4     Memoranda and Amendments. The parties are authorized to enter into agreements or understandings that do not need to be submitted for ratification. If an agreement or understanding amends an express provision of the ratified collective bargaining agreement, then the agreement or understanding shall become part of this Agreement upon ratification by both parties.

**ARTICLE 34**
**COPIES**

34.1     Copies.
        (a)     The University shall provide UFF 200 copies of this Agreement at no cost.

        (b)     The University shall make available a print-on-demand feature. The cost of such printed copies shall be borne by the user.

        (c)     The University shall provide UFF an electronic copy of this Agreement and all supplements.

        (d)     The University shall provide a link titled "Faculty Collective Bargaining Agreement," to a searchable PDF version of the ratified UF BOT-UFF Agreement, on the University's Human Resource Services web page.

**ARTICLE 35**
**DEFINITIONS**

The following terms, not otherwise defined in Articles, are used in this agreement:

— "academic year" means a period consisting of a Fall and Spring semester of approximately thirty-nine (39) consecutive weeks, or approximately forty-two (42) consecutive weeks for the P. K. Yonge Developmental Research School.

— "semester" means one of the two approximately 19.5-week periods (approximately twenty-one (21) week period for the P. K. Yonge Developmental Research School) that together constitute the academic year.

— "year" means a period of twelve (12) consecutive months.

— "fiscal year" is the University fiscal year (July 1-June 30).

— "months" means calendar months.

— "days" means calendar days, unless otherwise indicated.

— "University" means the University of Florida and its Board of Trustees.

— "Agreement" means this Collective Bargaining Agreement between the University of Florida Board of Trustees and the United Faculty of Florida.

— "Trustees" or "Board of Trustees" or "Board" means the legally responsible governing body of the University of Florida, established by Florida Statutes, acting through the President and the rest of the University Administration and staff. "Trustees" is usually intended to mean the University administration acting on behalf of the Trustees, and an instruction given by a member of the University Administration shall be understood to be an instruction from the Trustees.

— "administration" or "University Administration" means administrative staff acting on behalf of the Board of Trustees or its designees.

— "college" or "college/unit" means a college or a comparable administrative unit generally equivalent in size and character to a college.

— "dean" means the principal administrator of a college or of a comparable administrative unit equivalent in size and character to a college.

— "department" or "department/unit" means a department or a comparable administrative unit generally equivalent in size and character to a department.

— "supervisor" means an individual identified by the President or designee as having immediate administrative authority over bargaining-unit employees.

— "faculty member" means a member of the bargaining unit, and "faculty" or "faculty members" means all members of the bargaining unit.

— "bargaining unit" means those employees, collectively, represented for collective bargaining purposes by UFF pursuant to the certification of the Florida Public Employees Relations Commission.

— "UFF" means the United Faculty of Florida. However, passages in the Agreement referring to notifying or providing documents to UFF, unless otherwise indicated, mean notifying or providing documents to the President of the UFF Chapter or designated representative.

— "UFF Grievance Chair" means the chair of the Grievance Committee of the UFF Chapter.

— "equitable" means fair and reasonable under the circumstances.

— "if practicable" means capable of being put into practice and resources are available.

— "FTE" means "full time equivalent or effort."

— "principal place of employment" means the campus location or other University site specified on the faculty member's official employment documents and where most of the assignment is performed.

— "continuous service" means employment uninterrupted by a break in service. For academic- year faculty members (9- or 10-month faculty members), one (1) year of continuous service is equivalent to the nine (9)- or ten (10)-month employment period.

— "break in service" means those absences following which the faculty member is treated as a new faculty member for purposes of computing seniority and years of service. An absence as a result of an approved compensated or uncompensated leave is not considered a "break in service."

— "in writing" shall mean any form of written communication (electronic or hard copy).

**APPENDIX A**
**POSITION CLASSIFICATIONS IN THE BARGAINING UNIT**

All employees at the University of Florida in the following positions holding regular, visiting, provisional, research, affiliate, or joint appointments are included in the bargaining unit (for convenience, the positions are listed here with the corresponding University of Florida position classification code, as of May 2007):

000512 — Eminent Scholar
000516 — Graduate Research Professor
000517 — Distinguished Service Professor 000518 — Professor
000524 — Associate Professor
000530 — Assistant Professor
000789 — Clinical Professor
000790 — Clinical Associate Professor
000791 — Clinical Assistant Professor
000534 — Master Lecturer
000533 — Senior Lecturer
000531 — Lecturer
000428 — University Librarian
000432 — Associate University Librarian
000436 — Assistant University Librarian
000431 — University School Professor
000435 — University School Associate Professor
000438 — University School Assistant Professor
000440 — University School Instructor
000507 — Curator
000519 — Associate Curator
000525 — Assistant Curator
000421 — Research Associate
001558 — Senior Associate in_____(a person who is directly engaged in teaching, researching, student advising, or library-related services requiring professional knowledge, and is not purely technical support or exercises purely administrative functions)
000429 — Associate in_____(a person who is directly engaged in teaching, researching, student advising, or library-related services, requiring professional knowledge, and is not purely technical support or exercises purely administrative functions)
000433 — Assistant in_____(a person who is directly engaged in teaching, researching, student advising, or library-related services requiring professional knowledge, and is not purely technical support or exercises purely administrative functions)
000508 — Engineer
000520 — Associate Engineer

141

000526 — Assistant Engineer
000509 — Scholar
000521 — Associate Scholar
000527 — Assistant Scholar
000510 — Scientist
000522 — Associate Scientist
000528 — Assistant Scientist
001254, 001427, or 001428 — Research Information Co-ordinator
001245, 001418, or 001419— Broadcasting Coordinator I
001255 — University Research Associate Director V
001264 or 001433 — Psychologist III or VI
001278 — Psychiatrist
001279 — University Physician
001280, 001449, or 001471 — Physician's Assistant
001294, 001462 — Student Counseling Specialist
C1 — Chairs or School Director (Chair equivalent) in the following colleges:
　　　　College of Liberal Arts and Sciences
　　　　College of Education
　　　　College of Business Administration
　　　　College of the Arts
　　　　College of Health and Human Performance
C2 — Associate Chair or Associate School Director (Associate Chair equivalent)
C3 — Assistant Chair or Assistant School Director (Assistant Chair equivalent)
G1 — Program Director, or Center Director (with "F" as the third digit of the position classification code, having duties that are more akin to those of a Chair than those of a Dean); and
　　　　Program/Center Director (with "7" as the third digit of the occupational code) of English (Dial Center); Criminology, Law, and Society; Linguistics; Women's Studies; Dean's Office Education (Lastinger Learning Center); and European Studies programs
N1 — Coordinator

All other employees of the University of Florida Board of Trustees are excluded from this bargaining unit.

