# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### GAINESVILLE DIVISION

**UNITED FACULTY OF FLORIDA,**
**et al.,**

       *Plaintiffs,*

**v.**                                     **Case No.: 1:24cv136-MW/MAF**

**BRIAN LAMB, in his official capacity**
**as Chair of the Florida Board of Governors,**
**et al.,**

       *Defendants.*

_____/

## ORDER GRANTING IN PART AND DENYING IN PART
## MOTION TO DISMISS

This Court has considered, without hearing, Defendants' motion to dismiss Plaintiffs' Complaint, ECF No. 17, Plaintiffs' memorandum of law in opposition, ECF No. 24, and Defendants' reply in support, ECF No. 28. For the reasons stated below, Defendants' motion is due to be granted in part and denied in part.

I

In evaluating Defendants' motion to dismiss, this Court accepts the factual allegations in the complaint as true and construes them in the light most favorable to

Plaintiffs. *See Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016). The facts are these.

This case is a challenge by university faculty unions to a Florida law that purportedly bans their ability to arbitrate certain employment decisions. Plaintiffs are United Faculty of Florida ("UFF") and its chapters at the University of Florida ("UF") and Florida State University ("FSU"). ECF No. 1 ¶¶ 13–15. UFF is the statewide collective bargaining representative of more than 25,000 faculty, graduate employees, and academic professionals at Florida universities, state and community colleges, and lab schools. ECF No. 1 ¶ 13. Its UF chapter, UFF-UF, represents 2,069 faculty employed by the University of Florida, ECF No. 1 ¶ 15, and its FSU Chapter, UFF-FSU, represents 1,932 faculty employed by Florida State University, ECF No. 1 ¶ 14. Defendants are members of the Florida Board of Governors, University of Florida Board of Trustees, and Florida State University Board of Trustees, all sued in their official capacities. ECF No. 1 ¶¶ 16–25. UFF-UF and UFF-FSU, "with the support of UFF," negotiate collective bargaining agreements ("CBAs") with their universities' respective Boards of Trustees, represent members in grievance proceedings, and "engage[] in other advocacy in support of higher education faculty and public education more generally." ECF No. 1 ¶¶ 14–15.

Plaintiffs challenge a recent Florida law, Section 3 of Senate Bill 266 ("SB 266"), codified at Florida Statutes Section 1001.741(2) under the title "State

university personnel; recruitment of faculty; performance assessment and reporting; employment practices; requiring certain oaths or statements prohibited; grievances." ECF No. 1 ¶ 3; § 1001.741(2), Fla. Stat. The statute, in relevant part, provides that ". . . personnel actions or decisions regarding faculty, including in the areas of evaluations, promotions, tenure, discipline, or termination, may not be appealed beyond the level of a university president or designee. Such actions or decisions must have as their terminal step a final agency disposition, which must be issued in writing to the faculty member, and are not subject to arbitration . . ." § 1001.741(2), Fla. Stat.

Plaintiffs claim this portion of the statute, which they refer to as the "Arbitration Ban," is preempted by the Federal Arbitration Act ("FAA") "and thus invalid." ECF No. 1 ¶¶ 4–5. Plaintiffs bring an action pursuant to the Federal Arbitration Act, using 42 U.S.C. § 1983 and/or equity as vehicles, and seek "a declaration that the Arbitration Ban is invalid with respect to all CBAs governed by the FAA" and a "permanent injunction requiring Defendants to arbitrate adverse personnel decisions before a neutral arbitrator, as required by any operative CBAs, as well as prohibiting Defendants from enforcing the Arbitration Ban, removing or seeking removal of arbitration provisions from any public university CBA, or relying on the Arbitration Ban in future contract negotiations." ECF No. 1 ¶ 6.

Defendants' motion to dismiss raises several issues with Plaintiffs' Complaint. First, Defendants attack Plaintiffs' theory of standing, claiming Plaintiffs lack both an organizational and associational injury in fact and that their alleged injury is not traceable to or redressable by the Board of Governors. ECF No. 17 at 3–12. Second, Defendants claim Plaintiffs' purported cause of action under § 1983 and/or equity is deficient. *Id.* at 12–15. Third, Defendants claim the FAA does not preempt section 1001.741(2) because the latter "governs solely the State's relationship with its own employees." *Id.* at 15–17. Fourth, Defendants claim the FAA does not apply to the CBAs in question because they do not involve interstate commerce. *Id.* at 17–19. Fifth, Defendants claim that even if the FAA applies to the CBAs, Plaintiffs have failed to show any conflict between it and section 1001.741(2). *Id.* at 19–21.

In evaluating a Rule 12(b)(6) motion to dismiss, federal courts are instructed to adhere to a two-pronged approach. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). First, this Court must accept as true all factual allegations in the complaint, except for legal conclusions "supported by mere conclusory statements." *Id*. at 678. Second, taking the well-pleaded facts, this Court draws on its "judicial experience and common sense" to determine if the complaint states a "plausible claim for relief" that allows this Court to infer more than the "mere possibility of misconduct" from a defendant. *Id*. at 679. "A 'claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Hunt*, 814 F.3d at 1221 (quoting *Ashcroft*, 556 U.S. at 678).

This Court finds that Plaintiffs UFF-UF and UFF have associational standing to sue the UF Board of Trustees and Board of Governors, but that Plaintiff UFF-FSU does not have standing to sue any defendant. Next, this Court finds that Plaintiffs cannot bring their action for FAA preemption under § 1983 but can bring it in equity. Finally, this Court finds that Plaintiffs state a claim that the FAA applies to the CBAs and preempts section 1001.741(2).

