# Exhibit 21



December 5, 2024

Susan Hegeman, PhD
Grievance Representative
United Faculty of Florida

On behalf of:
Sheryl Kroen, PhD
Department of History
College of Liberal Arts and Sciences

Dear Dr. Kroen:

This letter constitutes the University's response to the Grievance #UFF-2024-10-14-00182. I note several important considerations regarding this grievance. I note that the parties agreed to extend the timeline for consideration of this Grievance beyond those deadlines provided for in the CBA. Additionally, the parties agreed to hear this Grievance initially at Step 2.

I was the Grievance Officer at the Step 2 Hearing held on November 19, 2024, at 2:00pm via Zoom. You did not attend the meeting, but Susan Hegeman (UFF Grievance Representative) participated on your behalf. John Leavey (UFF Grievance Representative) also participated.

In the Grievance, you alleged violations of the CBA as follows:

- CBA Article 9.1(b)
- CBA Article 10.4(c) & (d)
- CBA Article 11.2(a)(1)
- CBA Article 12.4(e)(1)
- CBA Article 14.5(b) & (d)
- CBA Article 18.8(f)

I have considered the evidence presented verbally at the Step 2 Hearing in addition to the written documents including the statement of Grievance and all attachments.

I will respond to each part of the Grievance (shown in italics) below:

*"UF has violated the CBA, together with relevant rules, regulations, policies, and procedures and/or practices, both written and/or unwritten, and/or otherwise treating the grievant adversely through application of a Performance Improvement Plan (PIP) resulting from post-tenure review (PTR). As a remedy, the grievant should be restored to her previous situation with all previous emoluments, entitlements, and benefits and otherwise be made whole."*

This Grievance is related to the Post Tenure Review (PTR) process, which is required by Florida Statutes section 1001.706(6)(b):

1

**UF-UFF_000499**

"The Board of Governors shall adopt a regulation requiring each tenured state university faculty member to undergo a comprehensive post-tenure review every 5 years. The board may include other considerations in the regulation, but the regulation must address:
1. Accomplishments and productivity;
2. Assigned duties in research, teaching, and service;
3. Performance metrics, evaluations, and ratings; and
4. Recognition and compensation considerations, as well as improvement plans and consequences for underperformance."

Accordingly, the Florida Board of Governors (FLBOG) adopted a regulation on March 29, 2023 outlining the requirements regarding the process and outcomes for PTR and setting forth an explicit implementation timeline. The University subsequently issued a PTR policy in compliance with FLBOG Regulation 10.003 on March 29, 2023.

Your PTR was conducted in accordance with FLBOG Regulation 10.003 and the University's PTR Policy. As will be addressed further below, you have not met your burden of proving that the University violated the CBA when assigning your performance improvement plan (PIP) resulting from your recent PTR. Additionally, you have not been subject to any adverse employment actions for which you would need to be made whole.

*"Additionally, the Performance Improvement Plan should be revised as follows: the objectives of the PIP should be revised to require the submission of only one article, a book proposal, and a conference presentation abstract."*

The Provost's authority to determine the details of PTR PIPs are described in the University's PTR Policy, specifically in (4)(b), which reads:
"For each faculty member who receives a final performance rating of 'does not meet expectations,' the dean, in consultation with the faculty member and the faculty member's department chair, shall propose a performance improvement plan to the Provost. The Provost may finalize the performance improvement plan as is or make such modifications that the provost considers appropriate and finalize the plan as modified. The Provost may consult with the appropriate dean, department chair, and/or faculty member before finalizing any improvement plan."

During the hearing, the Grievant cited a portion of an impact bargaining session between the University and the UFF-UF, held on July 10, 2024, specifically an exchange between Associate Provost Chris Hass and Chief Negotiator for UFF-UF Meera Sitharam. The exchange included the following:

> "Hass: I would argue, right, that if a person has one fifth of, you know, if we're under the assumption or working assumption, that, I think you guys propose that the most a person could have in a PIP is to achieve one fifth of what 'meets expectations' is, right?"
>
> Sitharam: Uh huh."