**APPENDIX B**
**UNITED FACULTY OF FLORIDA UFF-FEA-NEA**
***SAMPLE* UFF DUES DEDUCTION AUTHORIZATION FORM**

*Please fill out the form below and return it to:*

__ [Name]_, President, UFF-UF Chapter, P.O. Box 112070, 308 Yon Hall

MEMBERSHIP FORM, UNITED FACULTY OF FLORIDA
*Please Print Complete Information*

_____     _____
Social Security Number                          Last Name            First Name        MI

_____     _____
Home Street Address                             Campus Address & P.O. Box Department

_____     _____
City                   State      Zip Code          Office Phone                      Home Phone

_____     _____
E-mail Address – Personal / Home            Email Address – Office

Please enroll me immediately as a member of the United Faculty of Florida (FEA-NEA-AFT, AFL-CIO). I hereby authorize my employer to begin bi-weekly payroll deduction of United Faculty of Florida dues in such amount established from time to time in accordance with the constitution and bylaws of the UFF and certified in writing to the University Administration. This deduction authorization shall continue until revoked by me at any time upon thirty (30) days written notice to the Office of Human Resource Services and to the United Faculty of Florida.

_____
Signature (for payroll deduction authorization)                   Today's Date

Return to the UFF State Office, 115 N Calhoun Street, Suite 6, Tallahassee, FL 32301, or to the UFF-UF Office,
P.O. Box 112070, 308 Yon Hall, UF.

*Visit the UFF-UF Chapter Web Site at* http://www.uff-uf.org

143

**UNITED FACULTY OF FLORIDA UFF-FEA-NEA**
**SAMPLE UFF-PAC PAYROLL DEDUCTION AUTHORIZATION FORM**

United Faculty of Florida - Political Action Committee 115 N Calhoun Street, Suite 6
Tallahassee, FL 32301
850-224-8220

*Please Print*

University/College_____Dept.: _____

Name: _____

Address: _____

City:_____State:_____Zip: _____

*UFF-PAC Payroll Deduction (For University of Florida Faculty)*

I authorize the UF Board of Trustees, through the University Administration, to deduct from my pay contributions to UFF Political Action Committee in the amount of $1 per pay period, and I direct that the sum so deducted be paid over to UFF. The above deduction authorization shall continue until revoked by me through written notice to the Office of Human Resource Services and to UFF.

_____
Signature (for payroll deduction authorization)                Today's Date

Return to the UFF State Office listed above, or to the UFF-UF Office, P.O. Box 112070, 308 Yon Hall, UF.

144

**APPENDIX C**
**GRIEVANCE FORM**

I.   Date received by the Office of Human Resource Services (as authenticated by receipt, postmark, or date recorded on fax or email, as applicable)_____(must be received within forty-five (45) days of the date of the act or omission giving rise to the grievance, or within fifteen (15) days of the Notice of Discipline in grievances involving disciplinary action) by:

Personal delivery _____
U. S. Mail _____
Fax _____
Email _____ for email filing use:   (to be determined)

GRIEVANT                                                    STEP 1 GRIEVANCE   REPRESENTATIVE

NAME: _____     NAME: _____
                                              (print)                                                    (print)

CAMPUS MAILING ADDRESSES:

COLLEGE:_____     COLLEGE:_____

DEPT:_____     DEPT:_____

DEPT ADDRESS:_____     DEPT ADDRESS:_____

_____     _____

PHONE:_____     PHONE:_____

If grievant is represented by UFF or legal counsel, all University communications should go to the grievant's representative. Other addresses to which University mailings pertaining to grievance shall be sent:

_____

_____

_____

II.      GRIEVANCE

Article(s) and Sections(s) of Agreement allegedly violated:

_____

_____

Statement of grievance (must include date of acts or omissions complained of):

Remedy Sought:

III.     AUTHORIZATION

I will be represented in this grievance by (check one — representative must sign on the appropriate line):

_____ UFF                    _____

_____ Legal Counsel         _____

_____ Myself                _____

If the grievant elects self-representation or to be represented by legal counsel, the UFF shall also be notified in writing of the date, time, and place of any meeting or hearing called for the purpose of discussing the grievance, shall have the right to have an observer present at all meetings and/or hearings called for the purpose of discussing such grievance, and shall be sent copies of all decisions at the same time as they are sent to the other parties. No resolution of any individually processed grievance can be inconsistent with the terms of this Agreement.

I understand and agree that by filing this grievance, I waive whatever rights I may have

under chapter 120 of the Florida Statutes with regard to the matters I have raised herein and under all other University procedures which may be available to address these matters.

_____

Signature of Grievant                                                    Today's Date
(Grievant must sign if grievance is to be processed.)

The decision of the hearing officer shall be transmitted, by personal delivery with written documentation of receipt or by certified mail, return receipt requested, to the grievant, the grievant's representative, the UFF Grievance Chair, and the Provost or designee within ten (10) days following the conclusion of the meeting.