II

A

First, this Court addresses Defendants' arguments that Plaintiffs lack standing. Standing is a constitutional prerequisite to a federal court exercising subject matter jurisdiction over an action. A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction "can be asserted on either facial or factual grounds." *Carmichael v. Kellogg, Brown & Root Servs.*, 572 F.3d 1271, 1279 (11th Cir. 2009). A facial challenge occurs when, as here, a defendant bases its challenge to subject matter jurisdiction solely on the allegations in the complaint. *Id.* In considering the Defendant's facial challenge, this Court must take Plaintiffs' allegations as true and draw reasonable inferences from the facts alleged. *Id.*; *Iqbal*, 556 U.S. at 678. At the

motion-to-dismiss stage, standing is evaluated by determining whether the complaint clearly alleges facts demonstrating each element of Article III standing. *Glynn Env't Coal. v. Sea Island Acquisition*, 26 F.4th 1235, 1240 (11th Cir. 2022). Only factual allegations, and not legal conclusions, are relevant to this inquiry, and "mere conclusory statements . . . do not suffice." *Id.* (alteration in original) (quoting *Iqbal*, 556 U.S. at 678).

Article III standing requires a plaintiff to have (1) suffered an injury in fact that is (2) fairly traceable to the challenged conduct of the defendant, and (3) is likely to be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). An injury in fact must be "concrete, particularized, and actual or imminent." *Muransky v. Godiva Chocolatier*, 979 F.3d 917, 925 (11th Cir. 2020). An injury that is "conjectural or hypothetical" is constitutionally insufficient. *Id.*

Organizational plaintiffs, like the unions here, can demonstrate standing either on their own behalf (organizational standing) or on behalf of their members (associational standing). Plaintiffs claim they have demonstrated both.

1

First, this Court addresses Defendants' argument that Plaintiffs do not have organizational standing. Plaintiffs have organizational standing if they "sue on their own behalf for injuries they have sustained" as an organization and demonstrate "the usual standards for injury in fact, causation, and redressability that apply to

6

individuals." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79, 379 n. 19 (1982).

Organizational plaintiffs can establish standing by showing they diverted or drained their resources in response to a defendant's actions so long as that diversion "directly affect[s] and interfere[s]" with their "core business activities." *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). For example, in *Havens*, plaintiff, an issue-advocacy organization that also operated a housing counseling service, used this theory of standing in its suit against a local apartment complex for engaging in "racial steering." 455 U.S. at 367–68. Because the defendant had given false information to the plaintiff's employees regarding housing, it had "perceptibly impaired" the plaintiff's ability to provide housing counseling and referral services. *Id.* at 379. This "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitute[d] far more than simply a setback to the organization's abstract social interests," and therefore, was sufficient for organizational standing. *Id.*

But without this sort of concrete injury, a plaintiff "cannot spend its way into standing" by merely alleging a "strong opposition to the government's conduct" that requires it to "gather information and advocate against the defendant's action." *FDA*, 602 U.S. at 369–70, 394–95. For example, in *FDA*, the Court rejected plaintiffs'

argument that they had standing to challenge the FDA's approval of mifepristone because they disagreed with it and therefore were "forced . . . to expend considerable time, energy, and resources" advocating in opposition "to the detriment of other spending priorities." *Id.* at 394 (internal citation omitted). In doing so, the Court reiterated its holding from *Havens* but emphasized that without a "similar impediment" to plaintiffs' advocacy business, they did not have standing.[1]

Here, Plaintiffs claim section 1001.741(2) injures them directly "by injecting uncertainty into the previously well-defined grievance procedures laid out in the CBA," and therefore they have "been compelled to re-negotiate operative CBAs during their currently existing contractual term specifically to address the Arbitration Ban's effect on the CBAs' grievance process." ECF No. 1 ¶¶ 37–38. Plaintiffs allege that UFF-UF personnel have "spent at least 216 hours towards negotiating with UF regarding a replacement for the arbitration provision in the UF CBA," that "UFF-FSU personnel have spent at least 84 hours towards negotiating with FSU regarding a replacement for the arbitration provisions in the FSU CBA," and that "UFF personnel have spent at least 795 hours supporting Universities around the state in responding to the Arbitration Ban, including advising Universities regarding

---

[1] The Court's opinion in *FDA* also emphasized that the diversion of resources theory upheld in *Havens* is a narrow one. 602 U.S. at 396 ("*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context. So too here.").

negotiation of alternatives to the arbitration provisions in their CBAs." ECF No. 1 ¶ 47.

Plaintiffs' theory of organizational standing falls short as to each plaintiff. First, Plaintiffs have not demonstrated that UFF-UF has organizational standing. The UF CBA expired on June 30, 2024. ECF No. 1 ¶ 36. Plaintiffs' Complaint alleges that a major part of UFF-UF's role is to "negotiate[] the CBA with the UF Board of Trustees." ECF No. 1 ¶ 15. Therefore, when the UF CBA expired on June 30, 2024, this Court can infer that UFF-UF would have a role in re-negotiating it regardless of the passage of section 1001.741(2). *See id.* Certainly, UFF-UF has devoted a portion of its preordained negotiation to section 1001.741(2)'s impact on the new CBA. But because UFF-UF would have had to re-negotiate regardless of the new law, it has not demonstrated that doing so "directly affect[s] and interfere[s]" with its core business activities. *See FDA*, 602 U.S. 367, 395. Therefore, Plaintiffs have not shown that UFF-UF has organizational standing.

Second, Plaintiffs have not demonstrated that UFF-FSU has organizational standing. Unlike UFF-UF, UFF-FSU's CBA term is ongoing and does not expire until June 30, 2025. While being forced to re-negotiate a CBA during its existing term would weigh in favor of standing, it was UFF-FSU, not the university, that initiated the re-negotiation of their CBA. Plaintiffs claim that UFF-FSU, recognizing "that the Arbitration Ban would likely be interpreted by FSU as nullifying its

members' contractual right to arbitration," "began negotiations with FSU to try to establish an alternative set of dispute resolution procedures that would protect the integrity of its CBA and ensure a meaningful dispute resolution process." ECF No. 1 ¶ 45. Once engaged in the negotiation process, Plaintiffs claim that "based solely on the Arbitration Ban, FSU has refused to consider any proposal involving arbitration of personnel decisions." *Id.* ¶ 46. Plaintiffs' allegations that UFF-FSU is injured because it has been "compelled," *id.* ¶ 18, or "forc[ed]," *id.* ¶ 47, to re-negotiate its CBA thus fail. Plaintiffs do not allege FSU took any action during the CBA term to enforce section 1001.741(2) in a way that "directly affect[ed] and interfere[ed]" with UFF-FSU's "core business activities." *See Havens*, 455 U.S. at 365. Plaintiffs cannot initiate re-negotiation during an existing CBA term and then brand that re-negotiation as an injury caused by FSU. Therefore, Plaintiffs have not shown that UFF-FSU has organizational standing.