2

UF-UFF_000500

The appropriate application of this statement will be considered below in context. The History Department PTR Research criteria (dated April 29, 2024) for the "meets expectations" achievement level are as follows:

"A faculty member who meets expectations is generally expected to have produced evidence of the following over the prior 5 years:

- Between 3 and 5 peer reviewed research articles or scholarly works of similar quality, or their intellectual equivalent, including several unpublished book manuscript chapters and other demonstrable evidence of progress toward a book
- Evidence of professional impact, for example including regular participation in invited presentations, exhibits, commissions, or performances at key meetings, conferences, or other venues within one's field; book reviews; seminar presentations at major research universities or state/federal agencies; journal editorships, grant applications, and citations to or reviews of one's scholarly work"

During the hearing, we engaged in significant conversation regarding Associate Provost Hass's statement in the context of the History Department PTR Research criteria. When I asked how the Grievance representatives interpreted the criteria, the Grievance Representative Susan Hegeman asserted that published and unpublished articles are both worthy of consideration in meeting the criteria. Hegeman went on to assert, "this is about effort, not about peer-reviewed status." Hegeman further refuted a proportional relationship between "submitted" articles and "accepted" articles (two "submitted" equivalent to one "accepted") that she ascribed to Hass.

Grievance Representative John Leavey offered a different interpretation stating that an "accepted" article would meet the criteria, but not necessarily just a "submitted" one. Leavey acknowledged that the University would need to see some example of success, which I interpreted to mean "acceptance" and/or "publication" rather than just "submission." Leavey also acknowledged, "I think they use 'peer-reviewed' to have gone through the process, but not published."

Hegeman then described the writer's effort as an important consideration and that the writing of a single article requires substantial time and effort but is wholly separate from publication. Hegeman also described a significant difference between a desk rejection, which she believed was indicative of an article requiring significant rewriting and other rejections that encourage smaller-scale reworks or revisions prior to likely acceptance.

What I must interpret involves several key questions:
1. Is the statement made by Associate Provost Hass during the bargaining session binding with respect to PTR PIPs being limited to one fifth (1/5) of the "meets expectations" requirements?
2. Do the History Department PTR Research criteria require articles be submitted, accepted, published, or something else to meet the descriptor of "peer reviewed."
3. If the statement provided by Associate Provost Hass is binding, how does one appropriately divide "between 3 and 5" into fifths?

Associate Provost Hass was involved in the authorship of the University PTR policy and assists the Provost with implementation of the PTR program in general. He also serves on the

3

UF-UFF_000501

University's Bargaining Team and was present for the numerous sessions in which the University and UFF-UF bargained PTR to impasse. As the University and UFF did not reach an agreement on PTR, Associate Provost Hass's statements during impact bargaining are not indicative of the intent behind ratified language, but rather indicative of intent behind a proposal from the University. That stipulation identified, Associate Provost Hass's comments should not be interpreted as more authoritative than the University's PTR Policy as cited above, which describes the authority of the Provost to make the final decision regarding PTR PIPs. As such, his statements are not binding with respect to whether PTR PIPs are limited to one fifth (1/5) of the "meets expectations" requirements.

Notwithstanding the foregoing, the question of defining "peer-review" remains. Obvious it seems that the History Department PTR Research Criteria contemplate works that are successfully accepted through the peer-reviewing process. Even Grievance Representative Leavey acknowledged that the University would need to see "some example of success." This is not to refute Hegeman's point that the authorship of an article, even if rejected, does not take effort and time, but rather that the standard for the criteria of PTR is higher than the accounting of time and effort only.

This is further supported by the University Criteria for Post-Tenure Review (dated March 29, 2024), which describe the "meets expectations" category of Research as follows:
"A faculty member who meets expectations is generally expected to have produced evidence of the following during the PTR Evaluation Period:
- Productivity in research or other scholarship or creative works of quantity and quality commensurate with typical productivity of faculty in the faculty member's discipline at AAU institutions
- Where applicable, grant awards / external funding commensurate with other faculty in the discipline
- Evidence of professional impact, including adequate participation in invited/peer-reviewed presentations exhibits/commissions/ performances at key meetings, conferences, venues within one's field, seminar presentations at major research universities/ state and federal agencies, professional awards, and citations to/critically acclaimed reviews of one's scholarly work, normed to the faculty member's specific discipline"

The use of the word "productivity" in these criteria indicates that the University Criteria under which the departmental clarifications are to occur are expected to consider "scholarship or creative works" that have actually reached publication.