UNIVERSITY OF FLORIDA
Board of Trustees–United Faculty of Florida

**APPENDIX D**
**NOTICE OF ARBITRATION**

This notice was filed with the Office of Human Resource Services (as authenticated by receipt, postmark, or date recorded on fax or email) on_____by (check one):

        Personal delivery _____

        U. S. Mail _____

        Fax _____

        Email _____        for email filing use:  (to be determined)

The United Faculty of Florida hereby gives notice of its intent to proceed to arbitration in connection with the decision of the Trustees dated_____and received by the UFF Grievance Representative or the Grievant (if not represented by UFF) on _____ in this grievance of:

        NAME:

        BOT FILE NO:

The following statement of issue(s) before the Arbitrator is proposed:


_____  _____
Signature of UFF President or Designee           Date

I hereby authorize UFF to proceed to arbitration with my grievance. I also authorize UFF and the Board of Trustees or its representatives to use, during the arbitration proceedings, copies of any materials in my evaluation file pertinent to this grievance and to furnish copies of the same to the arbitrator.



_____  _____
Signature of Grievant                     Date

UNIVERSITY OF FLORIDA
Board of Trustees–United Faculty of Florida

**APPENDIX E**
**P. K. YONGE SALARY SCHEDULE**

The parties acknowledge that salary schedules and systems are subject to change as the Legislature and the Department of Education work to implement changes resulting from SB 736. What follows became effective for the 2013-14 year based on current understanding of Legislative intent and technical assistance by the Florida Department of Education. The system will remain in place for the entire contract, unless Florida statute or state board rules change the system. If changed, the parties agree to re-open APPENDIX E to modify as appropriate. The re-opener negotiations shall be in accordance with the provisions of ARTICLE 33.

All raises for P. K. Yonge faculty shall be in accordance with the provisions of Article 24.7.

The state requires two salary schedules: Grandfathered and Performance. They are described below.

**Grandfathered Salary System**
- Limited to fulltime school employees who remain on a permanent status contract
- Raises for promotions shall be in accordance with the provisions of ARTICLE 24
  - the basis for promotion raises shall be prior year's salary plus any degree supplement
- Employees are eligible for salary supplements in accordance with APPENDIX F
- Employees are eligible for advanced degree supplements described below
- Employees are eligible for career milestone supplements for promotions at the University

**Grandfathered Salary Schedule**
- **Advanced degree supplement**
  - With the new salary system(s) advanced degrees are removed from current salary and transferred in to a permanent salary supplement
  - The supplements are:
    - Masters $2000
    - Specialist          $3600
    - Doctorate          $5550
  - Supplements are only awarded for an advanced degree held in an individual's area of certification (for advanced degrees earned after July 1, 2011).
  - Applies only to the highest degree earned
  - The total supplement is adjusted for degrees already earned (that is, an individual who has a master's degree who then earns a Specialist degree would receive an additional $1600 when the Specialist degree is awarded)
- **Annual adjustment and evaluation adjustment**
  - $500 annual adjustment
  - $200 for Effective/Highly Effective summative evaluation rating (requirement of

149

S.1012.22, F.S.)

**Performance Salary System**
- For all instructional personnel on annual contract and permanent status faculty members who "opt in" to the Performance Pay System in lieu of permanent status
  - once they opt in, they may not return to the Grandfather System nor regain permanent status
- Annual performance adjustments may not be provided for an employee who receives an evaluation other than highly effective or effective for the year
- Raises for promotions shall be in accordance with the provisions of ARTICLE 24
  o the basis for promotion raises shall be prior year's salary plus any degree supplement
- Employees are eligible for salary supplements in accordance with APPENDIX F
- Employees are eligible for advanced degree supplements described below
- Employees are eligible for career milestone supplements for promotions at the University

**Performance Salary Schedule**
- **Base entry level = $38,000**
  - New hires may be credited for documented, effective, full-time equivalent K-12 teaching
  - Each year of credit is $600 and will be added to the base entry salary level figure above
- **Advanced degree supplement**
  - With the new salary system(s) advanced degrees are removed from current salary and transferred in to a permanent salary supplement
  - The supplements are:
    - Masters $2000
    - Specialist          $3600
    - Doctorate          $5550
  - Supplements are only awarded for an advanced degree held in an individual's area of certification (for advanced degrees earned after July 1, 2011).
  - Applies only to the highest degree earned
  - The total supplement is adjusted for degrees already earned (that is, an individual who has a master's degree who then earns a Specialist degree would receive an additional $1600 when the Specialist degree is awarded)
- **Annual Performance Adjustment**
  - Unsatisfactory                          No salary adjustment
  - Developing/Needs Improvement           No salary adjustment
  - Effective                                $ 600
  - Highly Effective                         $ 775

Note: for both the grandfathered and performance systems, the faculty member's salary will be base salary plus any degree supplement plus cumulative annual performance adjustment plus

any promotion supplement that was awarded after October 1, 2013.

**APPENDIX F**
**P. K. YONGE DEVELOPMENTAL RESEARCH SCHOOL FACULTY SALARY SUPPLEMENTS**

| ACTIVITY | SUPPLEMENT AMOUNT |
|---|---|
| Daily Summer Stipend | $30/hour; $180/day max |
| Teacher on District Administrative Assignment | $1000-$5000 |
| Drivers Education Trainer | Based On Collection |
| Sixth Period Class | 20% Of Salary |
| Planning for three or more preparations | $1500 |
| Teacher Leader | $1000 |
| Learning Community Leader | $2000 |
| Professional Learning Partner – Assigned Year 1 | $1200 |
| Professional Learning Partner – Assigned Year 2 | $800 |
| Professional Learning Partner – Assigned Year 3 | $400 |
| *Teacher Induction Participant | $250 |
| Club, Class, or Student Publication Sponsor | $500-$1500 |
| Choral Director | $1500 |
| Band Director | $3500 |
| Spring Arts Festival Show Preparation | $800 |

*Payable at end of year as a lump sum.