Third, Plaintiffs have not alleged that UFF has suffered an organizational injury. UFF is not a signatory of the CBAs, ECF No. 24 at 5 n.1. Plaintiffs merely allege that UFF "support[s]" UFF-UF and UFF-FSU in negotiations generally, ECF No. 1 ¶¶ 14–15, and that UFF personnel "support[ed] Universities around the state in responding to the Arbitration Ban, including advising Universities regarding negotiation of alternatives to the arbitration provisions in their CBAs." ECF No. 1 ¶ 47. Taken together, these allegations do not demonstrate that the enforcement of

section 1001.741(2) "directly affect[s] and interfere[s]" with UFF's "core business activities." *See Havens*, 455 U.S. at 365. Therefore, Plaintiffs have not shown that UFF has organizational standing.

Accordingly, this Court finds that no plaintiff has demonstrated organizational standing.

2

Second, this Court evaluates Plaintiffs' claim that they have associational standing. Associational standing requires each Plaintiff to allege facts from which this Court can reasonably infer that at least one of its members has Article III standing to sue in their own right. *Hunt v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977). For the reasons explained below, this Court finds that UFF-UF and UFF, but not UFF-FSU, have demonstrated associational standing.

First, this Court finds that UFF-UF has associational standing in its action against the UF Board of Trustees and Board of Governors.[2] Plaintiffs allege that the UF CBA is still in effect and that it provides a right to arbitration. *See* ECF No. 1 ¶ 36.[3] During the UF CBA's term, UF began to enforce section 1001.741(2) against UFF-UF's members. A UF professor was terminated in February 2024, and together

---

[2] Defendants' arguments as to traceability to and redressability by the Board of Governors are addressed in further detail below.

[3] Although the UF CBA expired on June 30, 2024, it "remains the governing CBA until a new contract is ratified." ECF No. 1 ¶ 36.

with UFF-UF, filed a grievance. ECF No. 1 ¶ 52. On March 26, 2024, Ryan Fuller, Deputy General Counsel and Executive Vice President at UF, rejected the grievance, stating that "[p]ursuant to Fla. Stat. § 1001.741(2) . . . the Notice of Termination is not subject to arbitration and, therefore, constitutes the final unappealable action of the University." *Id.* When UFF-UF followed up on May 29, 2024, Mr. Fuller reiterated that "UF continues to maintain its March 26 position concerning [the professor's] dismissal grievance." *Id.* ¶ 53 (brackets in original).

Additionally, UF continues to indicate that, pursuant to section 1001.741(2), it will not arbitrate disputes that would otherwise be arbitrable under the parties' CBA. *Id.* ¶¶ 54–55. For example, in connection with Florida's post-tenure review ("PTR") process, "at least four tenured faculty members at UF had received letters of proposed termination" and "approximately twenty faculty members at UF, represented by UFF-UF" have received a "does not meet expectations" rating and are therefore "at risk of termination." *Id.* Mr. Fuller, in response to an inquiry from UFF-UF, stated that "[t]he University's position is that terminations resulting from PTR … are not arbitrable pursuant to Fla. Stat. 1001.741(2)" and that "a 'does not meet expectations' PTR rating . . . is also not arbitrable under the same Florida statute." *Id.*

Based on these facts, this Court finds that UFF-UF has properly alleged that at least one of its members has been or will imminently be injured by the

enforcement of section 1001.741(2), which Plaintiffs claim is preempted by federal law and thus invalid.

Second, relatedly, Plaintiffs have demonstrated that UFF has associational standing to sue the UF Board of Trustees because, as discussed *supra*, its member UFF-UF has standing. *See* ECF No. 1 ¶ 15 (UFF-UF is a local chapter of UFF).

Third, conversely, Plaintiffs have not demonstrated that at least one of UFF-FSU's members have Article III standing to sue in their own right. Unlike their allegations regarding UFF-UF's members, Plaintiffs offer no specific allegations that any of UFF-FSU's members have been or will be denied arbitration pursuant to section 1001.741(2). Therefore, Plaintiffs have not demonstrated that UFF-FSU has associational standing.

Accordingly, this Court finds that Plaintiffs UFF-UF and UFF have demonstrated associational standing as to the UF Board of Trustees and Board of Governors, but that Plaintiff UFF-FSU has not demonstrated standing as to any defendant.

3

Third, this Court addresses Defendants' final standing argument that Plaintiffs have not demonstrated traceability and redressability as to the Board of Governors.

Plaintiffs cite several statutory provisions to support their allegation that their injuries are traceable to and redressable by the Board of Governors. *See* ECF No. 1

¶ 17. Most of the cited provisions address the Board of Governors' general enforcement authority over constituent institutions and their Boards of Trustees. For example, first, section 1001.705(2)(l) provides that the constitutional duties of the Board of Governors include "[c]omplying with, and enforcing for institutions under the board's jurisdiction, all applicable local, state, and federal laws." § 1001.705(2)(l), Fla. Stat. Second, section 1001.706(8) provides that the "Board of Governors has responsibility for compliance with state and federal laws, rules, regulations, and requirements" and "shall oversee the performance of state university boards of trustees in the enforcement of laws, rules, and regulations." § 1001.706(8), Fla. Stat. Third, section 20.155(4)(a) provides that the Board of Governors "shall operate, regulate, control, and be responsible for the management of the whole State University System in accordance with s. 7, Art. IX of the State Constitution and law." § 20.155(4)(a), Fla. Stat.