Given the interpretation of "peer review" above, there is no clear equivalency between a submitted article and an accepted or published article. Further, because a one-year PIP limits the timeframe during which a faculty member will be notified by journals of acceptance or denial, more interpretation is necessary. Given the stated authority granted to the Provost to assign finalized PIPs in the PTR Policy, clear is that the Provost is best situated to interpret the criteria and make an assignment of a finalized PIP. To substitute my own judgement for that of the Provost would be inappropriate.

*"Dr. Sheryl Kroen has been harmed by the implementation of the PIP, which contains expectations for productivity that are arbitrary and unreasonable and that threaten her continued employment at the university. Dr. Kroen faces termination at the end of the PIP*

4

UF-UFF_000502

*period if it has been determined that she has not satisfactorily accomplished the tasks identified in the PIP."*

The PIP has been assigned in accordance with the FLBOG Regulation and the PTR Policy; that is not in dispute. That the requirements are "arbitrary and unreasonable" appears clearly inaccurate. The criteria require "3-5 research articles or similar scholarly works" in a five-year period. The PIP period is only one year. Given that the time period may be too short to receive an acceptance, but knowing that not all articles and scholarly works are accepted, the Provost required multiple article submissions as a reasonable equivalency to an accomplishable portion of for the "meets expectations" criteria.

Furthermore, the Grievant relies on a false assumption in arguing that at the beginning of the PIP Period, she has no progress available from which to draw on any articles or scholarly works. Given the stipulated timeline for publication, faculty members are not expected to send an article for submission and then just wait until they hear back before working on other projects. Given that the expectation is three to five published works in a five-year period in order to demonstrate success, a faculty member should have works in different states of progress at both the end of a PTR period but also at the beginning. As such, the Grievant is not starting "from scratch," or should not be, in the pursuit of fulfilling her PIP and her more comprehensive employment responsibility to the University.

Finally, the Grievant failed to demonstrate how the implementation of the PIP harmed her. There is no evidence that the Grievant has been noticed of termination. The Grievant also presented no evidence that she was unable to complete the PIP requirements rendering termination a *fait accompli*.

*"On June 28, 2024, Dr. Kroen received a PTR rating of "does not meet expectations." A letter from Provost Angle explained that this rating was the result of assessed deficiencies in research productivity (attachment 1). Per the PTR policy, a PIP was developed by outgoing History Chair Jon Sensbach, incoming Chair Joseph Spillane, and Interim Dean Mary Watt, in consultation with Dr. Kroen. The draft PIP of July 30, 2024, required that within the one-year period of the plan, Dr. Kroen was to submit one article for publication, submit a book proposal to a publisher, and submit an abstract proposal for a conference presentation (attachment 2). This PIP was reviewed by the provost, who increased the expectations for research productivity to two submitted articles, a submitted book proposal, and a submitted abstract for a conference presentation. Dr. Kroen signed this final PIP on August 30, 2024 (attachment 3)."*

None of the facts in this portion of the Grievance are in dispute nor is there an evident CBA violation.

*"The expectations for productivity in the signed PIP are unreasonable and arbitrary, in violation of Article 14.5 (b) and PTR Policy(2)(c) and (4)(b) 1.a. These expectations exceed the average yearly productivity necessary to achieve History Department criteria for 'meets expectations,' which are 3 to 5 articles or the equivalent over the 5-year PTR period (attachment 4). The UFFUF and UF-BOT have agreed in bargaining that a reasonable expectation for productivity in a PIP is "one fifth" of the criteria for "meets expectations" (attachment 5)."*

Consistent with the explanation above, the Grievant failed to prove that expectations of the PIP are unreasonable and arbitrary. Further, the Grievant failed to prove that the expectations

5

UF-UFF_000503

of the PIP exceed the average yearly productivity due to the lack of equivalency between a "submitted" and a "peer reviewed" article.

Additionally, the Grievant mischaracterizes a statement made during bargaining as an agreement of some kind.