| ATHLETIC COACHES | SUPPLEMENT AMOUNT |
|---|---|
| Assistant Athletic Director | $2886 |
| Baseball Varsity Head Coach | $2419 |
| Baseball Varsity Assistant Coach | $1168 |
| Baseball JV Head Coach | $1381 |
| Baseball JV Assistant Coach | $1036 |
| Basketball Varsity Head Coach | $3368 |
| Basketball Varsity Assistant Coach | $2331 |
| Basketball JV Head Coach | $2331 |
| Cheerleading Head Coach | $2333 |
| Cheerleading Varsity Assistants/JV Head Coach | $1500 |
| Cross Country Head Coach | $1467 |
| Cross Country Assistant Coach | $650 |
| Cross Country JV | $400 |
| Diving Head Coach | $1168 |
| Football Head Coach | $4321 |
| Football Offensive Coordinator | $3361 |
| Football Defensive Coordinator | $3361 |
| Football Varsity Assistant Coach I | $2938 |
| Football Varsity Assistant Coach II & III | $2938 |
| Football JV Head Coach | $1869 |
| Football JV Assistant Coach | $1500 |
| Golf Head Coach | $1557 |
| Soccer Varsity Head Coach | $1988 |
| Soccer Varsity Assistant Coach | $1211 |
| Soccer JV Head Coach | $1211 |
| Softball Varsity Head Coach | $2419 |
| Softball Varsity Assistant Coach | $1168 |
| Softball JV Head Coach | $1381 |
| Swimming Head Coach | $1815 |

| | |
|---|---|
| Swimming Assistant Coach | $1168 |
| Tennis Head Coach | $1800 |
| Tennis Assistant Coach | $1036 |
| Track Head Coach | $2419 |
| Track Assistant Coach I, II, & III | $1381 |
| Volleyball Head Coach | $1988 |
| Volleyball Varsity Assistant Coach | $1168 |
| Volleyball JV Head Coach | $1211 |
| Volleyball Freshman Head Coach | $1036 |

(1)     A Faculty member who coaches both genders of the same sport but runs practice at the same time will receive 1 full stipend and ½ of the other (gender) stipend.

(2)     Ten percent (10%) of current supplement will be awarded to each athletic coach for advancement to and participation in regional finals. An additional ten percent (10%) of the current supplement will be awarded to each athletic coach for state play-offs. (Note: This additional supplement applies ONLY to those athletic coaches receiving a supplement listed above during regular season play.)

**APPENDIX G**
**UFOLIO ELECTRONIC SYSTEM FOR DISCLOSURE AND**
**REVIEW OF OUTSIDE ACTIVITIES AND INTERESTS**

**General Remarks**

*[**Note:** The "General Remarks" section of* APPENDIX G *contains information that is specific to faculty in the UFF-UF bargaining unit. It appears in this appendix as an informational preamble but will not appear in the UFOLIO system.]*

University of Florida faculty are required to disclose certain Outside Activities and Financial Interests. When properly approved and managed, the University of Florida and UFF-UF agree that Outside Activities may support faculty professional growth and reputation, create and disseminate new knowledge and ideas and further the University's mission of excellence in education, research and service. A faculty member's primary professional obligations are to maintain the highest ethical and professional standards and, as an agent of the University, act in its best interests. Faculty members may engage in approved Outside Activities, including employment, and hold Financial Interests as long as the activities and interests are in accordance with the law and do not conflict with their University duties and responsibilities.

UFOLIO is the University's electronic system for disclosure and review of Outside Activities and Financial Interests. The faculty member shall provide responses to the UFOLIO questions listed below. ARTICLE 26 of the Collective Bargaining Agreement governs such reporting for members of the UFF-UF bargaining unit. When consistent with the provisions of ARTICLE 26, relevant University officials may ask a faculty member follow up questions, beyond the UFOLIO questions, related to the disclosed Outside Activity to gather information helpful to the review and approval process. Faculty are under no obligation to provide additional information; however, the University may, under the provisions of Article 26.4(b), disapprove an activity if it has insufficient information to conduct its review. The University shall not make substantive changes to these questions in APPENDIX G or the information necessary for disclosure without bargaining with UFF.

Faculty are advised to review the definitions, terms and conditions of the reporting requirements defined in ARTICLE 26. By reporting such activities, a faculty member does not waive his or her constitutional rights and retains the rights and ownership to intellectual property consistent with ARTICLE 22.

**Basic Information**

Welcome to UFOLIO!

UFOLIO will guide you through disclosing your outside interests and activities.

You should gather any documents, such as consulting agreements, appointment letters, and contracts, which pertain to your Outside Activities and interests. You may need to reference or submit a copy of these documents on the following pages to determine if you should disclose your interests and to answer questions.

You may also want to reference the UFOLIO resources on our website, including quickstart guides, examples of inside/Outside Activities, and other materials are available here.

Please submit separate disclosures for each of your applicable Outside Activities and Financial Interests.

Please DO NOT disclose activities that your department leadership considers to be part of your UF role ("Inside Activities"). See example list for additional clarification: Examples of Inside and Outside Activities.

For faculty in the bargaining unit, please refer to ARTICLE 26, OUTSIDE ACTIVITY AND CONFLICT OF INTEREST, APPENDIX G, and ARTICLE 22, INTELLECTUAL PROPERTY, especially 22.4(a) with regard to Faculty exclusive ownership rights) of the Collective Bargaining Agreement to understand your reporting obligations and the definitions and examples of Inside Activity and other material terms utilized in UFOLIO.

For all other employees, please refer to the University's Conflict of Interest policy to understand your reporting obligations and definitions utilized in UFOLIO.

If you have nothing to disclose, please select that option on the next screen.

Please select the type of Outside Activity or interest you have to disclose. If you have multiple disclosures to enter, you will disclose one at a time (e.g., consulting for one outside entity and a leadership role with a different outside entity). If none of these activities or interests apply to you, select that option at the bottom of the list.

(1)      **Management or Material Interest:** An employee must report a management position (e.g., officer, director, partner, proprietor) held or material interest (more than a 5% ownership interest) owned by themselves, anyone in the Reporting Household, and any Relative (as defined in Florida Statute 112.312) whose position or interest is known to the employee, in an Entity that enters into any agreements or contracts with University (e.g., service agreements, leases, sales agreements).

(2)      **Publicly-Traded Entity Payments/Ownership:** An employee must report receipt of payments from or an ownership interest of $5,000 or more (including shares, partnership stake, or derivative interests such as stock options) in a publicly-traded Entity by the employee or anyone in the Reporting Household where the payments or ownership interest reasonably appear to be related to the employee's Inside Activities or Institutional Expertise. This does not include an ownership interest managed by a third party, such as a mutual or retirement fund.