Were these their only allegations as to traceability and redressability for the Board of Governors, Plaintiffs would face an uphill battle, because general enforcement authority is usually insufficient for that purpose. *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1254 (11th Cir. 2020) (recognizing that the Eleventh Circuit has previously rejected litigants' reliance upon "a host of provisions" of state law that "generally describe the [Defendant's] enforcement authority to establish traceability") (quotation marks omitted).

14

But Plaintiffs also claim that the Board of Governors has taken concrete steps to enforce section 1001.741(2), namely by "promulgating and enforcing regulations implementing" the law. *See* ECF No. 24 at 11. In support, Plaintiffs cite Florida Board of Governors Reg. 10.003, which incorporates the text of section 1001.741(2) and states that "universities shall not enter into any collective bargaining agreement that conflicts with this regulation." *See* No. 1 ¶ 27.

Further, Plaintiffs claim that if the boards of trustees do not comply with state law, the Board of Governors has a responsibility to compel them to do so and can ensure compliance through a variety of mechanisms, including withholding funding, declaring universities ineligible for grants, and vetoing their annual budgets. ECF No. 1 ¶ 17 (citing § 1008.322(5)(a), Fla. Stat. (withholding funding appropriated to the Board of Governors for disbursement to state universities), § 1008.322(5)(b), Fla. Stat. (declaring "the state university ineligible for competitive grants disbursed by the Board of Governors"); Florida Board of Governors Reg. 9.007 (vetoing annual board of trustee budgets)).

This Court is satisfied that the Board of Governor's promulgation of Regulation 10.003, which explicitly incorporates section 1001.741(2) and mandates that universities shall comply, creates a sufficient thread of traceability and redressability to connect it to Plaintiffs UFF-UF and UFF. *See Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1261–62 (N.D. Fla. 2022)

(Board of Governors "makes the determination that could lead to withholding performance funding, which in turn leaves the universities little choice but to" follow state statute).[4]

In sum, this Court finds that UFF-UF and UFF have associational standing to sue the UF Board of Trustees and the Board of Governors, and UFF-FSU does not have standing to sue any defendant.

B

Now that this Court has found that UFF-UF and UFF have standing to sue the UF Board of Trustees and Board of Governors, it moves on to Defendants' argument that Plaintiffs' cause of action for preemption is deficient. ECF No. 17 at 12–15. Because the Supremacy Clause confers no private right of action, parties seeking to challenge a state law as preempted must employ a proper cause of action to proceed in federal court. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). Plaintiffs assert their cause of action here under § 1983 and/or equity.

---

[4] Defendants' motion to dismiss further argues that, by separate regulation, the Board of Governors delegated its powers and duties of "establishing state university 'personnel program[s], including tenure and grievance procedures' and 'as the sole public employer . . . for the purposes of collective bargaining'" to each university's board of trustees. ECF No. 17 at 9 (citing Florida Board of Governors Reg. 1.001(5)(a)). Plaintiffs respond that the Board of Governors still retains the power to "revoke or modify the scope of any power or duty it has delegated" to the boards of trustees under Fla. Stat. § 1001.706(11). ECF No. 1 ¶ 17; ECF No. 24 at 12.

The delegation issue is not determinative here. Without more, the Board of Governors' general enforcement authority and the delegation of relevant duties might be insufficient for standing purposes. But here, the Board of Governors has taken steps to enforce section 1001.741(2) via Florida Board of Governors Reg. 10.003, which is sufficient to establish traceability and redressability.

ECF No. 1 ¶¶ 68–84. Defendants claim they may do neither because the FAA does not grant personal rights and because it forecloses Plaintiff's cause of action. ECF No. 17 at 12–15; ECF No. 24 at 25–32. With no binding precedent directly on point, these issues are a matter of first impression for this Court.

The parties' briefing is not a model of clarity as to what standard governs this Court's analysis. The parties address § 1983 and equity in tandem and seems to assume they are governed by the same rights and foreclosure inquiries. *See* ECF No. 17 at 12 ("Plaintiffs seek to use § 1983 and equity. Both avenues are foreclosed for the same two reasons.") (internal citation omitted); ECF No. 24 at 25 ("Defendants argue that Plaintiffs lack a cause of action because the FAA does not grant "personal rights" and because Congress demonstrated an intent to foreclose a private cause of action in favor of administrative remedies under the FAA. Neither of these arguments has any merit. Plaintiffs have causes of action in equity and through § 1983 to challenge the Arbitration Ban.") (internal citation omitted). But, contrary to the parties' explanation, the two causes of action differ greatly. *See Armstrong*, 575 U.S. at 340 ("the principles that we have developed to determine whether a statute creates an implied right of action, or is enforceable through § 1983, are not transferable to [this] context") (Sotomayor, J., dissenting) (referring to actions in equity). Therefore, this Court will evaluate Plaintiffs' § 1983 and equity claims separately below.

1

First, this Court addresses whether Plaintiffs' action can proceed under § 1983. The test for a viable § 1983 action is the more straightforward of the two causes of action alleged here and was set forth in *Gonzaga v. Doe*, 536 U.S. 372 (2002) (the "*Gonzaga* test"). Plaintiffs may use § 1983 to "enforce unambiguously conferred federal individual rights, unless a private right of action under § 1983 would thwart any enforcement mechanism that the rights-creating statute contains for protection of the rights it has created." *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 172 (2023) (citing *Gonzaga*, 536 U.S. at 284). Therefore, the analysis is twofold.

a

The statutory provision a plaintiff seeks to enforce must "unambiguously confer individual federal rights upon a class of beneficiaries" to which the plaintiff belongs. *Id.* at 180 (citing *Gonzaga*, 536 U.S. at 280). "Notably, it must be determined that 'Congress intended to create a federal right' *for* the identified class, not merely that the plaintiffs fall 'within the general zone of interest that the statute is intended to protect.'" *Id.* at 183 (citing *Gonzaga*, 538 U.S. at 283) (emphasis in original).