*"The provost's increase in expectations for productivity in the PIP was also arbitrary and discriminatory, as it singled out Dr. Kroen for consideration via special criteria. In communication with Chair Spillane, Associate Provost Chris Hass justified the increased expectations by introducing new criteria for productivity not covered in the History Department criteria or PTR policy: "from communications [she] is less than 40% towards her book over the last 5 years including a year-long sabbatical" (attachment 6).*

*"The fact that Dr. Kroen was granted a sabbatical is irrelevant to the PIP. Productivity during the sabbatical period was already evaluated in the PTR. It is therefore arbitrary and unreasonable to consider the sabbatical as grounds for increasing productivity in the PIP, the stated purpose of which is to improve performance in future reviews (attachment 3).*

*"The estimate that 40% of the book should have been completed within the PTR period is arbitrary and irrelevant to History Department PTR criteria and the university's PTR policy. Dr. Kroen is completing a 20-chapter, 100,000-word manuscript. It is typical for books of this length and unusually broad scope of research (especially with archival research in multiple languages in the UK, Germany, and France) to take more than five years to complete. The decision to require her to produce a second article is arbitrary, and, as Chair Spillane argued (attachment 6), it takes time away from progress on the book. It thus detracts from the stated goal of the PIP to "enable a faculty member who has fallen below performance standards to refocus academic and professional efforts and return to expected levels of performance" (attachment 3)."*

Worthy of note is that at the time of Associate Provost Hass's email, Dr. Spillane was not yet Chair of the History Department.

Unclear is how the email demonstrates that the increase in expectations for the PIP were arbitrary or discriminatory. The communications referenced by Associate Provost Hass in his email were not included for further context and examination.

While Representative Leavey asserted during the hearing that there is not a requirement to "make up" what was missed in a previous PTR evaluation period, it is not clear that this is what was represented by the Provost's modification to the PIP. Additionally, the inclusion of consideration of the sabbatical could be relevant in evaluation as it would be expected that if a faculty member receives one sabbatical approximately every seven (7) years, then faculty members would have the advantage of a sabbatical every other PTR period. While possibly smoothed over time in the averages of the PTR Criteria, the consideration is not inherently irrelevant nor discriminatory.

The Grievant failed to prove that the 40% of the book being completed is arbitrary. The Grievance states, "Dr. Kroen is completing a 20-chapter 100,000-word manuscript. It is typical for books of this length and unusually broad scope of research (especially with archival research in multiple languages in the UK, Germany, and France) to take more than five years to complete." While I had asked for additional details of progress during the hearing, I was told by Representative Hegeman, "How far she is on the book is immaterial."

6

UF-UFF_000504

Nevertheless, the breadth and scope of the book were submitted in the Grievance, making it germane to consideration of the Grievance.

It appears that the Grievant has been working on this book for many years. This is supported by the Grievant's own research narrative submitted with her PTR Packet in which she writes, in part:

"This has been an ambitious project for me. Trained as an intellectual and cultural historian of France in the eighteenth and early nineteenth centuries, the subject of my first book, it took a lot of prep work to write this book about four countries in the middle of the twentieth century. I mastered new historiographies and archives in London, Paris, Berlin, and Washington, D.C. I learned German. Generous funding from outside agencies supported my journey: a Humboldt Fellowship, a German Marshall Fund Fellowship, the ACLS Burkhardt Fellowship, and a Fulbright Distinguished Professorship (in Italy). For the final leg, I applied for and received a two-semester sabbatical from UF for 2022-23."

While the UF History Department site does not include a current CV for the Grievant, and the link to her personal website returns a "504 Error" (See https://history.ufl.edu/directory/sheryl-kroen/ & http://users.clas.ufl.edu/stkroen/) the official Fulbright Scholar Program website lists the Grievant as a recipient in academic year 2009-2010 (see https://fulbrightscholars.org/grantee/sheryl-kroen).

Soon-to-be-Chair Spillane's comment about "books of this length and unusually broad scope of research" taking longer than five years to complete fails to contemplate the Grievant's situation, in which it appears the work has already been in progress for much longer than five years.