(3)      **Privately-Held Entity Ownership:** An employee must report any ownership in a privately held Entity by the employee or a member of the Reporting Household, where the ownership interest reasonably appears to be related to the employee's Inside Activities or Institutional Expertise.

(4)      **Public Office/Candidate:** An employee must report if the employee is a candidate for public office or holds public office.

(5)      **Outside Teaching Appointments:** An employee must report if the employee has or is seeking approval to hold an additional (to their UF appointment) teaching appointment with an outside Entity, in the area of their Institutional Expertise that represents a Private Interest.

(6)      **Outside Research:** An employee must report if the employee oversees or conducts or is seeking approval to conduct any research in the general area of their Institutional Expertise at, or receive any research resources or funding from or through, any Entity other than the University. Research by Investigators conducted at Entities as part of a University sponsored project or research funding received by the University is subsumed under Inside Activity and hence does not need to be disclosed in UFOLIO.

(7)      **Classroom Works:** An employee must report if the employee requires or seeks approval to require students to purchase works to be used in the employee's classroom when such works were created, authored or co-authored (e.g., textbook(s), computer software, electronic or digital media) by the employee or employee's spouse and for which the employee

or their spouse will receive, or anticipate receiving payment, loan, subscription, advance, deposit of money or service or anything of monetary value.

(8)      **Royalties/Copyright/Licensing Income (according to ARTICLE 22 for faculty in the bargaining unit):** An employee must report if the employee receives royalties, licensing fees, and/or copyright income in the area of their Institutional Expertise of $5,000 or more, annually from an Entity other than the University.

(9)      **Expert Witness/Legal Consulting:** An employee must report if the employee serves or seeks approval to serve as an expert witness and/or engage in consulting in the area of their Institutional Expertise or Inside Activities in a legal matter like a lawsuit or a potential lawsuit.

(10)      **Professional Services Related to Institutional Expertise:** An employee must report if an employee provides or seeks approval to provide professional services to an outside Entity in the area of the employee's Inside Activities or Institutional Expertise that represent a Private Interest.

(11)      **Leadership Roles:** An employee must report if the employee has a senior management, administrative, or leadership role, that represents a Private Interest, with an outside Entity related to the employee's Inside Activities or Institutional Expertise where the employee makes executive business and/or financial decisions on behalf of the outside Entity.

(12)      **Innovation Inducement Cash Value Prize:** An employee must report if they choose to participate, as an Outside Activity, in a competition, with a prize amount greater than $5000, in the area of their Institutional Expertise.

(13)      **Nothing to Disclose**: By selecting this option, the employee is certifying that none of the statements listed above applies to the employee.

[Faculty will see this screen first if they indicate an activity in any of the first twelve categories.]

**Entity Information**

1. External entity:
    a. If you are unable to find the entity, please enter as text below:
        i. Is the entity publicly traded?
        ii. Country:
        iii. Entity-related documents:
2. Entity EIN tax number (optional):
3. Entity website URL (optional):

[Faculty will see this screen after the Entity screen if they indicate an activity in any of the first three categories.]

**Management, Material Interests and Ownership Interests**

1. Please fully describe the details of this relationship, interest, or activity including your role(s) with the entity, a complete description of what you will be doing in simple terms, and how it relates to your institutional expertise. Please note, providing sufficient detail up front will help expedite the review process for you.
2. Location of Entity
    a. City:
    b. County:
    c. State:
    d. Country:
3. Own equity, stock, or stock options in this entity?
    a. Does the ownership interest exceed 5% of the total value of the entity?
4. Is the expected annual compensation $5,000 or more?
    a. If yes, what is the amount of expected annual compensation? (You may provide additional clarification using #14 below).
5. Will UF equipment, facilities, services, resources be used (on a more than incidental basis), or will staff and/or students be involved in this activity or Financial Interest?
    a. Please describe the use of UF resources and/or involvement of UF staff and/or students:
6. In your performance of UF responsibilities, do you use products or services from this entity?
    a. Explain:
7. Are you participating in UF research that would affect the disclosed entity (e.g. the entity: sponsors the research, makes a drug or device being evaluated in the study, options or licenses related technology or is otherwise related to the study)?
8. Does your contract or agreement with the outside entity include language regarding intellectual property, works, patents, inventions or copyrights?
9. Does the entity sponsor your research at UF?
10. Does the entity license your technology from UF?
11. To the best of your knowledge, does this entity do any business whatsoever with UF? (e.g. purchasing agreements, research sponsorship, agreements for service, clinical trials, etc.)
    a. Do you provide input, make recommendations, influence decisions, or have any involvement whatsoever in any business between the entity and UF? Please explain in detail.

160

12.  Please upload an agreement with the entity to authenticate your responses to the questions in this section. If you do not have a formal agreement, please upload any email, correspondence, or document that serves the same purpose.

13. Does this relationship require any of your time (e.g., providing services, attending meetings, etc.)?

14. Additional relevant information, if any, that would help clarify this disclosure:

15. Attach any additional supporting documentation, if applicable (descriptive emails, letters, etc.):

[Faculty will see this screen after the Entity screen if they indicate an activity in the fourth category.]

**Public Office**

1. Please fully describe the details of this relationship, interest, or activity including your role(s) with the entity, a complete description of what you will be doing in simple terms, and how it relates to your institutional expertise. Please note, providing sufficient detail up front will help expedite the review process for you.
2. Location
    a. City:
    b. County:
    c. State:
    d. Country:
3. Will UF equipment, facilities, services, resources be used (on a more than incidental basis), or will staff and/or students be involved in this activity or Financial Interest?
    a. Please describe the use of UF resources and/or involvement of UF staff and/or students:
4. Additional relevant information, if any, that would help clarify this disclosure:
5. Attach any supporting documentation, if applicable (descriptive emails, letters, etc.):

[Faculty will see this screen after the Entity screen if they indicate an activity in the fifth category.]