The *Gonzaga* test is satisfied where the relevant provision is "phrased in terms of the persons benefited" with "rights-creating language" and an "unmistakable

focus on the benefited class." 538 U.S. at 274, 284. Conversely, it is not satisfied where the provision has an "aggregate, not individual, focus" and "no rights-creating language." *Id.* at 291; *see also Ohlendorf v. United Food & Com. Workers Int'l Union, Loc. 876*, 883 F.3d 636, 641 (6th Cir. 2018) (collecting cases).

This Court is not convinced that the provisions of the FAA relied upon by Plaintiffs unambiguously confer individual rights as required to bring a § 1983 claim. Plaintiffs cite 9 U.S.C. § 2, which states that "[a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable. . ." as demonstrating "the FAA's broad guarantee of an individual right to enter into and enforce arbitration agreements." *See* ECF No. 24 at 32.

This provision does not demonstrate the unambiguous conferral of individual rights required for a cause of action under § 1983. 9 U.S.C. § 2 is phrased in terms of contract provisions, not individuals. To infer an individual right would require this Court to extrapolate from the statute and assume that individuals *with* qualifying contract provisions have some sort of right to their irrevocability. The statute does not say that, and case law makes clear this Court can accept nothing less than

"unambiguous confer[ral]," *See Talevski*, 599 U.S. at 180 (citing *Gonzaga*, 536 U.S. at 280), which is not present here. Therefore, this Court finds no individual right is present for the purposes of § 1983.

b

Even if a right did exist here, Plaintiffs' § 1983 action would separately fail due to its congressional foreclosure. A defendant may defeat a plaintiffs' ability to bring an action under § 1983 by "'by demonstrating that Congress did not intend' that § 1983 be available to enforce those rights." *See Talevski*, 599 U.S. 166, 186 (citing *City of Ranchos Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005)). Relevant here, a court can discern implicit congressional intent to foreclose from a statute's "comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Talevski*, 599 U.S. at 186 (citing *Ranchos Palos Verdes*, 544 U.S. at 120–21). "In all events, the question is whether the design of the enforcement scheme in the rights-conferring statute is inconsistent with enforcement under § 1983, such that a court must infer that 'Congress did not intend' to make available the '[§ 1983] remedy for [these] newly created right[s].'" *Id.* (citing *Ranchos Palos Verdes*, 544 U.S. at 120).

Implicit foreclosure has been found in "statutes with self-contained enforcement schemes that included statute-specific rights of action." *Talevski*, 599 U.S. at 189. Therefore, "[t]he provision of an express, private means of redress in

20

the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under § 1983." *Ranchos Palos Verdes*, 544 U.S. at 121; *see also id.* ("Moreover, in *all* of the cases in which we have held that § 1983 is available for violation of a federal statute, we have emphasized that the statute at issue . . . did not provide a private judicial remedy (or, in most of the cases, even a private administrative remedy) for the rights violated.") (emphasis in original) (collecting cases).

Additionally, if a statutory cause of action restricts remedies or imposes procedural hurdles to relief, it further indicates implicit foreclosure. The *Talevski* Court drew upon several cases where it had previously found implicit preclusion. *Id.* at 189–90. Each "required plaintiffs to 'comply with particular procedures and/or exhaust particular administrative remedies' under the statute's enforcement scheme before suing under its dedicated right of action" and each "offered fewer benefits than those available under § 1983." *Id.* "Thus, in all three cases, § 1983's operation would have thwarted Congress's scheme coming and going: It would have 'circumvented' the statutes' presuit procedures, and would have also 'given plaintiffs access to tangible benefits' as remedies that were 'unavailable under the statutes.'" *Id.* (citing *Fitzgerald v. Barnstable School Comm.*, 555 U.S. 246, 254 (2009)).

21

Such is the case here. The FAA provides a self-contained enforcement scheme with statute-specific rights of action. *See Talevski*, 599 U.S. at 189. Indeed, Plaintiffs themselves recognize that the FAA contains "specific private enforcement mechanisms" allowing parties to an arbitration provision to petition a district court for an order to compel arbitration, 9 U.S.C. § 4, petition for enforcement of an arbitration award, 9 U.S.C. § 9, and appeal an adverse order affecting arbitration rights, 9 U.S.C. § 16. *See* ECF No. 24 at 32. Plaintiffs rely on the more permissive foreclosure standard for causes of action in equity to support their position but fail to grapple with this more restrictive standard under § 1983. *See* ECF No. 24 at 28–33. The private judicial remedy in the FAA counsels toward foreclosure of a separate remedy under § 1983.

Further, the FAA's private enforcement mechanisms are exactly of the procedurally restrictive sort that are especially likely to indicate foreclosure. Parties seeking to utilize the FAA's private right of action must comply with certain procedures, including notice provisions, *see* 9 U.S.C. § 4, and particularized statutes of limitations, *see* 9 U.S.C. §§ 12, 16. These hurdles to relief indicate to this Court that permitting enforcement of the FAA through § 1983 would allow parties to "circumvent" the FAA's requirements, as *Talevski* disclaimed. 599 U.S. at 189–90.

In sum, this Court finds that Plaintiffs do not state a cause of action to bring their preemption claim under § 1983 for two separately sufficient reasons. First, the

FAA does not confer individual rights and, second, even if it did, Congress intended to foreclose its enforcement through § 1983.

2

This Court next considers Plaintiffs' preemption claim in equity. Unlike § 1983, which is governed by relatively straightforward precedent, the requirements of equity are murkier. This Court will address the issues Defendants raise regarding equity—existence of an individual right and foreclosure—below.

a

First, this Court will address whether an individual right comparable to that required under § 1983 is required to proceed in equity. The parties' briefing seems to assume so, but this Court is not convinced.

The most recent guidance from the Supreme Court, *Armstrong v. Exceptional Child Center*, provides a test for foreclosure of actions in equity, but does not squarely address whether an individual right is separately required. 575 U.S. at 328–29. And, though interpretations vary, this Court is persuaded by its colleagues who discern no such rights requirement from *Armstrong*.