While the actual "productivity" of the PTR period measured against the criteria should be the basis for the rating, in the case of research works that span such an extended period of time, it is reasonable for evaluators to consider which portions of such a work occurred within the review period and which portions occurred outside the review period. The Grievant failed to prove that consideration of this greater context represented arbitrary or discriminatory actions. No violation of the CBA is evident.

The Grievant asserts violation of CBA 9.1(b), which reads:
"The University and UFF have agreed by the express terms of this Agreement to delegate to the faculty of appropriate units, in specific instances and within specified parameters, the development of discipline-specific clarifications of University criteria for tenure, promotion, merit salary increases, market equity salary increases, and performance evaluations."

The PTR Criteria are not contemplated in CBA 9.1(b), nor anywhere else in the CBA, therefore the "specific instances and within specified parameters" under which PTR Criteria could be so delegated are not enumerated. Nonetheless, the Department of History still submitted PTR Criteria for research that were accepted by the Provost. No violation of CBA 9.1(b) is evident.

The Grievant asserts violation of CBA 10.4(c), which reads:
"Respect the integrity of the evaluation process, evaluating faculty fairly and accurately according to the criteria and procedures specified in the evaluation process."

The assignment of a PTR rating of "does not meet expectations" was not part of this

7

UF-UFF_000505

Grievance. Furthermore, no evaluation of the Grievant's performance in meeting the PIP has been conducted. Unclear is how CBA 10.4(c) is relevant to the Grievance. No violation of CBA 10.4(c) is evident.

The Grievant asserts violation of CBA 10.4(d), which reads:
"Sustain principles of the system of shared governance, which recognizes that in the development of academic policies and processes the professional judgments of faculty members are of crucial importance."

Unclear is how CBA 10.4(d) applies to the Grievance. No violation of CBA 10.4(d) is evident.

The Grievant asserts violation of CBA 11.2(a)(1), which reads:
"Personnel decisions shall be based solely on job-related criteria and performance."

Undisputed is that research is a part of a tenured faculty member's job responsibilities. No violation of CBA 11.2(a)(1) is evident.

The Grievant asserts violation of CBA 12.4(e)(1), which reads:
"The appointment of tenured or permanent status faculty shall be renewed annually unless terminated for just cause subject to the limitations set forth in ARTICLE 27, DISCIPLINARY ACTION AND JOB ABANDONMENT. The terms of the renewal of the appointment shall be consistent with the appointment in which the faculty member was granted tenure or permanent status or prior renewal."

The Grievant failed to provide evidence of her termination or non-renewal. No violation of CBA 12.4(e)(1) is evident.

The Grievant asserts violation of CBA 14.5(b), which reads:
"No faculty member's assignment shall be arbitrary or unreasonable."

This contract provision describes annual assignments, not PTR PIP requirements and is therefore not relevant. No violation of CBA 14.5(b) is evident.

The Grievant asserts violation of CBA 14.5(d), which reads:
"Assignments are subject to the provisions of the GRIEVANCE PROCEDURE AND ARBITRATION article."

Not in dispute is the contractual ability of the Grievant to bring the Grievance. This response herein is intrinsic evidence of the University's intent to abide by the CBA in this regard. No violation of CBA 14.5(d) is evident.

The Grievant asserts violation of CBA 18.8(f), which reads:
"The faculty member and their chair shall work in concert to set expectations and develop strategies for the performance improvement plan. The plan shall include specific performance targets and a reasonable time period for achieving the targets. If the faculty member and the chair are unable to reach agreement on a plan, the dean shall resolve the issues in dispute."

This provision applies to performance improvement plans resulting from Sustained Performance Evaluations. The PIP contemplated in this Grievance stems from PTR process. The two are distinct. Unclear is how this provision of the CBA applies to the Grievance. No

8

UF-UFF_000506

violation of CBA 18.8(f) is evident.

Decision

Based on all the evidence, the Grievant has not met her burden of proving that the University violated the cited portions of the CBA.

The grievance is denied.

Sincerely,

Patrick Keegan, Ed.D.
Chief Labor Negotiator


Cc:     Meera Sitharam, President, UFF-UF
        Robert Cancellieri, Director, Employee Relations and Engagement

9

**UF-UFF_000507**