**Outside Teaching Appointments**

1. Please fully describe the details of this relationship, interest, or activity including your role(s) with the entity, a complete description of what you will be doing in simple terms, and how it relates to your institutional expertise. Please note, providing sufficient detail up front will help expedite the review process for you.
2. Location where you will be teaching
   a. City:
   b. County:
   c. State:
   d. Country:
3. Is the estimated annual compensation $5,000 or more?
   a. If yes, what is the amount of estimated annual compensation?
4. Are you participating in UF research that would affect the disclosed entity (e.g. the entity: sponsors the research, makes a drug or device being evaluated in the study, options or licenses related technology or is otherwise related to the study)?
5. Does your contract or agreement with the outside entity include language regarding intellectual property, patents, inventions works or copyrights ?
6. Will UF equipment, facilities, services, resources be used (on a more than incidental basis), or will staff and/or students be involved in this activity or Financial Interest?
a. Please describe the use of UF resources and/or involvement of UF staff and/or students:
7. Please upload an agreement with the entity to authenticate your responses to the questions in this section. If you do not have a formal agreement, please upload any email, correspondence, or document that serves the same purpose.
8. Additional relevant information, if any, that would help clarify this disclosure:
9. Attach any additional supporting documentation, if applicable (descriptive emails, letters, etc.):

[Faculty will see this screen after the Entity screen if they indicate an activity in the sixth category.]

**Outside Research**

1. Please fully describe the details of this relationship, interest, or activity including your role(s) with the entity, a complete description of what you will be doing in simple terms, and how it relates to your institutional expertise. Please note, providing sufficient detail up front will help expedite the review process for you.
2. Location where you will be conducting the research
   a. City:
   b. County:
   c. State:
   d. Country:
3. Is the estimated annual compensation $5,000 or more?
   a. If yes, what is the amount of estimated annual compensation?
4. Are you participating in UF research that would affect the disclosed entity (e.g. the entity: sponsors the research, makes a drug or device being evaluated in the study, options or licenses related technology or is otherwise related to the study)?
5. Does your contract or agreement with the outside entity include language regarding intellectual property, patents, inventions, works or copyrights ?
6. Will UF equipment, facilities, services, resources be used (on a more than incidental basis), or will staff and/or students be involved in this activity or Financial Interest?
a. Please describe the use of UF resources and/or involvement of UF staff and/or students:
7. Does the entity sponsor your research at UF?
8. Does the entity license your technology from UF?
9. To the best of your knowledge, does this entity do any business whatsoever with UF? (e.g. purchasing agreements, research sponsorship, agreements for service, clinical trials, etc.)
   a. Do you provide input, make recommendations, influence decisions, or have any involvement whatsoever in any business between the entity and UF? Please explain in detail.
10. Please upload an agreement with the entity to authenticate your responses to the questions in this section. If you do not have a formal agreement, please upload any email, correspondence, or document that serves the same purpose.
11. Additional relevant information, if any, that would help clarify this disclosure:
12. Attach any additional supporting documentation, if applicable (descriptive emails, letters, etc.):

[Faculty will see this screen after the Entity screen if they indicate an activity in the seventh category.]

**Classroom Works**

1. Please fully describe the details of this relationship, interest, or activity including your role(s) with the entity, a complete description of what you will be doing in simple terms, and how it relates to your institutional expertise. Please note, providing sufficient detail up front will help expedite the review process for you.
2. Is the estimated annual compensation $5,000 or more?
    a. If yes, what is the amount of estimated annual compensation?
3. For books or other educational resources used in your classroom that you or your spouse created or co-authored and receive payments for (e.g., royalties), the work must generally meet the following parameters:
    a. The work is selected for academic reasons independent of any financial gain for you or your family members;
    b. The work includes original work by you, and is not solely a collection of the works of others;
    c. The work is offered at fair market prices;
    d. The work has been adopted for use at other higher education institutions;
    e. The work has been through a peer review process; and
    f. The work is protected by copyright and published/produced by an incorporated or registered publisher/entity that does not require users to waive intellectual property rights.
    g. Such required materials or resources also must not include sale, separate from the textbook or workbook, of exams, quizzes, required assignments, extra-credit assignments, and other general course information and evaluative materials that are customarily available in the textbook or workbook or are customarily made available to students free of charge.
        i. Does the book/resource meet these criteria?
        ii. If you answer no to the question above, please explain how the use of the resource best serves the academic interest of the class under the circumstances:
4. Please upload an agreement with the entity to authenticate your responses to the questions in this section. If you do not have a formal agreement, please upload any email, correspondence, or document that serves the same purpose.
5. Additional relevant information, if any, that would help clarify this disclosure:
6. Attach any additional supporting documentation, if applicable (descriptive emails, letters, etc.):

[Faculty will see this screen after the Entity screen if they indicate an activity in the eighth category.]

**Royalties/Licensing/Copyright Income**

1. Please fully describe the details of this relationship, interest, or activity including your role(s) with the entity, a complete description of what you will be doing in simple terms, and how it relates to your institutional expertise. Please note, providing sufficient detail up front will help expedite the review process for you.
2. Is the estimated annual compensation $5,000 or more?
    a. If yes, what is the amount of estimated annual compensation?
3. In your performance of your UF responsibilities, do you use this intellectual property?
    a. Explain:
4. Are you participating in UF research that would affect the disclosed entity (e.g. the entity: sponsors the research, makes a drug or device being evaluated in the study, options or licenses related technology or is otherwise related to the study)?
5. Does the entity sponsor your research at UF?
6. Does the entity license your technology from UF?
7. To the best of your knowledge, does this entity do any business whatsoever with UF? (e.g. purchasing agreements, research sponsorship, agreements for service, clinical trials, etc.)
    a. Do you provide input, make recommendations, influence decisions, or have any involvement whatsoever in any business between the entity and UF? Please explain in detail.
8. Please upload an agreement with the entity to authenticate your responses to the questions in this section. If you do not have a formal agreement, please upload any email, correspondence, or document that serves the same purpose.
9. Additional relevant information, if any, that would help clarify this disclosure:
10. Attach any additional supporting documentation, if applicable (descriptive emails, letters, etc.):

166

[Faculty will see this screen after the Entity screen if they indicate an activity in the seventh category and further indicate that it relates to a plaintiff in a health-care related matter.]