For example, though not binding upon this Court, the issue was discussed in detail by the majority and concurring opinions in a 2017 Tenth Circuit case, *Safe Streets Alliance v. Hickenlooper*. 859 F.3d 865 (10th Cir. 2017). There, like here, the plaintiffs brought a cause of action for preemption in equity. *Id.* at 876–77. The

23

majority found that *Armstrong* impliedly required an individual right, and, lacking one, the plaintiffs' claims failed. *See id.* at 902–03 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) and *Gonzaga*, 536 U.S. at 283). But this Court is instead persuaded by Judge Hartz's concurrence in that case, which found that actions in equity could proceed untethered from an individual right. *Id.* at 914–20 (Hartz, J., concurring). Judge Hartz pointed out that *Armstrong* was conspicuously silent regarding a rights requirement. Reading between the lines, he explained that the *Armstrong* plaintiffs forwent more lucrative claims under the Administrative Procedure Act, § 1983, and an implied private right of action because those three remedies required an individual right, and the plaintiffs had none to assert. *Id.* at 915. Instead, they had "no choice" but to bring a claim in equity—the only action without an individual rights requirement. *Id.*

Judge Hartz argued both the majority and dissent in *Armstrong* recognized this reality. *Id.* at 915–18. He noted that Justice Scalia's opinion, though subtly, twice differentiated the plaintiff's action in equity from other actions requiring a right. *Id.* at 917 (citing *Armstrong*, 575 U.S. at 330 n.*; *id.* at 331 (plurality)). And Justice Sotomayor's dissent "did not dispute that the providers lacked a statutorily created private right," but nonetheless seemed to accept that one was not necessary for a cause of action in equity. *Id.* at 917 (Hartz, J., concurring). To Judge Hartz, this explains why the *Armstrong* Court instead focused their analysis on foreclosure. *Id.*

Because, if plaintiffs clearly lacked an essential prerequisite to an action in equity, "[w]hy, then, go through all the rigmarole" of the foreclosure analysis? *Id.* at 918.

As noted above, this Court finds Judge Hartz's interpretation of *Armstrong* persuasive. Moreover, while also not binding upon this Court, other courts have reached the same conclusion that a right is not required to proceed in equity. *See Restoration Risk Retention Grp., Inc. v. Gutierrez*, 880 F.3d 339, 345–46 (7th Cir. 2018); *Crown Castle Fiber, L.L.C. v. City of Pasadena, Texas*, 76 F.4th 425, 434–35 (5th Cir. 2023) ("Even though § 253 does not confer a private right, a plaintiff is not prevented from gaining equitable relief on preemption grounds.").[5] Accordingly, although this Court has found the FAA does not confer a private right, that finding is not fatal to Plaintiffs' claim in equity because one is not required. But the inquiry

---

[5] The parties offer no cases from the Eleventh Circuit discussing a rights requirement for actions in equity, and it appears the Circuit has not squarely addressed the issue. However, this Court finds some insight in the Eleventh Circuit's brief discussion of *Armstrong* in a 2018 opinion granting a preliminary injunction for a pipeline company to access a property it sought to condemn. *See Transcon. Gas Pipe Line Co., LLC v. 6.04 Acres, More or Less, Over Parcel(s) of Land of Approximately 1.21 Acres, More or Less, Situated in Land Lot 1049*, 910 F.3d 1130, 1152 (11th Cir. 2018).

Writing for a unanimous panel, Judge Julie Carnes explained that "when a party seeks an equitable remedy from the district court, the district court is presumed to have the authority to grant the requested relief, absent some indication in the underlying statute that such relief is not available." *Transcon.*, 910 F.3d at 1152 (citing *AT&T Broadband v. Tech Commc'ns, Inc.*, 381 F.3d 1309, 1316 (11th Cir. 2004)). Judge Carnes then cited *Armstrong* for the proposition that "[t]he question, then, is whether the 'fairest reading' of the statute 'display[s] a[n] intent to foreclose' the availability of equitable relief.'" *Id.* (citing *Armstrong*, 575 U.S. at 330). Though *Transcontinental Gas* dealt with a separate legal issue, this Court finds this brief discussion buttresses its conclusion that the only limit on equitable power is foreclosure, and there is no rights requirement.

does not end there because Plaintiffs' claim in equity still cannot proceed if it has been foreclosed by Congress.

b

As discussed *supra*, the parties blend the analyses for claims under § 1983 and equity, though the legal standard for each is quite different. However, the parties both use the *Armstrong* foreclosure analysis, suggesting neither disputes it applies to actions in equity. *See* ECF No. 17 at 12–13; ECF No. 24 at 28–32.

*Armstrong*'s key holding was that equitable causes of action fail if Congress "inten[ded] to foreclose equitable relief" in the relevant statute. 575 U.S. 320, 328–29 (internal citation omitted). *Armstrong* sets forth a two-factor test for foreclosure, and suggests they are to be considered together, with neither being determinative. 575 U.S. at 328; *see Coal. for Competitive Elec., Dynegy Inc. v. Zibelman*, 272 F. Supp. 3d 554, 566 (S.D.N.Y. 2017) ("There is no indication in *Armstrong* that both factors must be satisfied in order to conclude that Congress intended to foreclose equitable relief to private parties.").

First, it weighs toward foreclosure if a court can discern congressional intent to foreclose equitable relief from the statute. *Id.* at 328. This is demonstrated by a statute's "express provision of one method of enforcing a substantive rule," which "suggests that Congress intended to preclude others." *Id.* In *Armstrong*, that "one method" was explicit conferral of enforcement authority to the Secretary of Health

and Human Services. *Id.* ("'[e]xplicitly conferring enforcement of this judgment-laden standard upon the Secretary alone establishes, we think, that Congress 'wanted to make the agency remedy that it provided exclusive'") (citing *Gonzaga*, 536 U.S. at 273).

While an express administrative enforcement scheme indicates foreclosure of equitable remedies, a statute's provision of a private right of action instead demonstrates lack of congressional intent to foreclose.[6] *See St. Luke's Health Sys., Ltd. v. Labrador*, 2025 WL 888840, at *9 (D. Idaho Mar. 20, 2025) ("the fact that the statute expressly permits equitable relief by certain parties is evidence that Congress did not intend to bar the broader availability of equitable claims"); *Tohono O'odham Nation v. Ducey*, 130 F. Supp. 3d 1301, 1316 (D. Ariz. 2015) (Indian Gaming Regulatory Act's three flexible private causes of action did not foreclose equitable relief because they "d[id] not evince a congressional intent to keep disputes out of court.").