**Legal Consulting (Medical / Plaintiff)**

1.  Does this legal consulting/expert witness engagement relate to medical malpractice or any healthcare-related matter?
2.  I affirm that I have confirmed with the attorney with whom I will be working that neither the medical care or treatment at issue was provided by the University of Florida (either in Gainesville or in Jacksonville), the University of South Florida, Florida State University, the University of Central Florida, Florida International University, Florida Atlantic University, or any of their major affiliates. Should I subsequently learn that care or treatment at issue was provided by one of those entities, I will be expected to withdraw from participation in the matter.
3.  I affirm that the attorney with whom I will be working understands that my engagement in this activity is in my capacity as a private citizen and not as an employee of the University of Florida.
4.  Enter Plaintiff(s) name:
    a.   Enter full name of Patient (if applicable):
5.  Enter Plaintiff law firm/attorney name:
6.  Enter Defendant(s) name:
7.  Enter Defendant law firm/attorney name:
8.  City/State where the alleged issue occurred or relates to:
    a.   Will you be performing an Independent Medical Exam (IME)?
        i.   Where will the exam be conducted?
9.  Is the estimated annual compensation $5,000 or more?
    a.   If yes, what is the amount of estimated annual compensation?
10. Are you participating in UF research that would affect the disclosed entity (e.g. the entity: sponsors the research, makes a drug or device being evaluated in the study, options or licenses related technology or is otherwise related to the study)?
11. Will UF equipment, facilities, services, resources be used (on a more than incidental basis), or will staff and/or students be involved in this activity or Financial Interest?
    a.   Please describe the use of UF resources and/or involvement of UF staff and/or students:
12. Please explain whether you think this activity/case could in any way place you in a position that is adverse to the interests of the University of Florida.
13. Please upload an agreement with the entity to authenticate your responses to the questions in this section. If you do not have a formal agreement, please upload any email, correspondence, or document that serves the same purpose.
14. Additional relevant information, if any, that would help clarify this disclosure:

15. Attach any additional supporting documentation, if applicable (descriptive emails, letters, etc.):

[Faculty will see this screen after the Entity screen if they indicate an activity in the ninth category and further indicate that it relates to a defendant in a health-care related matter.]

**Legal Consulting (Medical / Defendant)**

1. Does this legal consulting/expert witness engagement relate to medical malpractice or any healthcare-related matter?
2. I affirm that the attorney with whom I will be working understands that my engagement in this activity is in my capacity as a private citizen and not as an employee of the University of Florida.
3. Enter Plaintiff(s) name:
    a. Enter full name of Patient (if applicable):
4. Enter Plaintiff law firm/attorney name:
5. Enter Defendant(s) name:
6. Enter Defendant law firm/attorney name:
7. City/State where the alleged issue occurred or relates to:
    a. Will you be performing an Independent Medical Exam (IME)?
        i. Where will the exam be conducted?
8. Is the estimated annual compensation $5,000 or more?
    a. If yes, what is the amount of estimated annual compensation?
9. Are you participating in UF research that would affect the disclosed entity (e.g. the entity: sponsors the research, makes a drug or device being evaluated in the study, options or licenses related technology or is otherwise related to the study)?
10. Will UF equipment, facilities, services, resources be used (on a more than incidental basis), or will staff and/or students be involved in this activity or Financial Interest?
    a. Please describe the use of UF resources and/or involvement of UF staff and/or students:
11. Please explain whether you think this activity/case could in any way place you in a position that is adverse to the interests of the University of Florida.
12. Please upload an agreement with the entity to authenticate your responses to the questions in this section. If you do not have a formal agreement, please upload any email, correspondence, or document that serves the same purpose.
13. Additional relevant information, if any, that would help clarify this disclosure:
14. Attach any additional supporting documentation, if applicable (descriptive emails, letters, etc.):

[Faculty will see this screen after the Entity screen if they indicate an activity in the ninth category and further indicate that it does not relate to a health-care related matter.]

**Legal Consulting (NON Medical / Government OR Defendant OR Plaintiff)**

1. Does this legal consulting/expert witness engagement relate to a civil, criminal or administrative proceeding? Indicate any that apply.
2. Will you be hired by the Government, Plaintiff or Defendant? Indicate any that apply.
3. I affirm that the attorney with whom I will be working understands that my engagement in this activity is in my capacity as a private citizen and not as an employee of the University of Florida.
4. Enter Plaintiff(s) name:
5. Enter Plaintiff law firm/attorney name:
6. Enter Defendant(s) name:
7. Enter Defendant law firm/attorney name:
8. City/State where the alleged issue occurred or relates to:
9. Is the estimated annual compensation $5,000 or more?
   a. If yes, what is the amount of estimated annual compensation?
10. Are you participating in UF research that would affect the disclosed entity (e.g. the entity: sponsors the research, makes a drug or device being evaluated in the study, options or licenses related technology or is otherwise related to the study)?
11. Will UF equipment, facilities, services, resources be used (on a more than incidental basis), or will staff and/or students be involved in this activity or Financial Interest?
    a. Please describe the use of UF resources and/or involvement of UF staff and/or students:
12. Please explain whether you think this activity/case could in any way place you in a position that is adverse to the interests of the University of Florida.
13. Please upload an agreement with the entity to authenticate your responses to the questions in this section. If you do not have a formal agreement, please upload any email, correspondence, or document that serves the same purpose.
14. Additional relevant information, if any, that would help clarify this disclosure:
15. Attach any additional supporting documentation, if applicable (descriptive emails, letters, etc.):

[Faculty will see this screen after the Entity screen if they indicate an activity in the tenth category.]