As this Court explained *supra*, the FAA provides several such private rights of action. *See* 9 U.S.C. § 4 (allowing parties to an arbitration provision to petition a district court for an order to compel arbitration), 9 U.S.C. § 9 (petition for enforcement of an arbitration award); 9 U.S.C. § 16 (appeal an adverse order

---

[6] This is notably inapposite to the § 1983 foreclosure analysis, where a private right of action generally counsels *toward* foreclosure. *See, e.g.*, *Ranchos Palos Verdes*, 544 U.S. at 121.

affecting arbitration rights). Because the FAA expressly permits parties to seek forms of equitable relief, this Court finds that Congress did not intend to bar the broader availability of equitable claims.

c

Second, equitable relief may be precluded where the relevant statutory provision has a "judicially unadministrable nature." *Id.* at 328. In *Armstrong*, the statute in question delineated broad and nonspecific "judgment-laden" standards for state Medicaid plans. *Id.* at 328. The Court found that an exclusively administrative remedy made sense because it helped avoid "'the comparative risk of inconsistent interpretations and misincentives that can arise out of an occasional inappropriate application of the statute in a private action.'" *Id.* (citing *Gonzaga*, 536 U.S. at 273).

Conversely, a statute is not judicially unadministrable where courts proceeding in equity would be dealing with familiar topics and tasks. *See St. Luke's Health Sys.*, 2025 WL 888840, at *9 ("The Court is not faced with a rate-setting statute that is 'judicially unadministrable.' Rather, it is called upon to perform a very familiar task—statutory interpretation, or, more specifically, deciding whether a state statute conflicts with a federal one.").

Here, unlike *Armstrong*, allowing an action for preemption in equity under the FAA would not be "judicially unadministrable" because courts are well-suited to engage in the sort of inquiry Plaintiffs seek here. *See id.* Indeed, courts regularly

28

handle causes of action for equitable relief under the FAA and frequently decide whether state statutes conflict with federal law. Therefore, this Court finds the FAA is not judicially unadministrable.

Accordingly, because no right is required and neither *Armstrong* foreclosure factor is met, this Court finds Plaintiffs' action can proceed in equity.

C

Next, this Court turns to Plaintiffs' claim that the FAA preempts section 1001.741(2). The FAA states in relevant part that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable . . . ." 9 U.S.C. § 2. Plaintiffs' CBAs provide for arbitration in certain circumstances. ECF No. 1 ¶ 72. According to Plaintiffs, section 1001.741(2) "directly conflicts with the FAA because the Arbitration Ban purports to invalidate terms providing for arbitration of adverse personnel decisions for higher education faculty in Florida and stands as an obstacle to Congress's objectives and purpose of promoting arbitration and enforcing arbitration agreements as written." *Id.* ¶ 75. Therefore, Plaintiffs argue, it is preempted. *Id.*

Defendants' motion to dismiss raises three issues with Plaintiffs' preemption argument, which this Court addresses in turn below.

1

First, Defendants argue the FAA does not regulate state employers and therefore does not apply to, and cannot preempt, section 1001.741(2). ECF No. 17 at 15–17.

The FAA is silent regarding state employers and the parties dispute what this means. Defendants claim that because the FAA says nothing about state employers, it cannot be interpreted to apply to them. *Id.* at 15–17. Plaintiffs claim the FAA's application is liberal and therefore applies unless "overridden by a contrary congressional command" in the statute. ECF No. 24 at 21 (citing *Wiand v. Schneiderman*, 778 F.3d 917, 922 (11th Cir. 2015)). Plaintiffs point out that the FAA explicitly excludes certain employment contracts. *Id.* at 22. Therefore, according to Plaintiffs, it can be inferred from the absence of a specific state employment exemption that the FAA applies to those relationships. *Id.*

This Court agrees with Plaintiffs. There is a "'liberal federal policy favoring arbitration agreements,' such that 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Wiand*, 778 F.3d at 922 (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)). So, "[a] party seeking to avoid arbitration thus bears the burden of demonstrating a contrary congressional command using a statute's text, its legislative history, or identifying an 'inherent conflict between arbitration and the statute's underlying

purposes.'" *Wiand*, 778 F.3d at 922 (11th Cir. 2015) (citing *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 227 (1987)).

Defendants have not demonstrated that contrary congressional command here. Congress chose to explicitly exempt certain employment contracts in the text of the FAA. *See, e.g.*, 9 U.S.C. § 2 ("nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."). It did not choose to exempt states or their employment contracts. This does not seem to be an accidental oversight because Congress *did* explicitly exempt states from other similar statutes. *See* ECF No. 24 at 22; *see also* 29 U.S.C. § 152(2) (National Labor Relations Act) ("The term 'employer' . . . shall not include . . . any State or political subdivision thereof"); 29 U.S.C. § 402(e) (Labor-Management Reporting and Disclosure Act) ("'Employer' means any employer or any group or association of employers engaged in an industry affecting commerce . . . but does not include the United States or any corporation wholly owned by the Government of the United States or any State or political subdivision thereof.").

Taking the above considerations together, this Court is satisfied that Plaintiffs have demonstrated the FAA applies to state employment contracts like the CBAs here.

31

2

Second, Defendants argue the FAA only applies to transactions involving interstate commerce, and because the CBAs are between two in-state parties, they do not fall within its scope. ECF No. 17 at 17–19. Plaintiffs disagree.

The FAA applies to arbitration provisions in "any maritime transaction or a contract evidencing a transaction involving commerce." 9 U.S.C. § 2. In turn, it defines commerce as "commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation" with the qualification that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." *Id.* § 1.