**Professional Services Related to UF Expertise**

1. Please fully describe the details of this relationship, interest, or activity including your role(s) with the entity, a complete description of what you will be doing in simple terms, and how it relates to your institutional expertise. Please note, providing sufficient detail up front will help expedite the review process for you.
2. Location where you will perform these professional services
   a. City:
   b. County:
   c. State:
   d. Country:
3. Is the estimated annual compensation $5,000 or more?
   a. If yes, what is the amount of estimated annual compensation?
      (You may provide additional clarification using #13 below).
4. Are you participating in UF research that would affect the disclosed entity (e.g. the entity: sponsors the research, makes a drug or device being evaluated in the study, options or licenses related technology or is otherwise related to the study)?
5. Will UF equipment, facilities, services, resources be used (on a more than incidental basis), or will staff and/or students be involved in this activity or Financial Interest?
   a. Please describe the use of UF resources and/or involvement of UF staff and/or students:
6. Does your contract or agreement with the outside entity include language regarding intellectual property, patents, inventions, works or copyrights ?
7. In your performance of your UF responsibilities, do you use products or services from this entity?
   a. Explain:
8. Does the entity sponsor your research at UF?
9. Does the entity license your technology from UF?
10. To the best of your knowledge, does this entity do any business whatsoever with UF? (e.g. purchasing agreements, research sponsorship, agreements for service, clinical trials, etc.)
    a. Do you provide input, make recommendations, influence decisions, or have any involvement whatsoever in any business between the entity and UF?
       i. Please explain in detail.
11. Please upload an agreement with the entity to authenticate your responses to the questions in this section. If you do not have a formal agreement, please upload any email, correspondence, or document that serves the same purpose.
12. Additional relevant information, if any, that would help clarify this disclosure:

13. Attach any additional supporting documentation, if applicable (descriptive emails, letters, etc.):

[Faculty will see this screen after the Entity screen if they indicate an activity in the twelfth category.]

**Leadership Roles**

1. Please fully describe the details of this relationship, interest, or activity including your role(s) with the entity, a complete description of what you will be doing in simple terms, and how it relates to your institutional expertise. Please note, providing sufficient detail up front will help expedite the review process for you.
2. Location where you will perform your leadership role
   a. City:
   b. Gainesville
   c. County:
   d. State:
   e. Country:
3. Is the estimated annual compensation $5,000 or more?
   a. If yes, what is the amount of estimated annual compensation?
   (You may provide additional clarification using #13 below).
4. Are you participating in UF research that would affect the disclosed entity (e.g. the entity: sponsors the research, makes a drug or device being evaluated in the study, options or licenses related technology or is otherwise related to the study)?
5. Will UF equipment, facilities, services, resources be used (on a more than incidental basis), or will staff and/or students be involved in this activity or Financial Interest?
   a. Please describe the use of UF resources and/or involvement of UF staff and/or students:
6. In your performance of your UF responsibilities, do you use products or services from this entity?
   a. Explain:
7. Does the entity sponsor your research at UF?
8. Does the entity license your technology from UF?
9. To the best of your knowledge, does this entity do any business whatsoever with UF? (e.g. purchasing agreements, research sponsorship, agreements for service, clinical trials, etc.)
   a. Do you provide input, make recommendations, influence decisions, or have any involvement whatsoever in any business between the entity and UF? Please explain in detail.
10. Please upload an agreement with the entity to authenticate your responses to the questions in this section. If you do not have a formal agreement, please upload any email, correspondence, or document that serves the same purpose.
11. Additional relevant information, if any, that would help clarify this disclosure:

12. Attach any additional supporting documentation, if applicable (descriptive emails, letters, etc.):

[Faculty will see this screen after the Entity screen if they indicate an activity in the twelfth category.]

**Innovation Inducement Cash Value Prize**

1. If you choose to participate, as an Outside Activity, in an Innovation Inducement Cash Value Prize with prize amount greater than $5000 in the area of your Institutional Expertise, please provide a website or announcement that provides the prize details including topic and terms of the prize participation, submission deadlines, and prize amount. For faculty in the bargaining unit, please refer to Article 26.12(a)(1) of the CBA related to this disclosure.

[Faculty will see this screen at the end of the UFOLIO process if they indicate an activity in any of the first twelve categories.]

**Time Commitment**

1. Approximately how long do you expect this activity or relationship to last in total?
    a. 2 weeks or less
        i. Estimated start date:
        ii. Estimated end date:
        iii. Approximately how many hours in total do you expect to spend on this activity? (Numerical values only, please)
        iv. Explain any additional information to clarify the dates or time commitment involved:
    b. 3 to 6 weeks
        i. Estimated start date:
        ii. Estimated end date:
        iii. Approximately how many hours per week do you expect to spend on this activity? (Numerical values only, please)
        iv. Explain any additional information to clarify the dates or time commitment involved:
    c. More than 6 weeks
        i. Estimated start date:
        ii. Estimated end date:
            1. I am not sure of the end date: (checkbox)
        iii. Approximately how many hours per week do you expect to spend on this activity? (Numerical values only, please)
        iv. Explain any additional information to clarify the dates or time commitment involved:

**Certification**

My initials on this completed electronic disclosure affirm and certify an understanding of and compliance with UF's policies on conflicts of interest, Outside Activities, and Financial Interests as well as the completeness and accuracy of my responses in this disclosure.
I will keep my disclosures up-to-date and accurate, and I confirm I understand and agree with the above statements. Enter initials here:

## Signature Page

In witness of this Collective Bargaining Agreement, the parties have set their signatures this 30th day of July in 2021.

FOR THE UNIVERSITY OF FLORIDA BOARD OF TRUSTEES

FOR THE UNITED FACULTY OF FLORIDA

Jodi Gentry
Vice President for
Human Resource Services

Helene Huet
Co-Chief Negotiator

William Keegan
Co-Chief Negotiator

William Connellan
Chief Negotiator

Paul Ortiz
President
UFF-UF

Chris Hass
Ryan Fuller
Kevin Clarke
Olivia Zink Weisman
Shannon Edwards

Candi Churchill
Sean Trainor
Martin Sorbille
Macy Geiger
John Bourn
Meera Sitharam
Oscar Crisalle
Rosana Resende
Lisa Scott
Emily McCann
Graham Picklesimer

178