The Supreme Court has interpreted the term "involving commerce" in the FAA "as the functional equivalent of the more familiar term 'affecting commerce'— words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." *Jenkins v. First Am. Cash Advance of Georgia, LLC*, 400 F.3d 868, 874 (11th Cir. 2005) (quoting *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003)). This power extends where "in the aggregate the economic activity in question would represent a general practice subject to federal control," even if there

is no showing of a specific effect upon interstate commerce. *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1370 (citing *Alafabco*, 539 U.S. at 56–57). So, employment agreements are subject to the FAA where the employer's "overall employment practices affect commerce." *Caley*, 428 F.3d at 1370. The parties here disagree as to whether the CBAs—agreements between a state university and its employees—are within this scope. This Court agrees with Plaintiffs that they are.

Though not binding, this Court is persuaded by district courts in this Circuit that have repeatedly found in-state employment agreements subject to the FAA where the defendant employer was engaged in interstate commerce. *See McCloud v. Amusement USA, LLC*, 2019 WL 642755, at *2 n.1 (N.D. Fla. Feb. 6, 2019) (FAA applied to employment agreement because defendant solicited, advertised to, and charged admission fees to out-of-state tourists) (citing *907 Whitehead St., Inc. v. Sec'y of U.S. Dep't of Agric.*, 701 F.3d 1345, 1351 (11th Cir. 2012) ("[I]t is well-settled that, when local businesses solicit out-of-state tourists, they engage in activity affecting interstate commerce."); *Hudson Glob. Res. Mgmt., Inc. v. Beck*, 2006 WL 1722353, at *3 n.5 (M.D. Fla. June 20, 2006) (FAA applied to employment agreement "based on the multistate nature of Plaintiff's business and the diverse citizenship of its employees"); *Burries v. Sea Island Co.*, 2020 WL 3237595, at *3 (S.D. Ga. June 15, 2020) (plaintiff's employment at resort affected interstate

commerce because a "core focus" of defendant resort's business was "attracting and welcoming residents of other states").

Moreover, though also not binding, this Court is further persuaded by other courts that have specifically found that university employers are engaged in interstate commerce for purposes of the FAA. *See Grevlos v. Augustana Univ.*, 2023 WL 8880321 (D.S.D. Dec. 22, 2023) ("Generally, employment disputes within a university setting are sufficiently connected to interstate commerce because not only do universities teach out-of-state students, but frequently recruit out-of-state faculty members."); *Brennan v. King*, 139 F.3d 258, 264 n.5 (1st Cir. 1998) (professor's contract with Northeastern University not exempt from 9 U.S.C. § 1); *Abdullah v. Duke Univ. Health Sys., Inc.*, 2009 WL 1971622 (E.D.N.C. July 8, 2009) (parties agreed that employment contract between plaintiff and university hospital "involves interstate commerce because DUHS treats patients from all over the country and the world, it receives payments from individuals and entities other than North Carolina residents, and its employees travel outside of North Carolina to perform work.").

Although these cases do not address the precise issue at hand, they provide strong reinforcement for the proposition that Defendants are engaged in interstate commerce for purposes of the FAA. Plaintiffs' Complaint alleges that "each of the [Defendant] Universities solicits and accepts federal funding, including through student financial aid and research funding, purchases supplies from out of state, is

subject to federal regulation, and recruits students and faculty from around the country." ECF No. 1 ¶ 66. Because the standard for interstate commerce is permissive and Plaintiffs have alleged facts that demonstrate Defendants are engaged in interstate commerce, this Court finds that the FAA applies to the CBAs here.

3

Third, Defendants argue that even if the FAA applies to 1001.741(2), it does not conflict with, and therefore does not preempt, it. ECF No. 17 at 19–21. Defendants claim the FAA's purpose is not to "foster arbitration" but instead to "treat[] arbitration contracts like all others." ECF No. 17 at 19–20 (internal citation omitted). Therefore, they disagree with Plaintiffs' claim that "the FAA conflicts with § 1001.741(2) because it 'stands as an obstacle to the objective and purpose of the [FAA to promote arbitration.].'" *See* ECF No. 17 at 19 (citing ECF No. 1 ¶ 60) (brackets in original).[7]

Plaintiffs' Complaint sufficiently alleges a conflict between the FAA and 1001.741(2), and Defendants' cited cases do not contradict Plaintiffs' claim. "When state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA." *AT&T Mobility*

---

[7] Defendants also argue that "[a]t the very least, Plaintiffs have failed to state a claim as to FSU because they renegotiated FSU's CBA to remove arbitration." This Court need not address this argument because it finds no plaintiff has standing to sue the FSU Board of Trustees.

*LLC v. Concepcion*, 563 U.S. 333, 341 (2011). This Court does not find this principle was cabined or overruled by the Supreme Court in *Morgan v. Sundance, Inc.*, as Defendants claim. *See* 596 U.S. 411, 418 (2022) ("FAA's "policy favoring arbitration" does not authorize federal courts to invent special, arbitration-preferring procedural rules."); ECF No. 17 at 19–20.

Plaintiffs' Complaint alleges that the parties' CBAs provide for arbitration in certain circumstances. ECF No. 1 ¶¶ 31–33. And section 1001.741(2) states that "personnel actions or decisions regarding faculty" are "not subject to arbitration." § 1001.741(2), Fla. Stat. Therefore, Plaintiffs have sufficiently alleged that section 1001.741(2) conflicts with the FAA.

Accordingly,

**IT IS ORDERED:**

1. Defendants' motion to dismiss Plaintiffs' complaint, ECF No. 17, is **GRANTED in part** and **DENIED in part**.

2. The motion is **GRANTED** to insofar as this Court lacks jurisdiction as to UFF-FSU and the Florida State University Board of Trustees.

3.  The motion is otherwise **DENIED**.[8]

**SO ORDERED on April 11, 2025.**

<u>**s/Mark E. Walker**</u>
**Chief United States District Judge**

---

[8] To be clear, as this Court explained above, Plaintiffs' preemption action can proceed in equity but not under § 1983. This Court can dismiss counts but not alternative theories in support of those counts. Accordingly, the motion to dismiss is denied as to Plaintiffs' preemption claim because it survives as a cause of action in equity.